Receipt #A0602441

ORIGINAL

FILED
APR 9 2004
U.S. COURT OF FEDERAL CLAIMS

NO. 04-635C

ECF

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

METRIC CONSTRUCTION CO., INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# COMPLAINT

Filed:

Steven D. Meacham
Attorney of Record

Dann & Meacham
2014 East Madison Street, Suite 100
Seattle, WA 98122-2965
(206) 770-3339 phone
(206) 770-3490 fax



ORIGINAL

The Complaint of the plaintiff, by and through its attorney, Steven D. Meacham, respectfully shows and alleges:

## I. JURISDICTION

1. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1491. This claim is based upon an express written contract with the United States of America. Trial de novo and relief are sought pursuant to the Contract Disputes Act of 1978 (41 U.S.C. § 609, *et seq.*).

## II. PARTIES

2. Metric Construction Co., Inc. (hereinafter "Metric") is a construction contractor organized and doing business under the laws of the State of California, having its principal place of business in Westlake, California.

3. Defendant in this action is the United States of America acting through the Department of the Navy (hereinafter "Government" or "Navy").

## III. PROJECT AND CONTRACT

4. On or about August 1, 1994, the Government accepted Metric's offer of $11,066,277.50 and awarded an indefinite quantity contract, Contract No. N62474-94-C-6807 for the Repair Airfield Pavement project at San Nicolas Island (hereinafter "the Airfield project"), for the Naval Air Weapons Station, Point Magu, California.

5. In 1998, the Government awarded Contract No. N68711-98-C-5553 to repair the Roadway at San Nicolas Island (hereinafter "the Roadway project"), for the Naval Air Weapons Station, Point Magu, California.

## IV. SUBMISSION OF CLAIMS TO CONTRACTING OFFICER

6. During the course of construction, Metric's work was delayed by the Government and Metric was required to perform extra and/or changed work.

7. Metric requested additional compensation from the Government for Government caused delays and the changed/extra work. The delays and changed/extra work included:

a. delays to the Airfield project caused by the Navy's installation of a pontoon landing barge at Daytona Beach that restricted Metric's access to the island and delayed Metric's ability to barge equipment and materials to the island from May 14, 1999 through June 8, 1999;

b. delays to the Airfield project caused by the Navy's installation of a pontoon landing barge at Daytona Beach that restricted Metric's access to the island and delayed Metric's ability to barge equipment and materials to the island from June 9, 1999 through December 23, 1999;

c. delays to the Roadway project caused by the Navy's installation of a pontoon landing barge at Daytona Beach that restricted Metric's access to the island and delayed Metric's ability to barge equipment and materials to the island from June 9, 1999 through December 23, 1999;

d. delays to the Roadway project caused by the Navy's installation of a pontoon landing barge at Daytona Beach that restricted Metric's access to the island and delayed Metric's ability to barge equipment and materials to the island from December 24, 1999 through May 18, 2000; and

e. performing additional work associated with clean-up and the removal of hazardous waste and contaminated soil from the island in excess of what was required and indicated in the contract documents.

f. performing additional work installing the arrestor gear on the Airfield project which delayed project completion and resulting in Metric incurring significant costs to install the work to the satisfaction of the Government.

8. On or about January 9, 2003, Metric submitted a certified claim to the Government in the amount of $281,991.62 for an adjustment to the Contract amount for the delays to the Airfield project from May 14, 1999 through June 8, 1999. A copy of the cover letter and certification are attached hereto as Exhibit 1. On April 4, 2003, Metric revised the claim reducing the claimed amount to $281,966.23 and certified the lower amount. A copy of the letter and certification are attached hereto as Exhibit 2.

9. On or about January 9, 2003, Metric submitted a certified claim to the Government in the amount of $1,322,205.54 for an adjustment to the Contract amount for the delays to the Airfield project from June 9, 1999 through December 23, 1999. A copy of the cover letter and certification are attached hereto as Exhibit 3. On April 4, 2003, Metric revised the claim increasing the claimed amount to $1,322,205.45 and certified the higher amount. A copy of the letter and certification are attached hereto as Exhibit 4.

10. On or about January 9, 2003, Metric submitted a certified claim to the Government in the amount of $918,820.82 for an adjustment to the Contract amount for the delays to the Roadway project from June 9, 1999 through December 23, 1999. A copy of the

cover letter and certification are attached hereto as Exhibit 5. On April 4, 2003, Metric revised the claim reducing the claimed amount to $903,501.70 and certified the lower amount. A copy of the letter and certification are attached hereto as Exhibit 6.

11. On or about January 9, 2003, Metric submitted a certified claim to the Government in the amount of $1,637,784.10 for an adjustment to the Contract amount for the delays to the Roadway project from December 24, 1999 through May 18, 2000. A copy of the cover letter and certification are attached hereto as Exhibit 7. On April 4, 2003, Metric revised the claim increasing the claimed amount to $1,741,420.51 and certified the higher amount. A copy of the letter and certification are attached hereto as Exhibit 8.

12. On or about January 26, 2004, Metric submitted a certified claim to the Government in the amount of $183,417.78 for delays and costs associated with the removal of hazardous waste from San Nicolas Island. A copy of the cover letter and certification are attached hereto as Exhibit 9.

13. On or about June 17, 2003, Metric submitted a certified claim to the Government in the amount of $3,454,432.40 for the delays and costs incurred in making changes to the arrestor gear to the satisfaction and at the request of the Government. A copy of the cover letter and certification are attached hereto as Exhibit 10.

14. The contracting officer responded to the claims submitted on January 9, 2003 in a letter dated March 6, 2003. In that letter, the contracting officer stated, "I anticipate that the audit will take approximately 60 days from receipt of the requested information. Once the audit

is complete, I anticipate another 30 days for my analysis of the claim package and audit. Based on these estimate, I don't anticpate being able to issue a final decision prior to June 30, 2003."

15. On January 30, 2004, Metric requested the Armed Services Board of Contract Appeals to direct the contracting officer to issue a final decision. Metric subsequently withdrew the request.

16. The contracting officer has not issued a final decision on the claims submitted January 9, 2003. Since the contracting officer failed to issue a final decision within 60 days and failed to specify when final decisions for the January 9, 2003 claims would be issued, Metric hereby deems the claims denied.

17. Metric's claim relating to the delays and costs of removal of the hazardous materials was submitted on January 26, 2004. The contracting officer has not issued a final decision nor specified to Metric when a final decision would be issued. Metric hereby deems the claim to be denied.

18. Metric's claim relating to the delays and costs of modifying the arrestor gear was submitted on June 17, 2003. The contracting officer has not issued a final decision on that claim nor specified to Metric when a final decision would be issued. Metric hereby deems the claim to be denied.

19. Having deemed the claims denied due to the Contracting Officer's failure to issue final decisions regarding each of the above-stated claims, Metric has exhausted its administrative remedies and commences this action pursuant to 41 U.S.C. § 605.

## V. ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

20. Plaintiff realleges ¶¶ 1 through 19 above as if fully set forth and incorporates those paragraphs by reference herein.

21. The Government delayed Metric's performance of the work under the Roadway and Airfield projects resulting in Metric incurring significant delay damages. The Government also directed Metric to perform changed and extra work relating to construction on both projects. This work constituted both directed and constructive changes to the Contract, entitling Metric to equitable adjustments to the Contract.

22. As a result of the Government's delays to the work and changes, both directed and constructive, Metric incurred costs for which it has not been fully compensated.

## VI. FIRST CAUSE OF ACTION - BREACH OF CONTRACT

23. Plaintiff realleges ¶¶ 1 through 22 above as if fully set forth and incorporates those paragraphs by reference herein.

24. The Government's actions and requests for performance in excess of the Contract requirements as set forth herein constitute breaches of the Contract between Metric and the Government.

25. Said breaches by the Government have damaged Metric for which Metric has not been fully compensated.

## VII. SECOND CAUSE OF ACTION – CONSTRUCTIVE CHANGES/EXTRA WORK

26. Plaintiff realleges ¶¶ 1 through 25 above as if fully set forth and incorporates those paragraphs by reference herein.

27. As set forth above and herein, the Government directed and constructively ordered changes in the work for which Metric has not been completely and adequately compensated.

28. Said failure on the part of the Government to fully compensate Metric has damaged Metric. Metric is entitled to additional compensation for the changed and extra work that Metric has performed.

## VII. THIRD CAUSE OF ACTION –

## GOVERNMENT CAUSED DELAY

29. Plaintiff realleges ¶¶ 1 through 28 above as if fully set forth and incorporates those paragraphs by reference herein.

30. As set forth above and herein, the Government delayed Metric's work resulting in the delayed completion of the project and Metric incurring delay damages associated with the Government's delay.

31. Metric has not been compensated for the delays caused by the Government. Metric is entitled to additional compensation for the delays caused by the Government.

## IX. PRAYER FOR RELIEF

WHEREFORE, Metric Construction Co., Inc. prays that this Court enter judgment as follows:

A. For judgment against defendant, United States of America, in the amount of $7,886,944.07;

B. For costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(a);

C. For reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(b);

D. For interest on the judgment pursuant to the Contract Disputes Act, 41 U.S.C. § 611; and

E. For such other and further relief as the Court may deem to be just and equitable, including, but not limited to, consulting fees and any other adjustments to the claim amounts as proven at trial.

DATED this 8th day of April, 2004.

Steven D. Meacham, WSBA #23260
Attorney for Plaintiff

Dann & Meacham
2014 East Madison Street, Suite 100
Seattle, WA 98122-2965
(206) 770-3339 phone
(206) 770-3490 fax

NO. ____________________

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

METRIC CONSTRUCTION CO., INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

EXHIBIT LIST

Filed:

Steven D. Meacham
Attorney of Record

Dann & Meacham
2014 East Madison Street, Suite 100
Seattle, WA 98122-2965
(206) 770-3339

The following is an Exhibit List to correspond with the Complaint of Metric Construction Co., Inc. submitted herewith.

**EXHIBIT LIST**

1. January 9, 2003 correspondence (Tab A) from Metric Construction to the Officer in Charge of Construction;
2. April 4, 2003 correspondence (Tab A) from Metric Construction to the Officer in Charge of Construction;
3. January 9, 2003 correspondence (Tab B) from Metric Construction to the Officer in Charge of Construction;
4. April 4, 2003 correspondence (Tab B) from Metric Construction to the Officer in Charge of Construction;
5. January 9, 2003 correspondence (Tab C) from Metric Construction to the Officer in Charge of Construction;
6. April 4, 2003 correspondence (Tab C) from Metric Construction to the Officer in Charge of Construction;
7. January 9, 2003 correspondence (Tab D) from Metric Construction to the Officer in Charge of Construction;
8. April 4, 2003 correspondence (Tab D) from Metric Construction to the Officer in Charge of Construction;
9. January 26, 2004 correspondence from Metric Construction to the Officer in Charge of Construction;

10. June 17, 2003 correspondence from Metric Construction to the Officer in Charge of Construction;

DATED this 8th day of April, 2004.

Steven D. Meacham, WSBA #23260
Attorney for Plaintiff

Dann & Meacham
2014 East Madison Street, Suite 100
Seattle, WA 98122-2965
(206) 770-3339

0694 057 fd081801

METRIC
CONSTRUCTION CO., INC.
General Contractors

January 9, 2003

Officer in Charge of Construction
632 Laguna Street
Building 632
Point Mugu, California 93042

Tab A

**Re: Repair Airfield Pavements at San Nicolas Island**
**Contract # N62474-94-C-6807**

Attn: Contracting Officer

Gentlemen,

Attached is Metric Construction Co., Inc. certified claim in the amount of $281,991.62, resulting from delays caused by the Navy installation of a pontoon barge at Daytona Beach on San Nicholas Island (SNI) for the period of May 14, 1999 to June 8, 2000 a total of 25 days. Please see Tab H, Metric letters dated Jan. 5, 1999, Jan. 6, 1999 and Feb. 11, 1999 placing the Navy on notice of a changed condition along with the Navy letter of Feb. 12, 1999 acknowledging the changed condition.

Specification section 01600, Special Clauses Applying Only to Work on San Nicholas Island, article 1.6.3.5 states that "There are two barge landing sites on SNI". On Dec. 31, 1998 the Navy restricted Metric Construction Co., Inc. (Metric) from using the Daytona Beach Landing Site at San Nicholas Island by the placement of a Navy pontoon bridge. Metric had previously determined that Daytona Beach is the only viable landing site on San Nicholas Island for the landing of barges carrying bulk materials.

The Navy installed a pontoon bridge at the Daytona Beach site in mid December of 1998 and subsequently advised Metric that we could no longer land our barge on the beach as of Dec. 31,1998. We were instructed to land our barge in front of the newly installed pontoon bridge, lower the barge ramp onto the pontoon bridge and then drive our materials and equipment off the barge onto the Navy's pontoon bridge. The restriction from landing on Daytona Beach was not lifted until June 1, 1999 with the first landing after the restriction was lifted occurring on June 14, 1999.

Prior to the placement of the pontoon bridge, the condition of the beach or the height of the tide was not a consideration when landing a barge. After the placement of the pontoon bridge Metric was restricted to only landing at extremely high tides in

EXHIBIT
1

870 Hampshire Road, Suite X * Westlake Village, CA 91361 * Phone (805) 371-1222 * Fax (805) 379-0773 * email: info@metriccon.com

combination with minimal sand build-up around the pontoon bridge. The restrictions created by the pontoon bridge made it almost impossible to land bulk materials on SNI. The sand build-up in front of the Navy pontoon proved to be extremely difficult to predict at the time of landing as the sand buildup changed from tide to tide. It takes 14 to 16 hours to tow the barge from San Pedro to SNI, and the barge is towed at night, the tide changes approximately every six (6) hours.

The placement of the pontoon bridge also put our men and equipment at greater risk, please see Tab I a letter date February 18, 1999 from American Work Boats.

Metric Construction Co., Inc. was able to make five successful landings during the period we were restricted to using the pontoon bridge. We also attempted two additional landings that had to be aborted. The unsuccessful landings occurred because the barge ramp could not reach the pontoon bridge when we landed the barge on the beach due to a combination of tide and sand build-up.

Based upon the attached surf records Metric Construction Co., Inc. could have made 26 successful landings instead of five during this same period. Please see Tab G, Pacific Weather Analysis of Daytona Beach during the restricted period. Metric only needed to make 16 successful landings in order to complete contracts N62474-98-C-5553 and N62474-94-C-6807.

The government raised two mitigating factors during our discussions of the delays caused by the placement of the pontoon. Section 01600 article 1.6.3.5 paragraph b. states in part "Protected animals seasonally occupy Daytona Beach, for this reason, the Contractor shall notify the Contracting Officer a minimum of 48 hours in advance of any planned landings. The Contracting Officer will notify the Contractor if a barge will not be allowed to land at Daytona Beach. A typical reason for denial would include the presence of a protected animal…" Metric has been landing barges at Daytona Beach since 1992 with this identical requirement in all four of the contracts that we have completed on the island. From Jan. of 1992 through Sept. of 2002 the Contracting Officer had only advised us that we could not land on Daytona Beach twice due to the presence of protected animals, for a total period of three weeks.

In the past when Metric was notified that Daytona Beach was closed due the presence of protected animals the notification was given without Metric requesting a landing. In the past landing restrictions were removed without Metric making a request that they be removed. Metric was never notified that the beach had been closed due to the presence of protected animals during the time we were required to use the pontoon bridge.

In the past there have been times when we were required to physically remove protected animals from the landing site by pushing them with our large earth moving equipment. At other times we have watched while government personnel have cleared the landing area by banging together trash can lids to scare off protected animals. Clearly the existence of protected animals in the landing area during the subject changed conditions did not affect our ability to land our barge.

The installation of the pontoon bridge did not mitigate the existence of protected animals as Metric employees regularly observed protect animals lying on the pontoon bridge. In fact the last time Metric's president was at Daytona Beach the only protected animal he saw was lying on the Navy pontoon.

The government has also raised the issue of the fire at the asphalt batch plant that occurred on December 18, 1998. Based on the enclosed written time line it is clear that this fire had minimal impact on the completion of the subject project, and the minimal impact that it did have has been accounted for in this claim.

The Government has already recognized that the delivery of materials to San Nicholas Island is often the critical activity per section 01011 Additional General Paragraphs, paragraph 1.5.1.2. that states in part "Since the delivery of materials to San Nicholas Island is often the critical activity (longest duration) the Contractor may be required to have all material for each delivery order on site prior to beginning actual construction." Clearly, the delivery of material was the critical activity for the balance of work remaining on this project at the time the Navy pontoon was installed.

Tab E is a written time line and analysis that shows Metric Construction Co., Inc. completing the referenced project, if we had not been restricted to using the pontoon bridge, by May 14, 1999. This analysis also shows that as a result of the pontoon restriction Metric Construction Co., Inc. actually completed the work for this contract on Dec. 23, 1999.

Based on the attached analysis Metric Construction Co., Inc. has determined that the requirement to use the pontoon bridge from Dec. 31,1998 to June 1, 1999 impacted the completion of Contract N62474-98-C-5553 and N62474-94-C-6807 a total of 363 calendar days. We have apportioned any concurrent delay between the Roadway and Storm Drainage Repair, Contract No. N68711-98-C-5553 project and the Repair Airfield Pavement, Contract No. N62474-94-6807 project based upon the total tons of asphalt remaining to be placed at the time the delay occurred.

Per an agreement between the Navy and Metric all equipment rates are from the "Rental Rate Bluebook" (Bluebook) published by Dataquest. Attached is a summary of the costs

we have included from the Bluebook. Tab J is a schedule of the page number and line item taken from the Bluebook for each piece of equipment. The pieces of equipment that are listed in bold letters have been charged at full rental rate and not at the standby rate, as this equipment was being utilized for its intended purpose during the delay period. The Bluebook utilizes a cost factor for different areas of the country. Because there is no cost factor for San Nicholas Island, Metric has used a factor of 1.25. We believe this is the same factor the Navy uses in its own estimates.

Metric Construction Co., Inc. requests the final decision of the Contracting Officer within 60 days upon receipt of this claim.

Sincerely,
Metric Construction Co., Inc.

Tom Miller

CERTIFICATION OF CLAIM

I certify that this claim dated January 9, 2003, in the amount of $281,991.62, for the work described is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

By: ______________________

Tom Miller

Title: President

Date of Execution: JAN. 10, 2003

METRIC
CONSTRUCTION CO., INC.
General Contractors

April 4, 2003

Officer in Charge of Construction
632 Laguna Street
Building 632
Point Mugu, California 93042

Tab A

**Re: Repair Airfield Pavements at San Nicolas Island**
**Contract # N62474-94-C-6807**

Attn: Contracting Officer

Gentlemen,

Reference is made to the Metric Construction Co., Inc. (Metric) certified claim in the amount of $281,991.62, submitted to the Contracting Officer on January 9, 2003. This claim was submitted based on delays caused by the Navy's installation of a pontoon landing barge at Daytona Beach on San Nicholas Island (SNI) for the period of May 14, 1999, to June 8, 1999 a total of 25 days.

As a result of further investigations by Metric we have discovered some minor changes in the amounts that we have claimed for and wish to revise the claimed amount. At this time Metric is reducing the claimed amount from $281,991.62 to $281,966.23.

Sincerely,

Metric Construction Co., Inc.

Tom Miller
President

Encl. Certification

EXHIBIT
2

870 Hampshire Road, Suite X * Westlake Village, CA 91361 * Phone (805) 371-1222 * Fax (805) 379-0773 * email: info@metriccon.com

# CERTIFICATION OF CLAIM

I certify that this claim dated April 4, 2003, in the amount of $281,966.23 for the work described is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

By: ______________________

Date: April 4, 2003

METRIC
CONSTRUCTION CO., INC.
*General Contractors*

January 9, 2003

Officer in Charge of Construction
632 Laguna Street
Building 632
Point Mugu, California 93042

Tab B

**Re: Repair Airfield Pavements at San Nicolas Island**
**Contract # N62474-94-C-6807**

Attn: Contracting Officer

Gentlemen,

Attached is Metric Construction Co., Inc. certified claim in the amount of $1,322,205.54, resulting from delays caused by the Navy installation of a pontoon barge at Daytona Beach on San Nicholas Island (SNI) for the period of June 9, 1999 to Dec. 23,1999 a total of 197 days. Please see Tab H, Metric letters dated Jan. 5, 1999, Jan. 6, 1999 and Feb. 11, 1999 placing the Navy on notice of a changed condition along with the Navy letter of Feb. 12, 1999 acknowledging the changed condition.

Specification section 01600, Special Clauses Applying Only to Work on San Nicholas Island, article 1.6.3.5 states that "There are two barge landing sites on SNI". On Dec. 31, 1998 the Navy restricted Metric Construction Co., Inc. (Metric) from using the Daytona Beach Landing Site at San Nicholas Island by the placement of a Navy pontoon bridge. Metric had previously determined that Daytona Beach is the only viable landing site on San Nicholas Island for the landing of barges carrying bulk materials.

The Navy installed a pontoon bridge at the Daytona Beach site in mid December of 1998 and subsequently advised Metric that we could no longer land our barge on the beach as of Dec. 31,1998. We were instructed to land our barge in front of the newly installed pontoon bridge, lower the barge ramp onto the pontoon bridge and then drive our materials and equipment off the barge onto the Navy's pontoon bridge. The restriction from landing on Daytona Beach was not lifted until June 1, 1999 with the first landing after the restriction was lifted occurring on June 14, 1999.

Prior to the placement of the pontoon bridge, the condition of the beach or the height of the tide was not a consideration when landing a barge. After the placement of the pontoon bridge Metric was restricted to only landing at extremely high tides in

EXHIBIT
3

combination with minimal sand build-up around the pontoon bridge. The restrictions created by the pontoon bridge made it almost impossible to land bulk materials on SNI. The sand build-up in front of the Navy pontoon proved to be extremely difficult to predict at the time of landing as the sand buildup changed from tide to tide. It takes 14 to 16 hours to tow the barge from San Pedro to SNI, and the barge is towed at night, the tide changes approximately every six (6) hours.

The placement of the pontoon bridge also put our men and equipment at greater risk, please see Tab I a letter date February 18, 1999 from American Work Boats.

Metric Construction Co., Inc. was able to make five successful landings during the period we were restricted to using the pontoon bridge. We also attempted two additional landings that had to be aborted. The unsuccessful landings occurred because the barge ramp could not reach the pontoon bridge when we landed the barge on the beach due to a combination of tide and sand build-up.

Based upon the attached surf records Metric Construction Co., Inc. could have made 26 successful landings instead of five during this same period. Please see Tab G, Pacific Weather Analysis of Daytona Beach during the restricted period. Metric only needed to make 16 successful landings in order to complete contracts N62474-98-C-5553 and N62474-94-C-6807.

The government raised two mitigating factors during our discussions of the delays caused by the placement of the pontoon. Section 01600 article 1.6.3.5 paragraph b. states in part "Protected animals seasonally occupy Daytona Beach, for this reason, the Contractor shall notify the Contracting Officer a minimum of 48 hours in advance of any planned landings. The Contracting Officer will notify the Contractor if a barge will not be allowed to land at Daytona Beach. A typical reason for denial would include the presence of a protected animal..." Metric has been landing barges at Daytona Beach since 1992 with this identical requirement in all four of the contracts that we have completed on the island. From Jan. of 1992 through Sept. of 2002 the Contracting Officer had only advised us that we could not land on Daytona Beach twice due to the presence of protected animals, for a total period of three weeks.

In the past when Metric was notified that Daytona Beach was closed due the presence of protected animals the notification was given without Metric requesting a landing. In the past landing restrictions were removed without Metric making a request that they be removed. Metric was never notified that the beach had been closed due to the presence of protected animals during the time we were required to use the pontoon bridge.

In the past there have been times when we were required to physically remove protected animals from the landing site by pushing them with our large earth moving equipment.

At other times we have watched while government personnel have cleared the landing area by banging together trash can lids to scare off protected animals. Clearly the existence of protected animals in the landing area during the subject changed conditions did not affect our ability to land our barge.

The installation of the pontoon bridge did not mitigate the existence of protected animals as Metric employees regularly observed protect animals lying on the pontoon bridge. In fact the last time Metric's president was at Daytona Beach the only protected animal he saw was lying on the Navy pontoon.

The government has also raised the issue of the fire at the asphalt batch plant that occurred on December 18, 1998. Based on the enclosed written time line it is clear that this fire had minimal impact on the completion of the subject project, and the minimal impact that it did have has been accounted for in this claim.

The Government has already recognized that the delivery of materials to San Nicholas Island is often the critical activity per section 01011 Additional General Paragraphs, paragraph 1.5.1.2. that states in part "Since the delivery of materials to San Nicholas Island is often the critical activity (longest duration) the Contractor may be required to have all material for each delivery order on site prior to beginning actual construction." Clearly, the delivery of material was the critical activity for the balance of work remaining on this project at the time the Navy pontoon was installed.

Tab E is a written time line and analysis that shows Metric Construction Co., Inc. completing the referenced project, if we had not been restricted to using the pontoon bridge, by May 14, 1999. This analysis also shows that as a result of the pontoon restriction Metric Construction Co., Inc. actually completed the work for this contract on Dec. 23, 1999.

Based on the attached analysis Metric Construction Co., Inc. has determined that the requirement to use the pontoon bridge from Dec. 31,1998 to June 1, 1999 impacted the completion of Contract N62474-98-C-5553 and N62474-94-C-6807 a total of 363 calendar days. We have apportioned any concurrent delay between the Roadway and Storm Drainage Repair, Contract No. N68711-98-C-5553 project and the Repair Airfield Pavement, Contract No. N62474-94-6807 project based upon the total tons of asphalt remaining to be placed at the time the delay occurred.

Per an agreement between the Navy and Metric all equipment rates are from the "Rental Rate Bluebook" (Bluebook) published by Dataquest. Attached is a summary of the costs we have included from the Bluebook. Tab J is a schedule of the page number and line item taken from the Bluebook for each piece of equipment. The pieces of equipment that are listed in bold letters have been charged at full rental rate and not at the standby rate,

as this equipment was being utilized for its intended purpose during the delay period. The Bluebook utilizes a cost factor for different areas of the country. Because there is no cost factor for San Nicholas Island, Metric has used a factor of 1.25. We believe this is the same factor the Navy uses in its own estimates.

Metric Construction Co., Inc. requests the final decision of the Contracting Officer within 60 days upon receipt of this claim.

Sincerely,
Metric Construction Co., Inc.

Tom Miller

CERTIFICATION OF CLAIM

I certify that this claim dated January 9, 2003, in the amount of $1,322,205.54 for the work described is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

By: ______________________

Tom Miller

Title: President

Date of Execution: JAN 10, 2003

METRIC
CONSTRUCTION CO., INC.
General Contractors

April 4, 2003

Officer in Charge of Construction
632 Laguna Street
Building 632
Point Mugu, California 93042

Tab B

**Re: Repair Airfield Pavements at San Nicolas Island**
**Contract # N62474-94-C-6807**

Attn: Contracting Officer

Gentlemen,

Reference is made to the Metric Construction Co., Inc. (Metric) certified claim in the amount of $1,322,205.54, submitted to the Contracting Officer on January 9, 2003. This claim was submitted to the Contracting Officer based on delays caused by the Navy's installation of a pontoon landing barge at Daytona Beach on San Nicholas Island (SNI) for the period of June 9, 1999 to Dec. 23, 1999 a total of 197 days.

As a result of further investigations by Metric we wish to make some minor changes in the amounts that we have claimed for and therefore wish to revise our claimed amount. At this time Metric is increasing the claimed amount from $1,322,205.45 to $1,341,354.13.

Sincerely,

Metric Construction Co., Inc.

Tom Miller
President

Encl. Certification

EXHIBIT
4

870 Hampshire Road, Suite X * Westlake Village, CA 91361 * Phone (805) 371-1222 * Fax (805) 379-0773 * email: info@metriccon.com

# CERTIFICATION OF CLAIM

I certify that this claim dated April 4, 2003, in the amount of $1,341,354.13 for the work described is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

By: ______________________

Date: April 4, 2003

METRIC
CONSTRUCTION CO., INC.
*General Contractors*

January 9, 2003

Officer in Charge of Construction
632 Laguna Street
Building 632
Point Mugu, California 93042

Tab C

**Re: ROADWAY AND STORM DAMAGE REPAIR AT SAN NICHOLAS ISLAND; Contract N68711-98-C-5553**

Attn: Contracting Officer

Gentlemen,

Attached is Metric Construction Co., Inc. certified claim in the amount of $918,820.82 resulting from delays caused by the Navy installation of a pontoon barge at Daytona Beach on San Nicholas Island (SNI) for the period of June 9, 1999 to Dec. 23, 1999 a total of 197 days. Please see Tab H, Metric letters dated Jan. 5, 1999, Jan. 6, 1999 and Feb. 11, 1999 placing the Navy on notice of a changed condition along with the Navy letter of Feb. 12, 1999 acknowledging the changed condition.

Specification section 01600, Special Clauses Applying Only to Work on San Nicholas Island, article 1.6.3.5 states that "There are two barge landing sites on SNI". On Dec. 31, 1998 the Navy restricted Metric Construction Co., Inc. (Metric) from using the Daytona Beach Landing Site at San Nicholas Island by the placement of a Navy pontoon bridge. Metric had previously determined that Daytona Beach is the only viable landing site on San Nicholas Island for the landing of barges carrying bulk materials.

The Navy installed a pontoon bridge at the Daytona Beach site in mid December of 1998 and subsequently advised Metric that we could no longer land our barge on the beach as of Dec. 31,1998. We were instructed to land our barge in front of the newly installed pontoon bridge, lower the barge ramp onto the pontoon bridge and then drive our materials and equipment off the barge onto the Navy's pontoon bridge. The restriction from landing on Daytona Beach was not lifted until June 1, 1999 with the first landing after the restriction was lifted occurring on June 14, 1999.

Prior to the placement of the pontoon bridge, the condition of the beach or the height of the tide was not a consideration when landing a barge. After the placement of the pontoon bridge Metric was restricted to only landing at extremely high tides in

EXHIBIT
5

870 Hampshire Road, Suite X * Westlake Village, CA 91361 * Phone (805) 371-1222 * Fax (805) 379-0773 * email: info@metriccon.com

combination with minimal sand build-up around the pontoon bridge. The restrictions created by the pontoon bridge made it almost impossible to land bulk materials on SNI. The sand build-up in front of the Navy pontoon proved to be extremely difficult to predict at the time of landing as the sand buildup changed from tide to tide. It takes 14 to 16 hours to tow the barge from San Pedro to SNI, and the barge is towed at night, the tide changes approximately every six (6) hours.

The placement of the pontoon bridge also put our men and equipment at greater risk, please see Tab I a letter date February 18, 1999 from American Work Boats.

Metric Construction Co., Inc. was able to make five successful landings during the period we were restricted to using the pontoon bridge. We also attempted two additional landings that had to be aborted. The unsuccessful landings occurred because the barge ramp could not reach the pontoon bridge when we landed the barge on the beach due to a combination of tide and sand build-up.

Based upon the attached surf records Metric Construction Co., Inc. could have made 26 successful landings instead of five during this same period. Please see Tab G, Pacific Weather Analysis of Daytona Beach during the restricted period. Metric only needed to make 16 successful landings in order to complete contracts N62474-98-C-5553 and N62474-94-C-6807.

The government raised two mitigating factors during our discussions of the delays caused by the placement of the pontoon. Section 01600 article 1.6.3.5 paragraph b. states in part "Protected animals seasonally occupy Daytona Beach, for this reason, the Contractor shall notify the Contracting Officer a minimum of 48 hours in advance of any planned landings. The Contracting Officer will notify the Contractor if a barge will not be allowed to land at Daytona Beach. A typical reason for denial would include the presence of a protected animal…" Metric has been landing barges at Daytona Beach since 1992 with this identical requirement in all four of the contracts that we have completed on the island. From Jan. of 1992 through Sept. of 2002 the Contracting Officer had only advised us that we could not land on Daytona Beach twice due to the presence of protected animals, for a total period of three weeks.

In the past when Metric was notified that Daytona Beach was closed due the presence of protected animals the notification was given without Metric requesting a landing. In the past landing restrictions were removed without Metric making a request that they be removed. Metric was never notified that the beach had been closed due to the presence of protected animals during the time we were required to use the pontoon bridge.

In the past there have been times when we were required to physically remove protected animals from the landing site by pushing them with our large earth moving equipment.

At other times we have watched while government personnel have cleared the landing area by banging together trash can lids to scare off protected animals. Clearly the existence of protected animals in the landing area during the subject changed conditions did not affect our ability to land our barge.

The installation of the pontoon bridge did not mitigate the existence of protected animals as Metric employees regularly observed protect animals lying on the pontoon bridge. In fact the last time Metric's president was at Daytona Beach the only protected animal he saw was lying on the Navy pontoon.

The government has also raised the issue of the fire at the asphalt batch plant that occurred on December 18, 1998. Based on the enclosed written time line it is clear that this fire had minimal impact on the completion of the subject project, and the minimal impact that it did have has been accounted for in this claim.

The Government has already recognized that the delivery of materials to San Nicholas Island is often the critical activity per section 01011 Additional General Paragraphs, paragraph 1.5.1.2. that states in part "Since the delivery of materials to San Nicholas Island is often the critical activity (longest duration) the Contractor may be required to have all material for each delivery order on site prior to beginning actual construction." Clearly, the delivery of material was the critical activity for the balance of work remaining on this project at the time the Navy pontoon was installed.

Tab E is a written time line and analysis that shows Metric Construction Co., Inc. completing the referenced project, if we had not been restricted to using the pontoon bridge, by June 8, 1999. This analysis also shows that as a result of the pontoon restriction Metric Construction Co., Inc. actually completed the work for this contract on May 18, 2000.

Based on the attached analysis Metric Construction Co., Inc. has determined that the requirement to use the pontoon bridge from Dec. 31,1998 to June 1, 1999 impacted the completion of Contract N62474-98-C-5553 and N62474-94-C-6807 a total of 363 calendar days. We have apportioned any concurrent delay between the Roadway and Storm Drainage Repair, Contract No. N68711-98-C-5553 project and the Repair Airfield Pavement, Contract No. N62474-94-6807 project based upon the total tons of asphalt remaining to be placed at the time the delay occurred.

Per an agreement between the Navy and Metric all equipment rates are from the "Rental Rate Bluebook" (Bluebook) published by Dataquest. Attached is a summary of the costs we have included from the Bluebook. Tab J is a schedule of the page number and line item taken from the Bluebook for each piece of equipment. The pieces of equipment that

are listed in bold letters have been charged at full rental rate and not at the standby rate, as this equipment was being utilized for its intended purpose during the delay period. The Bluebook utilizes a cost factor for different areas of the country. Because there is no cost factor for San Nicholas Island, Metric has used a factor of 1.25. We believe this is the same factor the Navy uses in its own estimates.

Metric Construction Co., Inc. requests the final decision of the Contracting Officer within 60 days upon receipt of this claim.

Sincerely,
Metric Construction Co., Inc.

Tom Miller

CERTIFICATION OF CLAIM

I certify that this claim dated January 9, 2003, in the amount of $918,820.82,for the work described is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

By: ______________________

Tom Miller

Title: President

Date of Execution: Jan. 10, 2003

METRIC
CONSTRUCTION CO., INC.
General Contractors

April 4, 2003

Officer in Charge of Construction
632 Laguna Street
Building 632
Point Mugu, California 93042

Tab C

**Re: ROADWAY AND STORM DAMAGE REPAIR AT SAN NICHOLAS ISLAND; Contract N68711-98-C-5553**

Attn: Contracting Officer

Gentlemen,

Reference is made to the Metric Construction Co., Inc. (Metric) certified claim in the amount of $918,820.82, submitted to the Contracting Officer on January 9, 2003. This claim was submitted to the Contracting Officer based on delays caused by the Navy's installation of a pontoon landing barge at Daytona Beach on San Nicholas Island (SNI) for the period of June 9, 1999, to Dec. 23, 1999 a total of 197 days.

As a result of further investigations by Metric we have discovered some minor changes in the amounts that we have claimed for and wish to revise the claimed amount. At this time Metric is reducing the claimed amount from $918,820.82 to $903,501.70.

Sincerely,

Metric Construction Co., Inc.

Tom Miller
President

Encl. Certification

EXHIBIT
6

870 Hampshire Road, Suite X * Westlake Village, CA 91361 * Phone (805) 371-1222 * Fax (805) 379-0773 * email: info@metriccon.com

CERTIFICATION OF CLAIM

I certify that this claim dated April 4, 2003, in the amount of $903,501.70 for the work described is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

By: [signature]

Date: April 4, 2003

METRIC
CONSTRUCTION CO., INC.
*General Contractors*

January 9, 2003

Officer in Charge of Construction
632 Laguna Street
Building 632
Point Mugu, California 93042

Tab D

**Re: ROADWAY AND STORM DAMAGE REPAIR AT SAN NICHOLAS ISLAND; Contract N68711-98-C-5553**

Attn: Contracting Officer

Gentlemen,

Attached is Metric Construction Co., Inc. certified claim in the amount of $1,637,784.10, resulting from delays caused by the Navy installation of a pontoon barge at Daytona Beach on San Nicholas Island (SNI) for the period of Dec. 24, 1999 to May 18, 2000 a total of 146 days. Please see Tab H, Metric letters dated Jan. 5, 1999, Jan. 6, 1999 and Feb. 11, 1999 placing the Navy on notice of a changed condition along with the Navy letter of Feb. 12, 1999 acknowledging the changed condition.

Specification section 01600, Special Clauses Applying Only to Work on San Nicholas Island, article 1.6.3.5 states that "There are two barge landing sites on SNI". On Dec. 31, 1998 the Navy restricted Metric Construction Co., Inc. (Metric) from using the Daytona Beach Landing Site at San Nicholas Island by the placement of a Navy pontoon bridge. Metric had previously determined that Daytona Beach is the only viable landing site on San Nicholas Island for the landing of barges carrying bulk materials.

The Navy installed a pontoon bridge at the Daytona Beach site in mid December of 1998 and subsequently advised Metric that we could no longer land our barge on the beach as of Dec. 31,1998. We were instructed to land our barge in front of the newly installed pontoon bridge, lower the barge ramp onto the pontoon bridge and then drive our materials and equipment off the barge onto the Navy's pontoon bridge. The restriction from landing on Daytona Beach was not lifted until June 1, 1999 with the first landing after the restriction was lifted occurring on June 14, 1999.

Prior to the placement of the pontoon bridge, the condition of the beach or the height of the tide was not a consideration when landing a barge. After the placement of the pontoon bridge Metric was restricted to only landing at extremely high tides in

EXHIBIT
7

combination with minimal sand build-up around the pontoon bridge. The restrictions created by the pontoon bridge made it almost impossible to land bulk materials on SNI. The sand build-up in front of the Navy pontoon proved to be extremely difficult to predict at the time of landing as the sand buildup changed from tide to tide. It takes 14 to 16 hours to tow the barge from San Pedro to SNI, and the barge is towed at night, the tide changes approximately every six (6) hours.

The placement of the pontoon bridge also put our men and equipment at greater risk, please see Tab I a letter date February 18, 1999 from American Work Boats.

Metric Construction Co., Inc. was able to make five successful landings during the period we were restricted to using the pontoon bridge. We also attempted two additional landings that had to be aborted. The unsuccessful landings occurred because the barge ramp could not reach the pontoon bridge when we landed the barge on the beach due to a combination of tide and sand build-up.

Based upon the attached surf records Metric Construction Co., Inc. could have made 26 successful landings instead of five during this same period. Please see Tab G, Pacific Weather Analysis of Daytona Beach during the restricted period. Metric only needed to make 16 successful landings in order to complete contracts N62474-98-C-5553 and N62474-94-C-6807.

The government raised two mitigating factors during our discussions of the delays caused by the placement of the pontoon. Section 01600 article 1.6.3.5 paragraph b. states in part "Protected animals seasonally occupy Daytona Beach, for this reason, the Contractor shall notify the Contracting Officer a minimum of 48 hours in advance of any planned landings. The Contracting Officer will notify the Contractor if a barge will not be allowed to land at Daytona Beach. A typical reason for denial would include the presence of a protected animal..." Metric has been landing barges at Daytona Beach since 1992 with this identical requirement in all four of the contracts that we have completed on the island. From Jan. of 1992 through Sept. of 2002 the Contracting Officer had only advised us that we could not land on Daytona Beach twice due to the presence of protected animals, for a total period of three weeks.

In the past when Metric was notified that Daytona Beach was closed due the presence of protected animals the notification was given without Metric requesting a landing. In the past landing restrictions were removed without Metric making a request that they be removed. Metric was never notified that the beach had been closed due to the presence of protected animals during the time we were required to use the pontoon bridge.

In the past there have been times when we were required to physically remove protected animals from the landing site by pushing them with our large earth moving equipment.

At other times we have watched while government personnel have cleared the landing area by banging together trash can lids to scare off protected animals. Clearly the existence of protected animals in the landing area during the subject changed conditions did not affect our ability to land our barge.

The installation of the pontoon bridge did not mitigate the existence of protected animals as Metric employees regularly observed protect animals lying on the pontoon bridge. In fact the last time Metric's president was at Daytona Beach the only protected animal he saw was lying on the Navy pontoon.

The government has also raised the issue of the fire at the asphalt batch plant that occurred on December 18, 1998. Based on the enclosed written time line it is clear that this fire had minimal impact on the completion of the subject project, and the minimal impact that it did have has been accounted for in this claim.

The Government has already recognized that the delivery of materials to San Nicholas Island is often the critical activity per section 01011 Additional General Paragraphs, paragraph 1.5.1.2. that states in part "Since the delivery of materials to San Nicholas Island is often the critical activity (longest duration) the Contractor may be required to have all material for each delivery order on site prior to beginning actual construction." Clearly, the delivery of material was the critical activity for the balance of work remaining on this project at the time the Navy pontoon was installed.

Tab E is a written time line and analysis that shows Metric Construction Co., Inc. completing the referenced project, if we had not been restricted to using the pontoon bridge, by June 8, 1999. This analysis also shows that as a result of the pontoon restriction Metric Construction Co., Inc. actually completed the work for this contract on May 18, 2000.

Based on the attached analysis Metric Construction Co., Inc. has determined that the requirement to use the pontoon bridge from Dec. 31,1998 to June 1, 1999 impacted the completion of Contract N62474-98-C-5553 and N62474-94-C-6807 a total of 363 calendar days. We have apportioned any concurrent delay between the Roadway and Storm Drainage Repair, Contract No. N68711-98-C-5553 project and the Repair Airfield Pavement, Contract No. N62474-94-6807 project based upon the total tons of asphalt remaining to be placed at the time the delay occurred.

Per an agreement between the Navy and Metric all equipment rates are from the "Rental Rate Bluebook" (Bluebook) published by Dataquest. Attached is a summary of the costs we have included from the Bluebook. Tab J is a schedule of the page number and line item taken from the Bluebook for each piece of equipment. The pieces of equipment that are listed in bold letters have been charged at full rental rate and not at the standby rate,

as this equipment was being utilized for its intended purpose during the delay period. The Bluebook utilizes a cost factor for different areas of the country. Because there is no cost factor for San Nicholas Island, Metric has used a factor of 1.25. We believe this is the same factor the Navy uses in its own estimates.

Metric Construction Co., Inc. requests the final decision of the Contracting Officer within 60 days upon receipt of this claim.

Sincerely,
Metric Construction Co., Inc.

Tom Miller

CERTIFICATION OF CLAIM

I certify that this claim dated January 9, 2003, in the amount of $1,637,784.10,for the work described is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

By: ______________________

Tom Miller

Title: President

Date of Execution: JAN 10, 2003

METRIC
CONSTRUCTION CO., INC.
*General Contractors*

April 4, 2003

Officer in Charge of Construction
632 Laguna Street
Building 632
Point Mugu, California 93042

Tab D

**Re: ROADWAY AND STORM DAMAGE REPAIR
AT SAN NICHOLAS ISLAND; Contract N68711-98-C-5553**

Attn: Contracting Officer

Gentlemen,

Reference is made to the Metric Construction Co., Inc. (Metric) certified claim in the amount of $1,637,784.10, submitted to the Contracting Officer on January 9, 2003. This claim was submit based on delays caused by the Navy's installation of a pontoon landing barge at Daytona Beach on San Nicholas Island (SNI) for the period of Dec. 24, 1999, to May 18, 2000 a total of 146 days.

As a result of further investigations by Metric we have discovered some minor changes in the amounts that we have claimed for and wish to revise the claimed amount. At this time Metric is increasing the claimed amount from $1,637,784.10 to $1,741,420.51.

Sincerely,

Metric Construction Co., Inc.

Tom Miller
President

Encl. Certification

EXHIBIT
8

870 Hampshire Road, Suite X * Westlake Village, CA 91361 * Phone (805) 371-1222 * Fax (805) 379-0773 * email: info@metriccon.com

## CERTIFICATION OF CLAIM

I certify that this claim dated April 4, 2003, in the amount of $1,741,420.51 for the work described is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

By: [signature]

Date: April 4, 2003

METRIC
CONSTRUCTION CO., INC.
*General Contractors*

January 26, 2004

Officer in Charge of Construction
632 Laguna Street
Building 632
Point Mugu, California 93042

Attn: Contracting Officer

Re: Repair Airfield Pavements at San Nicolas Island
Contract # N62474-94-C-6807

Gentlemen,

Enclosed is Metric Construction Co., Inc. (Metric) certified claim in the amount of $183,417.78 for delays and costs associated with the removal of hazardous waste from the spoils piles at the sand spit on San Nicholas Island (S.N.I.).

Metric's letters to the Contracting Officer dated June 11, 2003 and June 17, 2003 placed the Government on notice that it was not our responsibility to remove the hazardous waste in the spoils pile at the sand spit.

Metric believes that the subject contamination was caused prior to Metric occupying this site. The large amounts of contaminates in the spoils piles at the sand spit area could not have reasonably been caused by Metrics operation. A more likely culprit for the large amount of contamination were the contractors that had used this site as a construction yard prior to Metrics arrival and also the Navy. It is an undeniable fact that there are many sites on S.N.I. that have been contaminated by the Navy during the many years that they have occupied the island. Further more, the Navy does not have any records of the contractors that had used this site ever cleaning it up prior to Metric's arrival.

In accordance with the Freedom of Information Act (FOIA), 5 U.S.C. Sec. 552(a)(3) and



EXHIBIT
9

implementing regulations Metric sent a letter to the Contracting Officer dated June 11, 2003 requesting all documentation in the Governments possession concerning contamination at the sand spit area. This FOIA request asked for documentation of contamination at the sand spit prior to Metric being allowed to use the area and while Metric was using the sand spit for its work on S.N. I.

On July 10, 2003 the Contracting Officer wrote to Metric in response to the June 11, 2003 FOIA request. The Government's response does not indicate there is any evidence that Metric was the cause of any large motor oil or diesel spills at the sand spit area. The only evidence the government had that Metric had caused any hazardous waste spills at the sand spit was a minor spill caused by a leak from one of our pieces of equipment. Metric is not claiming for the cost of cleaning up this minor spill. The Contracting Officer confirmed in her letter of July 10, 2003 that the Government does not have any documentation or evidence that Metric caused the gross contamination contained in the spoils piles at the sand spit area.

Metric explained in both its letters of June 11th and June 17th, 2003 that we do not believe that Metric was the cause of the contamination at the sand spit area because this area was used by Metric primarily as a storage area for pipe and aggregates. Metric removed over 225 tons of soil that had been contaminated with diesel and motor oil from the sand spit area. Metric contends that in order to contaminate this amount of soil large amounts of diesel and motor oil must have been spilled at the sand spit area prior to Metric occupying the site.

The Government inspected Metric's construction yards, including the sand spit area, on S.N.I. on a regular basis. When ever a hazardous waste spill was discovered the Navy documented it and Metric was given notice. There are no records or credible evidence that the gross contamination at the sand spit area was caused by Metric. Based on the sampling done by IWS Environmental, Metric has calculated that the subject spoils pile had been contaminated with over 260 gallons of oil or diesel, yet the government can only provide evidence that Metric contributed approximately one (1) gallon of contaminate to the entire sand spit area.

In order to cleanup the contaminated soils at the various work sites that Metric occupied while constructing the subject project we shipped to S.N.I. 30 roll-off containers. Metric used 18 of the containers to cleanup the construction yard at the asphalt plant and the area around the concrete plant. The other 12 containers were used to remove the contaminated spoils piles from the sand spit.

OICC
Jan. 26, 2004
Page 3 of 3

In preparing this claim Metric has taken all of its cost associated with removing the contaminated soils from S.N.I. and charged the government 12/30 of the total costs. This is the same ratio as the amount of contaminated soils that we believe represent the government's responsibility verses all of the contaminated material we removed from S.N.I.

Metric requests the final decision of the Contracting Officer within 60 days upon receipt of this claim.

Sincerely,
Metric Construction Co., Inc.

Tom Miller

CERTIFICATION OF CLAIM

I certify that this claim dated January 26, 2004, in the amount of $183,487.78 for the work described is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

By:

Tom Miller

Ex. A

METRIC
CONSTRUCTION CO., INC.
General Contractors

June 17, 2003

Officer in Charge of Construction
632 Laguna Street
Building 632
Point Mugu, California 93042

Re: Repair Airfield Pavements at San Nicolas Island
Contract # N62474-94-C-6807

Gentlemen,

Enclosed is Metric Construction Co., Inc. (Metric) certified claim in the amount of $3,454,432.40 for delays and costs associated with the Arrester Gear Modification P-00017.

In accordance with Metric's letter of December 7, 2000 to the Contracting Officer, Metric had completed the work of Modification P-00017 at the South end of the runway on November 27, 2000. The work was done in accordance with the contract requirements and Modification P-00017. The Government continuously inspected the work while it was in progress.

Because the Governments design required a pavement patch with a width of only three feet and the asphalt had to be flush with the concrete arrester gear it was not possible for Metric to install the asphalt per section 02511 Bituminous Hot Mix Pavement paragraph 3.2.1 Machine Spreading. Instead Metric had to install the pavement in accordance with paragraph 3.2.3 Hand-Spreading in lieu of Machine-Spreading.

In response to the Governments RFP Metric prepared an estimate for this work based on the Hand-Spreading Method and the costs for Modification P-00017 were negotiated based on the Hand-Spreading Method. During the negotiations for Modification P00017 Metric made it very clear to the Navy's representative that because the Navy design called for a strip of pavement only three (3) feet wide Metric would have to use the hand placement method specified in the contract documents.

The first time Metric installed the asphalt at the arrester gear at the South end of the runway we were advised just prior to the scheduled final inspection that there were some areas that had

870 Hampshire Road, Suite X • Westlake Village, CA 91361 • Phone (805) 371-1222 • Fax (805) 379-0773 • email: info@metriccon.com

EXHIBIT
10

ponding and exposed aggregate, and therefore were unacceptable. Metric was told by the Governments representative that these areas need an asphalt sealer, which Metric agreed to provide at no cost to the Government. Shortly after receiving instructions to seal a portion of the asphalt Metric was told that a portion of the asphalt was unacceptable due to exposed aggregate and must be replaced. A few days latter Metric was directed to remove all of the asphalt we had installed at the arrester gear.

Metric attempted to place the asphalt at the South end arrester gear three (3) more times per the Governments design and Paragraph 3.2.3 of section 02511. Each time the Governments representative advised Metric that the finish product was unacceptable and needed to be removed. Metric even hired an outside company, Terra Pave, Inc. (Terra Pave) as an expert to assist us in placing the asphalt. Metric flew one of Terra Paves experts out to San Nicholas Island to ensure that we were complying with the Contract Documents and following the very best industry practices for the hand placement of asphalt. Despite the expert assistance from Terra Pave the Government would still not accept the hand placed asphalt. The typical problems were cited as being exposed aggregate and the asphalt was not sufficiently flush with the arrester gear concrete.

Metric requested that the Government specify the tolerance for the allowable variation between the concrete and the surrounding areas, i.e. the asphalt on numerous occasions. The tolerance for the concrete was specified at 3/32 of an inch yet the tolerance for the surrounding asphalt per section 02511-paragraph 3.5.2.3 c. Smoothness was 1/8-inch in10 feet. The Government refused to specify the tolerance between the asphalt and concrete surfaces. Metric was left to comply with the subjective evaluation of the governments inspection.

After four attempts by Metric to install the asphalt per the contract documents and Modification P-00017 Metric finally decided the only way the Government would accept the asphalt patch at the arrester gear was if it was done with a paving machine. With the Governments permission Metric removed 12 feet of asphalt, in lieu of the specified three (3) feet, on each side of the arrester gear and used a paving machine to make the required patch, which ultimately was accepted by the Government.

This claim covers the cost of the three attempts Metric made after November 27, 2000 in an attempt to comply with the Governments requirements using the Hand-Spreading method and the final acceptable installation using the Machine Spreading method. We have also included field overhead from November 27, 2000 to November 2, 2001, the date the South End arrester gear was finally accepted along with the costs to handle the added debris created by having to redo this work four times. This was essentially the last work Metric had to do on the project before it could demobilize from the site.

Per the agreement between the Navy and Metric all equipment rates are from the "Rental Rate Bluebook" (Bluebook) published by Dataquest. Attached is a summary of the costs we have included from the Bluebook that lists the page number and line item taken from the Bluebook. The pieces of equipment that are listed in bold letters have been charged at full rental rate and not at the standby rate, as this equipment was being utilized for its intended purpose during the delay period. The Bluebook utilizes a cost factor for different areas of the country. Because there is no cost factor for San Nicholas Island, Metric has used a factor of 1.25. We believe this is the same factor the Navy uses in its own estimates.

Metric requests the final decision of the Contracting Officer within 60 days upon receipt of this certified claim.

Sincerely,

Metric Construction Co., Inc.

Tom Miller

CERTIFICATION OF CLAIM

I certify that this claim dated June 17, 2003, in the amount of $3,454,432.40 for the work described is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

By: ____________________

Tom Miller