# UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| METRIC CONSTRUCTION CO., INC.,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 04-635C<br>Judge Charles F. Lettow |

PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Steven D. Meacham
Peel Brimley LLP
2014 East Madison Street, Suite 100
Seattle, WA 98122-2965
(206) 770-3339
Fax: (206) 770-3490

Attorneys for Plaintiff

TABLE OF CONTENTS

I. INTRODUCTION ..................................................................... 1

II. CONTENTIONS OF FACT ................................................... 4

1. Facts Relating to the Pontoon Claim..........................5

2. Facts Relating to the Arresting Gear Claim..................9

3. Facts Relating to the Contaminated Soil Removal Claim..13

III. CONTENTIONS OF LAW..........................................16

1. The Navy's Placement of the Pontoon at the Daytona Beach Landing Site, the Navy's Rejection of the 3' Asphalt Patch, the Navy's Directive to Install the Salvaged Rubber Rails, the Navy's Directive to use an Outside Hazardous Waste Contractor, the Navy's Requirement for metric to submit and Obtain Navy Approval of the Clean-up Plan, and the Navy's directive for Metric to Remove All of the Soil Contaminants at the Sand Spit Area Constituted Constructive changes to the Contract entitling metric to an Equitable Adjustment............................................ 17

2. Metric was entitled to rely upon the plans and specifications provided by the government allowing metric to land its barge at the landing site at Daytona Beach......................................................................... 18

3. Metric's Use of the Blue Book Owned Equipment Rates is a Reasonable Basis for Computation of Its Costs.............................................................. 19

VI. CONCLUSION......................................................................... 15

TABLE OF AUTHORITIES

**Cases**

*Ace Constructors, Inc. v. United States*,
70 Fed.Cl. 253, 274 (2006) .................................................. 19, 20

*Appeals of marshall Associated Contractors, Inc. and Columbia Excavating, Inc. (J.V.) 2002* WL 504788 (IBCA),
IBCA 1901, IBCA 3433, IBCA 34335..........................20, 22

*Bruce Constr. Corp v. United States*,
163 Ct.Cl. 97, 324 F.2d 516, 518-19 (1963)..........................19

*Chris Berg, Inc. v. United States*,
197 Ct. Cl. 503, 455 F2d 1037, 1050 (1972).........................17

*Conner Bros. Constr. Co. v. United States*,
65 Fed.Cl. 657, 685-6 (2005)...................................................... 19

*Daly Constr., Inc. v. Garrett*,,
5 F.3d 520, 522 (Fed.Cir. 1993).......................................19

*F.H. McGraw & Co. v. United States*,
131 Ct.Cl. 501, 130 F.Supp. 394 (1955).............................19

*George Bennett*,
178 Ct. Cl. 61, 371 F.2d 859 ..........................................21

*George Sollit Constr. Co. v. United States*,
64 Fed.Cl. 229, 245 (2005)............................................19

*Harvey C. Jones, Inc.*, IBCA 2070 et al. 90-2 BCA
22,762 at 114,246-47..................................................21

*Houston Ready-Cut House Co. v. United States*,
119 Ct.Cl. 120, 96 F.Supp. 629 (1951)..............................19

*Jack L. Olsen, Inc.*, 93-2 BCA 25,767 at 128,220...........................21

*Jack L. Olsen v. Epsy*, 26 F.3d 141, 93-1324, 1994 WL 198184
(May 19, 1994, unpublished)..........................................21

*L.L. Hall Constr. Co. v. United States*,
177 Ct.Cl. 870, 886, 379 F.2d 559 (1966)...........................20

*Lathan Co. v. United States*,
20 Cl. Ct. 122, 128 (1990)....................................................19

*Locke v. United States*,
151 Ct.Cl. 262, 283 F.2d 521 (1960)......................................19

*Miller Elevator Co. v. United States,*
30 Fed. Cl. 662, 678 (1994)........................................................ 17

*North American Const. Corp. v. United States*,
56 Fed. Cl. 73, 83 (2003)............................................................ 18

*Jack L. Olsen, Inc.*, 93-2 BCA 25,767 at 128,220.............................20

*SIPCO Servs. & Marine v. United States*,
41 Fed. Cl. 196, 222 (1998)...................................................17

*Richerson Construction, Inc*. GSBCA 11161,
93-1 BCA 25,239 at 125,704, ............................................21

*Tom Shaw Inc.,* DOT BCA 2106, et al. 90-1 BCA 22,580
at 113,337-38........................................................20, 21

*United States v. Spearin*,
248 U.S. 132, 137, 39 S.Ct. 59, 63 L.Ed. 166 (1918).......................... 19

*Wunderlich Contracting Co. v. United States*,
173 Ct.Cl. 180, 351 F.2d 956, 968 (1965)..............................19

# I. INTRODUCTION

In August 1994, Metric entered into a contract with the government to repair the airfield on San Nicolas Island. In September 1998, Metric entered into a contract with the government to repair certain roadways on San Nicolas Island. There are three claims that are the subject of this trial: (1) the pontoon claims; (2) the arresting gear claim; and (3) a claim for removing contaminated soil at the Sand Spit area.

The pontoon claim is a constructive change claim. San Nicolas Island ("SNI") is one of the channel islands off the coast of California. Access to the island is limited. At the time Metric entered into the contracts with the government, materials and supplies were brought to the island either by plane or by barge. Barge deliveries were adversely affected by weather, tides, fog, currents, surf, and other conditions. The government has since constructed a pier to improve access to the island for delivery of materials and supplies. Metric was familiar with SNI and had performed other contracts on the island prior to the contracts at issue in this trial. Due to the limited access to the island, a critical aspect of the project was Metric's ability to get materials and supplies to the island. The contracts designated two barge landing sites on the island: Sissy Cove and Daytona Beach. At the time of the bid, Metric had access to a barge. It was the same barge it had used on other projects for work performed on San Nicolas Island. The barge was too large to use at the landing site at Sissy Cove, but it had been used successfully at the Daytona Beach landing site on several occasions. The barge was designed to land directly on the beach. After being run up on the beach, large ropes were tied to deadmen (large anchors or blocks on the shore that prevented the barge from drifting). After tightening the ropes, the barge would lower its ramp onto the landing site for loading and unloading the barge. In late December 1998, the government installed pontoons at the Daytona Beach landing site. The pontoons were

large floating ramps that were placed directly over the location that Metric had landed its barge on numerous occasions. Placing the pontoons at the landing site severely affected Metric's ability to land its barge at the landing site. Instead of landing on the beach as the barge was designed to do, the government directed Metric to land its barge on the pontoons. This proved very difficult and Metric could only land the barge on the pontoons under limited conditions. This delayed Metric's ability to get materials on the island and delayed the performance of the work. The government later allowed Metric to land the barge further up the beach and create another landing site, but due to environmental restrictions, this landing site also had serious limitations. The installation of the pontoons was a change to the contract that limited Metric's ability to land the barge on the island delaying completion of the project by 310 days. As a result of the pontoon change, Metric was damaged in the amount of $3,674,740 less minimal adjustments for delay damages that are concurrent with the pontoon claim that were in other claims and some barge costs that should be deducted because Metric was able to mitigate the damages by renting out its barge to third parties.

The arresting gear claim also involves a constructive change to the contract. During the course of the project, Metric received a change order to revise the arresting gear. Arresting gear is the system typically found on an aircraft carrier that allows the plane to land on the carrier while dropping a hook from the plane that catches a cable on the carrier to stop the plane quickly. San Nicolas Island was set up for an arresting gear system, presumably to allow for pilots to train on an airfield rather than a carrier. The changed work involved the installation of the concrete, asphalt, and beams that the cable rests on, not the arresting cable system itself. Metric did not have responsibility for installing the cable system. The dispute involves the installation of the asphalt, its quality, and the surface smoothness at the joint between the asphalt

and the concrete. Metric installed, removed, and reinstalled the asphalt on numerous occasions to meet the subjective demands of the Navy. Due to the Navy's excessive demands, the installation of the arresting gear delayed the project completion requiring Metric and its equipment to be on SNI much longer than anticipated. This claim also involves delays associated with the Navy providing Metric with rubber rails that attach to steel beams embedded in the concrete. The change order did not indicate that Metric was to install rubber rails on the steel beams that Metric embedded in the concrete it replaced, nor did the change order indicate that the existing rails were to be salvaged and installed or whether the Navy was to provide new rails. As a result of the arresting gear change, Metric was damaged in the amount of $3,996,881.16 less minor adjustments similar to the pontoon claim adjustments.

The hazardous waste removal claim also involves a constructive change to the contract. After completion of work on the island, Metric was directed to clean-up and remove contaminated soils. Metric concurs that it contaminated the soil at various locations, and was prepared to remove the contaminated soils. The Navy required Metric to implement a plan that exceeded what was required by the contract, required Metric to hire an outside firm to administer the removal of the contaminated materials, and to remove contaminants that were not Metric's responsibility. Specifically, Metric was directed to clean-up and remove contaminated soils at the Sand Spit location. This work involved the removal of contaminates that existed prior to Metric using that area. Metric accepted responsibility for some of the clean-up in the Sand Spit area, but requests compensation for removal of the contaminated soil that is not its responsibility. As a result of the removal of the contaminated soils at the Sand Spit that were not caused by Metric, Metric is entitled to $183,417.78.

## II. CONTENTIONS OF FACT

On or about August 1, 1994, Metric Construction Company, Inc. ("Metric") was awarded Contract No. N62474-94-C-6807 (the "airfield contract") entitled Repair Airfield Pavement at the Naval Air Weapons Station on San Nicolas Island, California (the "airfield project").

In September 1998, Metric was awarded Contract No. N68211-98-C-5553 (the "roadway contract") entitled Roadway and Storm Drainage Repair Effort at San Nicolas Island, California (the "roadway project").

The U.S. Department of the Navy (hereinafter referred to as the "government" or the "Navy") prepared the plans and specifications for the projects. The Navy also administered the projects.

Metric submitted four claims relating to the Navy's installation of a pontoon at Daytona Beach. Metric submitted the four claims to the Navy on January 9, 2003 in the amounts of $281,991.62 for the Airfield project from May 14, 1999 through June 8, 1999; $1,322,205.54 for the Airfield project from June 9, 1999 through December 23, 1999; $918,820.82 for the Roadway project from June 9, 1999 through December 23, 1999; and $1,637,784.10 for the Roadway project from December 24, 1999 through May 18, 2000. These four claims total $4,160.802.08. These claims were certified in accordance with the Contract Disputes Act. After the DCAA audited the pontoon claims, Metric adjusted the claims. The revised claims were submitted to the Contacting Officer on April 4, 2003 in the amounts $281,966.23; $1,341,354.13; $903,501.70; and $1,741,420.51 for a total of $4,268,242.57. These claims were also certified in accordance with the Contract Disputes Act. This Court has proper jurisdiction over these claims.

On June 17, 2003, Metric submitted a claim for work related to the installation of the arresting gear. The arresting gear claim was submitted in the amount of $3,454,432.40. The claim was certified in accordance with the Contract Disputes Act. This court has proper jurisdiction over the arresting gear claim.

On January 26, 2004, Metric submitted a claim for work related to the removal of contaminated soil. The contaminated soil claim was submitted in the amount of $183,417.78. The claim was certified in accordance with the Contract Disputes Act. This court has proper jurisdiction over the hazardous waste/contaminated soil removal claim.

1. Facts Relating to the Pontoon Claim

San Nicolas Island ("SNI") is a one of the channel islands off the coast of California. access to the island is limited. At the time Metric entered into the contracts with the government, materials and supplies were brought to the island either by plane or by barge. Barge deliveries were adversely affected by weather, tides, fog, currents, surf, and other conditions. These conditions made it difficult to predict when the barge could land. The number of successful barge landings varied from year to year based upon the conditions encountered. The government has since constructed a pier to improve access to the island for delivery of materials and supplies. Metric was familiar with SNI and had performed other contracts on the island prior to the contracts at issue in this trial. Due to the limited access to the island, a critical aspect of the project was Metric's ability to get materials and supplies to the island.

Specification Section 1600.1.6.3.5 informed the contractor that there are two barge landing sites on SNI: Daytona Beach and Sissy Cove. The contractor had the option of using either site.

Delivery of materials to the island was critical. Specification Section 1011.1.5.1.2 states, "Delivery orders will be issued to the Contractor throughout this contract. Each delivery order will include construction phasing for that portion of the contract. Since the delivery of materials to San Nicolas Island is often the critical activity (longest duration) the Contractor may be required to have all materials for each Delivery Order on site prior to beginning actual construction."

The airfield project included 8 delivery orders. The Navy did not require Metric to have the materials for each Delivery Order on site prior to beginning actual construction.

Metric barged its equipment and materials to the island using a barge designed to land directly on the beach. It landed the barge at the landing site at Daytona Beach. Metric's barge could not land at Sissy Cove. Sissy Cove was determined not to be a viable option for landing bulk asphalt materials and equipment at SNI due to access, depth of water, rocks, and current. Metric made successful barge landings at the Daytona Beach landing sites for projects prior to the airfield and roadway projects and continued to make successful barge landings for both the airfield and roadway projects at Daytona Beach.

Landing the barge on SNI was affected by tides, currents, weather, wave action, surf conditions, and other environmental conditions. Delivery of materials to the island was critical; therefore, Metric would attempt to land the barge and deliver material whenever possible. After a successful landing, Metric would load the barge and wait for the next time that the barge could be safely landed. Metric did not wait to attempt the landings until it ran out of materials or projected that it would run out of materials. Metric received numerous time extensions because of delays in landing the barge due to adverse conditions.

In December 1998, Metric's asphalt batch plant caught on fire. At that time, the airfield project was scheduled to be complete on May 14, 1999. The roadway project was scheduled to be complete in June 1999. Because the delivery of material was critical for the completion of the project, Metric continued to barge materials to SNI for the completion of the two projects.

In late December 1998, the Navy installed a pontoon at Daytona Beach to assist the Navy in loading and unloading its barge at Daytona Beach. By letter dated January 4, 1999, Metric notified the Navy that placing the pontoon at the Daytona Beach landing site was a change to the contract and would impair Metric's ability to land barges at the site. Metric attempted to land barges using the pontoon as directed by the Navy; however, landing Metric's barge on the pontoon required more restricted conditions than landing the barge at the landing site without the pontoon in place.

Metric made several attempted landings on the pontoon. The success of the landings varied. Landing attempts were aborted when conditions were not right. Metric's attempts to land the barge on the pontoon which Metric's barge was not designed to do, led to damage to both the barge and pontoon. The Navy restricted Metric's access to the pontoon.

As a result of the Navy placing the pontoon at the Daytona Beach landing site, Metric was required to locate another suitable beach landing site. Metric was unable to resume beach landings until June 1999 after the Navy installed additional deadmen further down the beach. Once the beach landings were resumed, Metric could only off load bulk materials at the new landing site. All hard wheeled loads such as oil trucks had to be off loaded on the pontoon, due to the sand conditions and the restrictions imposed at the new landing site.

The installation of the pontoon delayed getting the replacement parts from the asphalt batch plant to SNI by several weeks. Once the batch plant was operational, Metric used the

materials that had been stockpiled while the asphalt plant was being repaired, but Metric soon ran out of materials. Metric's operations were limited by the sporadic delivery of materials to SNI. The delivery of materials was limited by barge access caused by the pontoons. During the period from January through June of 1999, Metric had good conditions for making multiple landings at Daytona Beach had the pontoon not been placed at the landing site. But for the placement of the pontoon and the changed condition, Metric would have completed the project by July 13, 1999, 15 days after the scheduled completion. With the changed conditions and added restrictions placed on Metric because of the pontoon, the materials could not be delivered to SNI until May 18, 2000. This resulted in a 310 day delay in completing the work on the airfield and roadway projects.

Metric incurred costs as a result of the Navy installing the pontoon including the costs associated with preparing a new landing site, costs resulting from the aborted landings, costs for the extended duration that Metric was on SNI for completing the contract work. Metric initially submitted four claims to the Navy on January 9, 2003 in the amounts of $281,991.62 for the Airfield project from May 14, 1999 through June 8, 1999; $1,322,205.54 for the Airfield project from June 9, 1999 through December 23, 1999; $918,820.82 for the Roadway project from June 9, 1999 through December 23, 1999; and $1,637,784.10 for the Roadway project from December 24, 1999 through May 18, 2000. These four claims total $4,160.802.08.

After the DCAA audited the pontoon claims, Metric adjusted the claims. The revised claims were submitted to the Contacting Officer on April 4, 2003 in the amounts $281,966.23; $1,341,354.13; $903,501.70; and $1,741,420.51 for a total of $4,268,242.57. Subsequent to a review by Metric's experts, the claim was reduced to $3,674,740. Metric is entitled to an equitable adjustment to the contract in the amount of $3,674,740 less offsets for delays

concurrent with the pontoon delays for which Metric has already been compensated and for the barge rental costs when Metric was able to rent out its barge to third parties during the delay period thus mitigating the damages associated with the installation of the pontoon.

2. Facts Relating to the Arresting Gear Claim

As Metric was nearing completion of the airfield project, the Navy issued Change Order No. 17 to demolish the existing arresting gear concrete pads and install new arresting gear pads. The scope of work included the demolition of the existing pads, pouring new concrete pads with new steel beams embedded in the concrete, and installing a 3' wide asphalt patch between the existing asphalt and the new concrete pads.

Metric submitted a price of $637,924 to perform this work. The Navy did not have funding for the change. To use the word of the Navy, there was some "horse-trading" that went on to fund the change. At this time, here was a dispute as to how the contract required the measurement of materials delivered to the island were to be paid. The Navy indicated that Metric delivered approximately $600,000.00 less than Metric's records showed. The Navy agreed to pay for the materials per Metric's records and to pay Metric approximately $140,000.00 for materials not delivered to the project that constituted the remaining contract balance if Metric would agree to Change Order No. P000017 for $50,000.00.

The arresting gear was the last remaining work that Metric was to perform except for clean-up and demobilization; therefore, any delays to this work resulted in the delayed completion of the contract and Metric and its equipment being on SNI for an extended period of time.

Metric delivered the materials to the island in late August 2000 and began work on the arresting gear in early September 2000. The arresting gear was to be replaced at two locations. Metric was required to repair one arresting gear at a time. Metric was to repair the arresting gear at what is referred to as the "30-end" first. After the "30-end" was complete and operational, Metric could start work on the "12-end."

Metric poured the 30-end concrete in late September 2000. There were disputes about the concrete installation and the length of the embedded steel rails. Those issues were resolved in late November 2000 when Metric completed the recommended repair procedures. Metric believes that the Navy contributed to the problem relating to the embedded steel rails because Change Order 17 states that the new steel beams are to be 10'-0" long, but it also states that the beams were to be drilled according to the template provided by the Navy. The Navy provided a template for a 9'-8' rail. Metric drilled and installed 9'-8" rails per the Navy provided template. The Navy rejected the rails and required Metric to weld extensions onto the steel beams extending them to 10'-0". Metric is not seeking damages or delays for issues arising from the concrete or the embedded steel rails. Metric's claim is related to the asphalt installation.

After completing the concrete work, the plans called for a "3'-0" wide AC Patch" between the existing asphalt runway and the newly placed arresting gear concrete. Since the plans indicated this was only a 3' wide patch, the asphalt could not be laid with an asphalt paving machine. During change order negotiations, Metric notified the Navy that this work could not be machine placed and would be hand placed as allowed by the specifications. Specification Section 02511.3.2.3 allows for Hand Spreading in Lieu of Machine Spreading which states, "In areas where the use of machine spreading is impractical, spread mixture by hand."

Metric placed the 3' asphalt patch around November 29, 2000 using the hand placement methods as set forth under Specification Section 02511.3.2.3 and mix designs as specified by the contract. The Navy rejected the asphalt and directed Metric to remove it and replace it. The basis of the rejection was subjective and on the basis that there was excessive exposed aggregate and the surface was not even.

In its attempt to satisfy the Navy's subjective requirements in placing the 3' patch, Metric retained a paving expert, John Terry from Terra Pave, to inspect the process and procedures. His opinion was that Metric's installation was in compliance with the specifications. The Navy continued to reject the asphalt. From late November 2000 to early August 2001, Metric removed and replaced the 3' asphalt patch on five occasions.

Some of the issues that contributed to the delay in completing the arresting gear were the Navy's rejecting the asphalt because of the lip between the arresting gear concrete and the 3' asphalt patch and the "excessive" exposed rocks.

The change order indicated that the surface between the asphalt and the concrete had to be flush. Metric requested clarification as to what tolerances would be allowed. The Navy would not allow any deviation in elevation between the new asphalt and the new concrete. The Navy was concerned that if the concrete was higher than the asphalt that it would be possible for a plane hook to get caught on the lip. After months of discussion regarding the allowable tolerances, the Navy finally specified that the concrete had to be lower than the asphalt and that so long as the asphalt was higher than the concrete the acceptable tolerance would be ¼".

Metric also wanted to use a mix design that had more fine materials that would reduce the exposed aggregate and make the asphalt more conducive to hand placement. This too was rejected by the Navy. Ultimately, Metric could not satisfy the Navy's demands relating to the 3'

wide asphalt patch. Metric cut out a 12' wide section of asphalt adjacent to the arresting gear concrete. In lieu of the 3' wide patch, Metric used their asphalt paving machine to install a 12' wide section of asphalt to satisfy the Navy's demands.

Once the asphalt was accepted by the Navy, the completion of the 30-end was delayed due to the installation of the rubber rails. The change order documents gave no indication that Metric was to install the rubber rails that attach to the top of the embedded steel beams. The change order stated that Metric was to install the embedded steel beams and to drill and tap the embedded steel beams using a template provided by the Navy, but there was nothing that required Metric to provide or install the rubber rails.

Even though the new embedded steel beams were longer than the existing rubber rails, the Navy directed Metric to reinstall the rubber rails that had been removed during the demolition process. Since Metric was unaware that it was suppose to salvage and reinstall the old rubber rails, it could not locate all of the removed rubber rails. It took until November 8, 2001 for Metric to obtain and install the rubber rails from the Navy.

After completion of the 30-end, Metric started work on the 12-end. Due to the problems encountered on the 30-end to install the 3' asphalt patch, Metric used a unique approach in performing the work on the 12-end. Instead of placing the concrete first, Metric placed the asphalt first, sawcut a straight edge along the asphalt, installed the expansion joint against the sawcut asphalt edge, and then poured the concrete against the expansion joint material. This allowed Metric to machine place the asphalt and pour the concrete at the same height as the asphalt.

Metric incurred costs as a result of the Navy's wrongful rejection of the 3' asphalt patch. Metric was required to perform much more work and at a higher quality than expected and as set

forth in the change order and in the contract documents. Metric was also damaged by the Navy's directive to reinstall the removed rubber rails and the delays Metric incurred in procuring new rails for those rubber rails that were damaged or were not salvaged.

Metric's initial claim was submitted on June 17, 2003, in the amount of $3,454,432.40. Subsequent to a review by Metric's experts, the claim was increased to $3,996,881.16. Metric is entitled to an equitable adjustment to the contract in the amount of $3,996,881.16 less offsets for delays concurrent with the arresting gear delays for which Metric has already been compensated and for the barge rental costs when Metric was able to rent out its barge to third parties during the delay period thus mitigating the damages associated with the arresting gear.

3. Facts Relating to the Contaminated Soil Removal Claim

Shortly after entering into the airfield contract, Metric prepared an Environmental Protection Plan. The Plan includes in part, "Removal of hazardous waste from Government property will be by a hazardous waste transporter registered with the State of California. This includes transportation by barge. Used lubricants, excess fuels or construction materials, hazardous waste and contaminated soils will be carefully transported off the island per applicable CCR and CFR regulations. In the event of an accidental oil or hazardous material spill, the Contracting Officer will be notified and appropriate clean-up procedures implemented immediately."

On occasions during the course of the project, Metric did have spills of hazardous materials. On those occasions, Metric took the appropriate steps to clean-up the spills and properly dispose of the contaminated soil. As Metric neared completion of the project, the Navy observed some contaminated soils at various locations. Metric acknowledged its responsibility

to clean those areas that it had contaminated. Metric notified the Navy of the clean-up procedures it intended to use to clean the contaminated areas. These procedures were the same procedures Metric had used throughout the project on those occasions that accidental spills had occurred. The Navy rejected Metric's plan. The Navy directed Metric to hire a hazardous waste consultant to prepare a hazardous waste clean-up plan. The Navy would not allow Metric to proceed with the clean-up until the Navy approved Metric's clean-up plan. There was no contractual requirement for Metric to hire an outside consultant to prepare the clean-up plan or to get Navy approval of the clean-up plan. It took several submittals until the Navy accepted the clean-up plan. The Navy's clean-up requirements were more extensive than required by the contract or those implemented during the course of the project.

In spite of the more onerous requirements, Metric complied with the Navy's directives. Going through this extensive clean-up plan procedure delayed Metric's ability to clean-up the contaminated materials in a timely manner.

Metric was directed by the Navy to clean up contaminated soil in the Sand Spit area. Unlike many of Metric's work areas, the Sand Spit was not an area that Metric used as a concrete or asphalt batch plant area. Metric did not have any production operations in the Sand Spit area. The Sand Spit area was used by Metric as a storage area for pipe and aggregate. The only equipment used in the Sand Spit area was the equipment used for loading and unloading the pipe and aggregate.

The Sand Spit area was not an area originally assigned to Metric for its work. Metric was given access to the Sand Spit area in late 1998. Prior to Metric being given access to the Sand Spit, it had been used by the Navy and other contractors for many years. Prior to Metric being given access to the Sand Spit, the Sand Spit had been used by prior contractors as a batch plant

area. Although the Navy and Metric had inspected other areas for contamination prior to giving Metric access, no inspection was done in the Sand Spit area.

At the conclusion of Metric's contract, the Navy performed an environmental inspection of all areas that Metric worked. There is no evidence that the Navy performed an environmental inspection on any other contractors. There is no evidence that the Navy performed any environmental inspection of the Sand Spit area prior to turning it over to Metric.

The only evidence of contamination caused by Metric is a single occasion that the Navy observed a hydraulic leak on one of Metric's pieces of equipment. The Navy photographs indicated that there was a localized hydraulic fluid leak caused by Metric. This leak would have resulted in the removal of less than five cubic yards of materials; however, the Navy required the entire area surveyed. The survey indicated that the Sand Spit was contaminated with diesel fuel and waste oil. These wastes are more consistent with a fueling and batch plant operation than a pipe and aggregate storage area. In spite of the Navy's knowledge of the years of use by both the Navy and other contractors prior to Metric ever touching this area and the Navy's knowledge of the volume of contaminated soil, the Navy required Metric to clean the entire area and remove over 200 cubic yards of contaminated soil.

The Navy's requirement to hire an outside consultant to prepare a detailed clean-up plant and to get Navy approval of the clean-up plan and the requirement to clean the entire Sand Spit area constituted a change to the contract. Metric is entitled to an adjustment of the contract in the amount of $183,417.78.

4. Facts relating to the Use of Blue Book Rates

Prior to entering into the Airfield and Roadway contracts, Metric had performed other contracts for the Navy at San Nicolas Island. On those projects, Metric and the Navy had agreed

to use Blue Book Equipment Rates for Owned Equipment and agreed to a 25% adjustment to the rates due to the harsh conditions on SNI. Prior to commencing work on the Airfield project, Metric had specific discussions with the Navy during the preconstruction meeting about using Blue Book Rates with the adjustment to determine the reasonable costs for owned equipment on changed work. The Navy agreed to use the Blue Book rates with the 25% adjustment.

During the course of the project, Metric and the Navy negotiated several change orders. In negotiating the change orders, the owned equipment costs were calculated using the agreed upon method of the Blue Book rates with the 25% adjustment. The Navy agreed that the Blue Book rates with the adjustment were reasonable rates for the equipment used on SNI due to the harsh environmental conditions.

Since the Navy had agreed that the Blue Book rates with the 25% adjustment were reasonable rates for the owned equipment, Metric did not maintain detailed records for determining the ownership and operating costs for each piece of equipment. Metric also relied upon the agreement to use the Blue Book rates in making decisions as to what equipment to bring to SNI. Due to the remote location of SNI and the inability to mobilize and demobilize equipment on SNI, Metric's determination of what equipment it would bring to the island and commit to the project was dictated in part by the agreement to use Blue Book rates.

## III. CONTENTIONS OF LAW

1. The Navy's Placement of the Pontoon at the Daytona Beach Landing Site, the Navy's Rejection of the 3' Asphalt Patch, the Navy's Directive to Install the Salvaged Rubber Rails, the Navy's Directive to Use an Outside Hazardous Waste Contractor, the Navy's Requirement for Metric to Submit and Obtain Navy Approval of the Clean-Up Plan, and the

Navy's directive for Metric to Remove All of the Soil Contaminants at the Sand Spit Area Constituted Constructive Changes to the Contract Entitling Metric to an Equitable Adjustment.

A **constructive change** generally arises where the Government, without more, expressly or impliedly orders the contractor to perform work that is not specified in the contract documents. *SIPCO Servs. & Marine v. United States*, 41 Fed.Cl. 196, 222 (1998) (quoting *Lathan Co. v. United States*, 20 Cl.Ct. 122, 128 (1990), and citing *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 455 F.2d 1037, 1050 (1972)). Several categories of constructive changes have been identified. These include "(I) disputes over contract interpretation during performance; (II) Government interference or failure to cooperate; (III) defective specifications; (IV) misrepresentation and nondisclosure of superior knowledge; and (V) acceleration." *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994) (citations omitted).

The specifications designated the barge landing sites on San Nicolas Island. The specifications allowed the contractor to land on either site. Metric bid the project with the expectation that it would land its barge at the landing site at Daytona Beach. It was familiar with this landing site and had used it on prior occasions. By installing the pontoons at Daytona Beach, the government changed the contract. The installation of the pontoons and the delays associated with the pontoon installation constituted a constructive change to the contract. This change in the contract entitles Metric to an equitable adjustment to the contract.

The specifications and Change Order No. 17 set forth the manner and method of installation of placing the asphalt. Metric complied with the specifications. The government's multiple rejections of the asphalt placed at the arresting gear locations and associated delays constituted a construction change to the contract. This change to the contract entitles Metric to an equitable adjustment to the contract.

Change Order No. 17 did not require Metric to install the rubber rails on the embedded concrete rails, nor did it require Metric to salvage the existing rubber rails and reinstall them. The Navy's directive for Metric to salvage the rubber rails and reinstall them was a constructive change to the contract and entitles Metric to an equitable adjustment to the contract.

The specifications did not require Metric to retain an outside consultant or contractor to prepare a clean-up plan or remove hazardous materials, to submit a clean-up plan for government approval, or to clean-up contaminated soil at the conclusion of the project that Metric had not caused. Metric was required to hire an outside consultant/contractor, obtain government approval of its clean-up plan prior to commencing the clean-up, and to clean-up and remove contaminated soil that was not contaminated by Metric. This delayed the clean-up process and resulted in Metric performing extra work and constituted a constructive change to the contract. This change to the contract entitles Metric to an equitable adjustment to the contract.

2. Metric was entitled to rely upon the plans and specifications provided by the government allowing Metric to land its barge at the landing site at Daytona Beach

Metric was entitled to rely upon the plans and specifications provided by the government. The plans and specifications allowed for Metric to land its barge at the landing site at Daytona Beach. Metric relied upon those representations. The government's installation of the pontoons changed Metric's manner and method of landing its barge at Daytona Beach. A contractor is entitled to rely upon the representations and instructions given him by the government for the purpose of giving guidance in connection with the contract. *North American Const. Corp. v. United States*, 56 Fed. Cl. 73, 83 (2003). Metric reasonably interpreted the government's specifications to allow it to land on Daytona Beach in the condition that it existed at the time of the contract.

The contract also set forth with detail how the asphalt was to be hand laid. Metric followed those specifications, used asphalt mix designs designated and approved by the government. Although Metric followed the specifications, it resulted in a product unsatisfactory to the Navy.

The government's liability for losses that occur after a contractor follows the plans and specifications is well-settled law. The government impliedly warrants the accuracy of matters set forth in the contract documents. *United States v. Spearin*, 248 U.S. 132, 137, 39 S.Ct. 59, 63 L.Ed. 166 (1918). If the contractor follows the specifications, the government warrants that satisfactory performance will result. *Conner Bros. Constr. Co. v. United States*, 65 Fed.Cl. 657, 685-6 (2005).

3. Metric's Use of the Blue Book Owned Equipment Rates is a Reasonable Basis for Computation of Its Costs

In computing damages, this Court in *Ace Constructors, Inc. v. United States*, 70 Fed.Cl. 253, 274 (2006), stated:

> The question remaining for the court concerns the quantum of recovery. The burden is on ACE to establish the amount of the equitable adjustment by a preponderance of the evidence. *See* ▸*Teledyne McCormick-Selph v. United States*, 218 Ct.Cl. 513, 588 F.2d 808, 810 (1978). However, "[a] claimant need not prove his damages with absolute certainty or mathematical exactitude." ▸*Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956, 968 (1965) (citing ▸*Houston Ready-Cut House Co. v. United States*, 119 Ct.Cl. 120, 96 F.Supp. 629 (1951)). "It is sufficient if [a claimant] furnishes the court with a reasonable basis for computation, even though the result is only approximate." ▸ *Wunderlich Contracting*, 351 F.2d at 968 (citing ▸*Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521 (1960); ▸*F.H. McGraw & Co. v. United States*, 131 Ct.Cl. 501, 130 F.Supp. 394 (1955)); *see also* ▸*Daly Constr., Inc. v. Garrett*, 5 F.3d 520, 522 (Fed.Cir.1993) ("it was incumbent upon [the contractor] to establish a reasonable method for computing the requested compensation").
> The proper measure of an equitable adjustment is the extra costs incurred by the contractor, if those additional costs are reasonable. *Cibinic & Nash* 682; *George Sollit Constr. Co. v. United States*, 64 Fed.Cl. 229, 245 (2005) (citing ▸*Bruce Constr. Corp. v. United States*, 163 Ct.Cl. 97, 324 F.2d 516, 518-19 (1963)).

The Court in *Ace* allowed the contractor to recover the estimated operating costs for rented equipment using the Caterpiller Handbook and the Blue Book finding that ACE was reasonable in using these two widely used reference guides. The Court also allowed the use of the Corps of Engineers Construction Equipment Ownership and Operating Expense Schedule for calculating the ownership and operating costs for owned equipment. *Ace Constructors, Inc. v. United States*, 70 Fed.Cl. @ 278.

The dispute over the use of Blue Book rates in this case is similar to the issues set forth in *Appeals of Marshall Associated Contractors, Inc and Columbia Excavating, Inc. (J.V.),* 2002 WL 504788 (IBCA), IBCA 1901, IBCA 3433, IBCA 34335. The Board's decision regarding the use of Blue Book rates was addressed as follows:

> Ownership Rental Rates on Pre-Owned Equipment
>
> This category of costs produced the greatest differences of opinion and occupied the most time at the hearing, but it would serve no useful purpose to recapitulate the entire controversy here. The core of the disagreement was the allowability of "Blue Book" ownership rental rates versus some version or adaptation of the Corps of Engineers' rate manual which, not surprisingly, would have been more favorable to the Government than the Blue Book, since it is prepared from the standpoint of the Government as a customer. The imbroglio in this situation began with Appellant's submission of its CDA claim in September 1984. Appellant's equitable adjustment claim was for approximately $8.8 million, based on differing site conditions and defective specifications, and using the Dataquest Company's "Rental Rate Blue Book" for hourly rates. The CO at the time virtually ignored the claim and never rendered a final decision on it. But in 1989, when BOR finally audited the claim, the auditors denied the portion of it pertaining to pre-owned equipment on the ground that it had been fully depreciated and (erroneously) that it was based on AGC (i.e.. Associated Contractors of America) rental rates, which the auditors regarded as unacceptable. The auditors were wrong in both respects, for fully depreciated equipment is clearly entitled to reasonable ownership rental rate reimbursement ►(Tom Shaw. Inc.. DOT BCA 2106 ►et al.. 90-1 BCA 22,580 at 113,337-38) and AGC rates were accepted by the Government at least 18 years previously, on the ground that they are specifically owner rates rather than excessive commercial lease rates. ►L.L. Hall Construction Company v. United States. 177 Ct. Cl. 870, 886; ►379 F. 2d 559 (1966). It was the Associated Equipment Distributors (AED) Rate Manual and the so-called Means Manual, not AGC or Blue Book rates, that were ultimately

rejected by the boards as unreasonable. See M.E. Brown, supra, 91-1 BCA at 116,819, citing Tom Shaw, supra.
Blue Book rates have generally found acceptance in recent cases, and they were again proposed by Appellant in this appeal after BOR rejected its various alternative proposals, as discussed below. This Board accepted them in Harvey C. Jones. Inc.. IBCA 2070 ►et al.. 90-2 BCA 22,762 at 114,246-47, even though in that case the appellant had challenged them as inadequate rather than excessive. However, AGC rates have also been challenged as inadequate. See George ► Bennett. 178 Ct. Cl. 61, 371 F. 2d 859. The challenge in that case was also unsuccessful.

In this appeal, there was more than adequate testimony that the Blue Book is a widely-used rate reference source that has been relied upon by contractors for many years and is still approved by the Federal Highway Administration for use in connection with Federal highway grants in all 50 States. It was used by the Appellant in its initial claim; the State of Pennsylvania directs use of the Blue Book exclusively in its contracts; and Blue Book rates were used in a similar AGBCA case. ►Jack L. Olsen, Inc.. 93-2 BCA 25,767 at 128,220, which was reviewed by the Federal Circuit Court in ►Jack L. Olsen v. Espy. 26 F. 3d 141, 93-1324, 1994 WL 198184 (May 19, 1994, unpublished). No change was made in the Board's use of the Blue Book as a result of that review...

Mr. Grubb readily **agreed** that the COE manual was inadequate under the circumstances, so Appellant again proffered **Blue Book** rates as the best solution, whereupon the CO produced a formula of his own, one that Appellant regarded as both arbitrary and inadequate. In light of testimony at the hearing that Blue Book rates were relatively high, however. Appellant offered to reduce its total pre-owned equipment costs, based on Blue Book rates, by 20 percent, after increasing it by approximately 39 percent to account for the ultra severe site conditions of the project. The Board rejects as unnecessary any arbitrary recasting of the applicable and appropriate Blue Book rates for this project, but accepts the need to make a special adjustment of approximately 39 percent for the exceptional deterioration of the equipment used on the project, as proposed by the Appellant...

We find the testimony of John Marshall, one of the contractor's principals, as to the amount of equipment wear that was incurred to be entirely credible (See ► Richerson Construction. Inc., GSBCA 11161, 93-1 BCA 25,239 at 125,704, where the board similarly relied on the testimony of the company's president), but there was also ample supporting testimony from various experienced contracting and engineering witnesses to the same effect. While it is beyond the power of this Board to "make the Appellant whole," as the Agriculture Board was instructed to do in Olsen, we are satisfied both that the use of Blue Book rates as such is reasonable and allowable, and that the approximately 39 percent increase in those rates on the basis of proven ultra severe site conditions is fully justified.

> Accordingly, we award Appellant the sum of $5,530,632-i.e., $3,991,038, plus an adjustment of $1,539,594 or approximately 39 percent- as legitimate pre-owned equipment costs.

Similar to the circumstances in *Marshall,* the Blue Book rates including the 25% adjustment were a reasonable calculation of the owned equipment costs incurred by Metric on the airfield and roadway projects. The Navy by its own admission agreed that the Blue Book rates with the adjustment due to the harsh conditions on SNI were reasonable. The Blue Book rates with the 25% adjustment are reasonable costs for the contractor owned equipment on SNI.

## V. CONCLUSION

Metric had a right to rely upon the plans and specifications furnished by the government. The Navy's installation of the pontoons and multiple directives regarding the pontoon, the 3' asphalt patch, the installation of the rubber rails and the Navy's directives regarding the soil contamination were constructive changes to the contract. These items resulted in Metric incurring additional costs and delay damages. As a result of the changes to the contract, Metric is entitled to an equitable adjustment to the contracts in the amount of $7,855,038.94 less adjustments as indicated above.

DATED this 21st day of May, 2007.

PEEL BRIMLEY LLP

*/s/ Steven D. Meacham*
Steven D. Meacham
Attorney for Plaintiff

Peel Brimley LLP
2014 East Madison Street, Suite 100
Seattle, WA 98122-2965
(206) 770-3339
Fax: (206) 770-3490