IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| METRIC CONSTRUCTION CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-635C |
| | ) | (Judge Charles F. Lettow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

In accordance with Appendix A, paragraph 14(b) of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully submits the following pretrial memorandum of contentions of fact and law.

INTRODUCTION

This is a "constructive changes" case in which plaintiff Metric Construction Co., Inc. ("Metric"), will seek to prove at trial that the Government constructively changed Metric's contracts in six ways that purportedly delayed Metric's performance and increased Metric's costs. Pl. Memo. i-3.[1] At page "i" of Metric's pretrial memorandum, Metric contends that the Government imposed the following contract changes which allegedly impacted Metric as noted:

Pontoon Claim for $3,674,740:

1. The Navy's placement of the pontoon at the Daytona Beach landing site.

---

[1] "Pl. Memo. #" refers to Metric's Metric's pretrial memorandum of contentions of fact and law.

Arresting Gear Claim for $3,996,881:

2. The Navy's rejection of the 3' asphalt patch.

3. The Navy's directive to install the salvaged rubber rails.

Soil Removal Claim for $183,417:

4. The Navy's directive to use an outside hazardous waste contractor.

5. The Navy's requirement for Metric to submit and obtain Navy approval for a clean up plan.

6. The Navy's directive for Metric to remove all of the soil contaminants at the sand spit area.

Pl. Memo. i, 2, 3.

For the reasons described below, Metric's contentions are incorrect because the "constructive changes" alleged by Metric were simply not changes to Metric's contracts. Also, Metric's primary factual allegations, that the so-called constructive changes delayed Metric's performance, are incorrect and certainly do not meet Metric's burden of proof with regard to Government-caused delay or hindrance of contractor performance. Finally, Metric's damages claim, and particularly Metric's use of "blue book" equipment rates, is fraught with unsupported and inflated costs that are insufficient to support any damages award and, in fact, help disprove the liability aspects of Metric's case.

All told, Metric's attempts to blame its delayed completion of its contracts upon the Government is unavailing, and the Government should prevail at trial.

I. CONTENTIONS OF FACT

The Contracts

1. In August 1994, the Government awarded Contract No. N62474-94-C-6807 ("the airfield contract") to Metric to make improvements or repairs (pursuant to later-issued delivery orders) to the Government's airfield runway on San Nicholas Island, California ("SNI").

2. In September 1998, the Government awarded Contract No. N68211-98-C-5553 ("the roadway contract") to Metric to make improvements or repairs (pursuant to later-issued delivery orders) to the roads on San Nicholas Island, California ("SNI").[2]

3. The Solicitation/contract advised Metric of the environmentally sensitive nature of the site as follows:

> San Nicolas Island harbors many rare and sensitive plant and animal species, some of which occur nowhere else on earth. The island also has numerous archaeological sites, some with evidence of early human occupation at least 10,000 years old. These biological and cultural resources are extremely valuable, not only because of their rarity, but also because they provide important opportunities for scientific research and discovery. San Nicolas Island has the unique capacity

[2] Where necessary for clarity to distinguish between the airfield and roadway contracts, or individual delivery orders issued under either contract, we will do so. Otherwise we will refer to both contracts as "the contract" or simply "the project."

> of extending our knowledge, both of isolated biological populations and of early human migration and settlement in the Western hemisphere. Federal and state law mandate protection and preservation of this biological and cultural legacy. Areas having sensitive archaeological or biological features are identified and protected. All existing and proposed activities are assessed and tailored if necessary early on in planning to ensure harmony between the military mission and resource protection requirements.

<u>Facts Related To Metric's Pontoon Claim</u>

4. The contract contained a provision (section 1600.1.6.3.5) that required Metric to transport construction equipment and materials to SNI via boats or barges that could land on one of two beaches: Daytona Beach and Sissy Cove.

5. In general, section 1600.1.6.3.5 provided that Metric's use of the beach landing sites was affected by many factors and controlled by the Government; that Metric was to provide notice of intended barge landings; and that Metric would not be able to use Daytona Beach when Government barges were scheduled to land or when protected wildlife were present.

6. Daytona Beach is frequently populated by protected wildlife, sometimes for significant periods of time.

7. Section 1600.1.6.3.5 also noted that, if Metric chose to facilitate beach landings with a sand ramp, that Metric was required to take steps to ensure that certain environmental restrictions were met.

8. Finally, and most importantly, Section 1600.1.6.3.5 explicitly provided that the remedy to Metric for aborted or

impossible barge landings was a "no cost time extension" as follows:

> If the Contractor's attempt to land his barge is not successful due to weather and/or a high surf conditions - or if data is available which proves that barge landing is impossible, then sufficient justification may exist for a no cost time extension.

9. Since the inception of its work at SNI, Metric had invoked the no-cost-time-extension remedy several times when "Metric received numerous time extensions because of delays in landing the barge due to adverse conditions." Pl. Memo. 6.

10. In December 1998, as part of a continuing and evolving Government effort to improve the facilities at SNI and to reduce the environmental impact of barge landings at Daytona Beach (which virtually always required the construction of large sand ramps and often involved disturbing protected sea mammals who occupied the area), the Government replaced the beach landing facility with a barge-landing pontoon dock ("pontoon") and directed that further barges landings at Daytona Beach use the pontoon.

11. Metric complained that the barge that it was currently using was not entirely compatible with the pontoon and that pontoon landings required more ideal weather conditions than beach landings.

12. Over the next several months, from January until June 1999, Metric made a series of attempts to use the pontoon that

resulted both in successful landings and a few aborted landing attempts.

13. As an accommodation in response to Metric's requests, in June 1999, the Government installed additional equipment at Daytona Beach that permitted Metric to conduct beach landings again. Metric conducted beach landings at Daytona Beach for the remainder of its contract performance.

14. Faced with the purported impediment to Metric's work caused by installation of the pontoon between January and June of 1999, Metric;

a. Did not rent or otherwise obtain the use of another barge that, like the Government barge, was more compatible with the pontoon.

b. Did not avail itself of the Sissy Cove landing site.

c. Did not seek no-cost time extensions under the contract, as Metric had in the past.

d. Did not properly document the purported impacts of the aborted beach landings or the barge trips that Metric allegedly never scheduled as a result of the presence of the pontoon.

e. Did not properly take into account that the installation of the pontoon removed from Metric the need to construct sand ramps when landing upon the pontoon.

15. Metric's work, upon both the airfield and roadway contracts, was impacted far more by events that are unrelated to

Metric's barge landings (such as the fire that incapacitated Metric's asphalt plant from December 1998 through July 1999) than by the purported shortage of materials that Metric attributes to the installation of the pontoon.

Facts Related To Metric's Arresting Gear Claim

16. The Government issued change order 17 to Metric's airfield contract that provided for modifications to the airfield arresting gear pads, including installation of a three-foot asphalt patch between the existing asphalt runway and the new concrete arresting gear pads to be installed by Metric.

17. The parties bilaterally agreed to a price of $50,000 for the change-order work. Pl. Memo. 9.

18. Although Metric suggests that it "believes that the Navy contributed to the problem" by providing a 9"-8' template where the contract called for a 10-foot steel rail (Pl. Memo. 10), Metric "is not seeking damages or delays for issues arising from the concrete or the embedded steel rails. Metric's claim is related to the asphalt installation." Id.

19. The contract permitted Metric to hand-spread the asphalt, and also required the interface between the asphalt and the new concrete to be "flush" in order to maximize the safety of the aircraft whose tail hooks would come into contact with the asphalt/concrete seam.

20. Metric's asphalt was not flush and was poorly installed upon repeated occasions. The Government rejected Metric's asphalt installations several times for those reasons.

21. As an accommodation, after Metric's repeated inability to comply with the contract requirements, the Government relaxed the "flush" requirement to permit a one-quarter inch tolerance between the asphalt and the concrete, and permitted Metric to demolish an additional section of the runway in order to use Metric's asphalt paving machine to properly install the asphalt.

22. In addition to Metric's poor asphalt placement techniques, the completion of Metric's arresting gear work was further delayed by Metric's misapprehension of the contract requirements for reinstallation of the "rubber rail" component of the arresting gear pad.

23. Despite Metric's insistence that "the change order documents gave no indication that Metric was to install the rubber rails that attach to the top of the embedded steel beams," (Pl. Memo 12), and "there was nothing that required Metric to provide or install the rubber rails," (Id.), the contract (drawing C-25) clearly provided that Metric was to "remove cable support rail, weld new c-channel to exist I beam and reinstall cable support rail."

24. Metric's failure to salvage the existing rubber rails means that the time and costs associated with Metric's failure to

comply with the contract are not the responsibility of the Government.

25. Metric's claim to recover damages of $3,996,881 for alleged changes and delays in the performance of the $50,000 arresting gear change order, is unavailing.

Facts Relating To The Contaminated Soil Removal Claim

26. SNI is an environmentally sensitive area where, among other things, the breeding, birth, and nursing of several sensitive species of marine mammals (including seals, sea lions, and sea otters) is protected.

27. As part of the contract obligations, Metric submitted an environmental protection plan that committed to remove hazardous waste, comply with Federal environmental regulations, and clean up accidents and spills "immediately." Pl. Memo. 13.

28. Near the conclusion of the project, the Government discovered several violations of Metric's environmental plan that had been allowed to go unmitigated for a significant period of time. Some of those violations were documented in a report prepared by the Government.

29. Section 7.0 of the contract, concerning "health and safety" provides:

> Whenever a representative of the Government observes noncompliance and/or any conditions which poses a danger to the health or safety of others, the Contractor may be directed to immediately correct the conditions.

30. When the Government became aware of Metric's poor environmental performance, "Metric acknowledged responsibility to clean up those areas that it had contaminated." Pl. Memo. 14.

31. Unsatisfied with Metric's lack of adherence to its own environmental plan, and particularly Metric's unfulfilled promise to clean up contamination "immediately," the Government required Metric to obtain Government approval of an independent clean-up plan and the Government required Metric to clean up all contamination that could reasonably be attributed to Metric.

32. Considering Metric's environmental violations, and the Government's power under section 7.0 of the contract, at the very least, the Government's direction to Metric to mitigate its environmental contamination does not entitle Metric to extra compensation.

33. Metric objected to the Government's directive to clean up all contaminated soil in "the sand spit area," which metric had used for storage of construction materials and equipment.

34. Metric suggested that the soil had been contaminated prior to Metric's arrival, but Metric does not dispute that Metric caused at least a "localized" leak of hydraulic fluid in the sand spit area.

35. Without conclusive proof that the sand spit soil was contaminated prior to Metric's contact, and with proof that Metric had contaminated some of the sand spit area and had

violated its environmental plan regarding immediate detection and remediation of environmental contamination, the Government is not liable for its order to Metric to clean up the sand spit area.

Facts Relating To Metric's Use Of Blue Book Rates

36. Metric's claim seeks to recover "ownership costs" for Metric's equipment during the periods of delay claimed by Metric.

37. Instead of basing its ownership costs upon Metric's actual equipment records, Metric calculated hypothetical ownership costs using generic "blue book rates" obtained from a Dataquest guide book.

38. There is no contractual provision that authorizes or mandates the use of blue book rates for an equitable adjustment or certified claim.

39. There is no evidence that the Government agreed, as Metric contends, to Metric's use of blue book rates and the Government certainly never agreed to compensate Metric for change order work using an inflationary costing technique.

40. Based upon the limited information provided by Metric, Metric's use of blue book rates for the claims at issue in this case have been determined to be inflationary to a significant degree and unreasonable by the Government's expert accountant.

## II. CONTENTIONS OF LAW

### Overview

Although many of Metric's factual contentions are undisputed (for example that the Government installed the pontoon dock on Daytona beach and, for a time, required Metric to use it), the six constructive changes alleged by Metric were simply not changes to the contract. For this reason, Metric's changes claims are not legally supported and the Government should prevail at trial. The Court need only resolve the dispute between the parties regarding contract interpretation.

Even if the Government did impose contract changes upon Metric, the changes did not cause Metric's delayed contract completion (or claimed costs). To resolve this portion of the case, the Court will be asked to apply well-settled law regarding a plaintiff's burden of proof in a delay/hindrance claim, and to resolve the difference of opinion between Metric's scheduling/delay expert witnesses and the Government's.

Finally, Metric's damages claim is so unsupported and inflationary that, even if contractual liability exists, Metric cannot recover. Again, the Court will be asked to determine whether Metric's damages evidence meets a plaintiff's well-settled burden of proof with regard to damages, and to resolve the difference of opinion between Metric's damages expert witnesses and the Government's.

## ARGUMENT

### A. Metric's Pontoon Claims Are Contractually Unavailing

Metric's "pontoon claim is a constructive change claim." Pl. Memo 1. Metric correctly identifies the contract specification (Section 1600.1.6.3.5) that identifies the two barge landing sites on SNI and the procedures for conducting barge landings. Pl. Memo 5-6. Metric appears to argue, however, that Metric's choice of Daytona Beach, Metric's use of a specific barge, and Metric's previous experience conducting beach landings, were somehow contractually guaranteed to continue indefinitely in the manner that Metric preferred. They were not. The contract provisions governing barge landings are quite restrictive and Metric simply had no right to unfettered access to beach landings on Daytona Beach. The Government's installation of the landing pontoon, and instruction for Metric to use it from January to June of 1999, was simply not a change to Specification Section 1600.1.6.3.5.

Even if the landing pontoon was inconvenient for Metric compared to the restrictions already imposed by Section 1600.1.6.3.5, a factual contention that will be disputed at trial, there was no contractual provision that guaranteed Metric an unfettered ability to land directly on Daytona beach – especially when beach landings were believed to violate environmental regulations and policies or to unduly disturb

protected wildlife. Moreover, even if the Government's directive to use the pontoon was a change to Specification Section 1600.1.6.3.5, at the very most Metric might have been entitled to compensation for the extra costs of obtaining a barge that was more compatible with the pontoon (such as the Government's barge), but this was an alternative that Metric never proposed or implemented.

For these reasons, the installation of the pontoon was not a constructive change to Metric's contact and there is no Government liability for Metric's pontoon claim. Blinderman Constr. Co. v. United States, 695 F.2d 552, 559 (Fed. Cir. 1982).

B. Metric's Arresting Gear Claims Are Contractually Unavailing

The gist of Metric's arresting gear claim that Metric's asphalt installations were contractually conforming and that the Government did not have the right to reject Metric's installations as non-conforming. Metric's argument fails because there is no dispute that change order 17 (which was agreed upon bilaterally prior to Metric's asphalt installation) unambiguously required Metric to provide a properly installed three-foot asphalt interface between the existing runway and the concrete arresting gear pad installed by Metric. Metric simply did not conform to the contract's quality-control requirements and did not comply with the requirement that the seam between asphalt and concrete be "flush." Metric will be unable at trial to

demonstrate that the asphalt installations that were rejected were, in fact, contractually conforming. The fact that Metric was delayed by its persistent failures, or that the Government finally relented to Metric's request for a waiver of strict compliance with the specifications, is not attributable to the Government. To the extent that Metric's contract completion was delayed at all by its arresting gear asphalt failures (a fact that we dispute), the Government is not liable for that delay.

The portion of Metric's arresting gear claim that is based upon Metric's replacement of the cable supporting rubber rail is simply incorrect. The contract (change order 17, drawing C-25) unambiguously required Metric to remove the original rubber rail and to "reinstall" it. Metric's destruction or disposal of the original rubber rail was a clear violation of the contract, and the resultant costs and delay to Metric's performance are Metric's responsibility.

C. Metric's Contaminated Soil Removal Claim Is Contractually Unavailing

Metric's soil removal claim is unavailing for the same reasons as its pontoon and arresting gear claims. The Government's requirement for Metric to clean up the contaminated soil at the sand spit area is simply not a change to Metric's contract, which unambiguously required Metric to submit and comply with its own environmental plan and also to mitigate its environmental violations.

Metric does not dispute that it did, in fact, cause soil contamination on SNI in general, and at the sand spit area in particular – both of which were documented by the Government contemporaneously. The only dispute is the extent of the soil contamination at the sand spit area caused by Metric, and Metric will be unable to prove that its soil contamination was limited to an area that is smaller than the 200 cubic yards that Metric was required to remove. Given Metric's clear violations of its own environmental plan, the Government's clean-up directive to Metric was neither unreasonable nor extracontractual.

D. Even If The Government Constructively Changed The Contract, Metric Cannot Meet Its Burden Of Proof For Delay Or Hindrance To Its Contract Performance

Metric's claims for constructive changes are garden-variety constructive change claims, where Metric alleges that the Government's actions caused Metric's performance to be delayed – and seeks delay damages for the delay periods alleged. Even if the Government's actions constituted constructive changes to the contract, Metric cannot recover. There is ample case law that explains Metric's burden of proof – a burden that Metric will be unable to meet.

This Court explained in PCL Construction Services, Inc. v. United States, 47 Fed. Cl. 745 (2000):

> In order to recover for an alleged compensable delay, whether or not the delay is caused by hindrance, a contractor must demonstrate: (1) the extent of the

> delay with a reasonable degree of accuracy; (2) that the delay proximately was caused solely by the government's actions; and (3) that the delay caused specific, quantifiable injury to the contractor. See Servidone Constr. Corp. v. United States, 931 F.2d at 861; see also William F. Klingensmith, Inc. v. United States, 731 F.2d 805, 809 (Fed. Cir.1984); Blinderman Constr. Co. v. United States, 695 F.2d 552, 559 (Fed. Cir. 1982). The burden of establishing these factors falls squarely upon the contractor. William F. Klingensmith, Inc. v. United States, 731 F.2d at 809; Avedon Corp. v. United States, 15 Cl.Ct. 648, 653 (1988). Moreover, "[o]nly if the delay was caused solely by the government will the contractor be entitled to both an extension of time within which to perform, and recovery of excess costs associated with the delay." Weaver-Bailey Contractors, Inc. v. United States, 19 Cl.Ct. 474, 476 (1990) (emphasis in original) (citing William F. Klingensmith, Inc. v. United States, 731 F.2d at 809), reconsid. denied, 20 Cl. Ct. 158 (1990); G.M. Shupe, Inc. v. United States, 5 Cl. Ct. 662, 700 (1984); see also Blinderman Constr. Co. v. United States, 695 F.2d at 559.

PCL, 47 Fed. Cl. at 801.

Here, Metric cites its alleged pontoon difficulties and its rejected arresting gear asphalt and rubber rail replacement as the cause of its delayed contract completion and corresponding increased costs. Metric's expert analysis will be shown to be insufficient to support its delay allegations, and to meet Metric's burden of proof. Furthermore, the Government's expert analysis will demonstrate clearly that Metric's delays were not caused solely by the Government, were actually Metric's responsibility, and, in any event, were not attributable to the constructive changes alleged by Metric – even if they were, indeed, constructive changes.

For example, the Government's expert analysis shows:

1. Although the Navy installed the pontoon on January 2, 1999, the fire at the asphalt plant which disabled the plant for over seven months on the project preceded the installation of the Navy's pontoon bridge. The asphalt plant delay continued through July 1999, concurrent to the alleged beach landing restriction and beyond the point when Metric resumed barge landings on the beach.

2. Metric asserts that delays due to the inability to land its barge on the beach caused material shortages. In fact, Metric had all the materials necessary to produce asphalt in late December because the barge had landed three times, just before the asphalt plant caught fire, the day of the fire, and just after the fire. As a result, Metric had the materials but the plant could not produce asphalt. Metric did not produce asphalt again until July 9, 1999, after the Government permitted Metric to land directly upon Daytona beach again.

3. The asphalt plant was certainly not on standby between December 18, 1998 and July 9, 1999 (a period of seven months) because it was not operational and was incapable of producing asphalt.

4. The asphalt plant was in a constant state of needing repairs. During 1998 the plant was being repaired and not

operational for 118 days, and during 1999 the plant was being repaired and not operational for 223 days.

5. Metric rarely achieved its as-bid production rate of 600 cubic yards per day for asphalt, a rate that was confirmed in a letter from Tom Miller to E. G. Holmes (see Jones Report Exhibit II-21). In fact, Metric's average production of asphalt for the last half of 1999 was approximately 200 cubic yards per day (about one third the bid production rate).

6. Metric failed to start the work for the roadway contract from when it was awarded in October 1998 (prior to the asphalt plant fire and prior to the installation of the pontoon) until a full five months later -- in March 1999.

7. Metric's crew size remained constant throughout 1998 and 1999 which, once they were awarded the roadway contract in the amount of $2 million, meant that the same crew was performing work upon two contracts instead of one, which by definition detracted from Metric's efforts upon the airfield contract. In addition, Metric did not have different crews for asphalt and concrete work so when asphalt was being produced the crew abandoned any concrete work and vice versa.

The Government's expert has reached many more conclusions, summarized in her report and to be described at trial, that contradict the fundamental basis of Metric's case.

E. Metric’s Damages Claim Is Insufficient

The damages issues raised by Metric in its pretrial submission, primarily Metric’s use of “blue book” rates to recover the purported “ownership costs” for Metric’s equipment, are irrelevant because there is no Government liability for Metric’s constructive changes claims for the reasons discussed above. Even if there is Government liability, however, and delay periods can be attributed to the constructive changes alleged by Metric, Metric’s damages are so improperly calculated (for a myriad of reasons described in Mr. Cotton’s expert report which is not republished here) that any recovery by Metric is precluded. For now, however, we will briefly respond to Metric’s contention that its use of blue book rates is appropriate.

Metric's use of the Dataquest blue book rates for its claim calculations was inflationary because Metric's actual equipment costs were substantially lower that the costs for equipment upon which the Blue Book rates are based. For just six of the 87 items in Metric's claims, use of the Blue Book rates rather than Metric's actual equipment costs inflates the claims by $2,456,870. Cotton Report; Ex. 1002, pp 22-25, 123. Despite requests, Metric has failed to supply sufficient information to enable Mr. Cotton to determine the full inflationary effect of Metric’s use of the Blue Book rates, but Metric’s use of the blue book is clearly inflationary.

Metric also misapplied the Blue Book by failing to make required adjustments to the rates and by applying a wholly unsupported 125% so-called "area adjustment factor," further inflating its claim. Cotton Report; DX1002, pp 22-27.

Further, Metric has provided no evidence supporting the supposed "agreement" with the Navy that the Blue Book would be used in change order pricing. Indeed, had the Navy known of the full extent of the inflationary impact of use of the Blue Book on Metric's other changes orders, the Navy would undoubtedly not have allowed it to be used. In any event, use of blatantly inflated equipment rates in a claim calculation is patently improper, and potentially fraudulent. In Daewoo v United States, 73 Fed. Cl. 547 (2006), this Court held that "plaintiff purposely avoided looking at its own acquisition costs in favor of the higher manual [i.e. rate book] numbers. This intentional inflation of the claim is fraud. Daewoo also applied the manual rates improperly and inconsistently." Daewoo, 73 Fed. Cl. at 591-2.

Metric's pretrial arguments in favor of its use of the blue book miss the mark entirely. Although Metric can cite cases where blue book rates have been applied in litigation where there was no contention that use of those rates was unreasonably inflationary, that is not the case here. Certainly, any costing technique that is inflationary should be rejected by this Court.

F. Metric's Reliance Upon The "Spearin Doctrine" Is Inapposite

Although unclear how it applies to the facts of this case, Metric devotes approximately two sentences of its pretrial memorandum (at page 19) to United States v. Spearin, 248 U.S. 132 (1918), suggesting that "if the contractor follows the specifications, the government warrants that satisfactory performance will result." This is a misstatement and misapplication of the "Spearin doctrine," which only applies to "design specifications" which are certainly not present in this case.

The United States Court of Appeals for the Federal Circuit has explained:

> Performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, *selecting the means and assuming a corresponding responsibility* for that selection." . . . Design specifications, on the other hand, describe in precise detail the materials to be employed and *the manner in which the work is to be performed.* The contractor has no discretion to deviate from the specifications, but is "required to follow them as a road map."

P.R. Burke Corp. v. United States, 277 F.3d 1346, 1357 (Fed. Cir. 2002) (emphasis supplied) (quoting Blake Construction Co. v. United States, 987 F.2d 743, 745 (Fed. Cir. 1993) (quoting J.L. Simmons Co. v. United States, 188 Ct. Cl. 684, 689, 412 F.2d 1360 (1969))); accord, e.g., Connor Brothers Construction Co. v.

United States, 65 Fed. Cl. 657, 685-86 (2005); Utility Contractors, Inc. v. United States, 8 Cl. Ct. 42, 50-51 (1985) ("[D]esign specifications are explicit, unquestionable specifications which tell the contractor exactly how the contract is to be performed . . . ."), aff'd, 790 F.2d 90 (Fed. Cir. 1986) (table). The Government warrants the accuracy of design specifications, but no such warranty accompanies performance specifications. E.g., Connor Brothers Construction Co. v. United States, 65 Fed. Cl. 657, 685-86 (2005); Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed. Cir. 1987). Thus, whether the specifications were design or performance specifications is critically important for an understanding of the parties' respective rights and obligations.

Many Government specifications include both design and performance provisions. E.g., Blake Construction, 987 F.2d at 746. Thus, when a contractor alleges a violation of the Spearin warranty, the Court must first identify the specific provisions at issue, in light of the contractor's allegations; determine if these provisions are performance specifications (where the contractor had discretion for determining how to perform) or design specifications (where the contractor had no such discretion); and then determine if the problems alleged by the contractor were caused by design specifications (i.e., contractor had no discretion) or by the manner in which the contractor

exercised its discretion under performance specifications. See Blake Construction, 987 F.2d 743, 746 (Fed. Cir. 1993); Conner Brothers Construction Co. v. United States, 65 Fed. Cl. at 685-86; PCL Construction Services, Inc. v. United States, 47 Fed. Cl. 745, 796 (2000) (citing cases); Monitor Plastics Co., ASBCA No. 14447, 72-2 BCA ¶ 9626 at 44,971-72 (1972); R. Nash, Jr. & J. Cibinic, Jr., Federal Procurement Law 1017, 1023-24 (3d ed. 1980); D'Alosio, The Design Responsibility and Liability of Government Contractors, 22 Pub. Cont. L.J. 515, 519-24, 537-40, 567-73 (1993).

Furthermore, contractors typically are granted at least some discretion even when specifications are largely of the design variety, and the labels "design" and "performance," while helpful to some degree, are merely labels. It is the contract's provisions, and the amount of discretion that the contract affords the contractor, that govern whether the contractor can recover for problems that occurred during performance. Blake Construction Co. v. United States, 987 F.2d 743, 746 (Fed. Cir. 1993); Conner Brothers Construction Co. v. United States, 65 Fed. Cl. at 685-86; PCL Construction Services, Inc. v. United States, 47 Fed. Cl. at 796.

Thus, where a specification does not tell a contractor how to perform a specific task, that part of the specifications is a performance specification even if the rest of the specifications

are design specifications. This is clearly illustrated in Penguin Industries, Inc. v. United States, 209 Ct. Cl. 121, 530 F.2d 934 (1976). In that case, the contractor was partially terminated for default when it failed to produce acceptable ignition cartridges under a supply contract. The specifications provided detailed direction with regard to many aspects of production, but did not explain how the contractor was to glue one component to another. The contractor encountered great difficulties mastering this one step, which led to the Government's rejection of one lot of ignition cartridges. Id. at 123-25, 530 F.2d at 936.

The contractor argued that the specifications were design specifications and that they were defective because they failed to explain how the two components were to be glued together. The Court of Claims rejected this notion and upheld the termination for default, stating that "selection of the method of applying the glue was left to the manufacturer" and that, accordingly, the Government's "data package was not defective." Id. at 124-25, 530 F.2d at 936. Thus, where the specifications allow the contractor the discretion to determine how to perform, the specifications are performance specifications.

Here, Metric has not identified any portion of its contract that it contends to be design specifications. Further, the contract specifications at issue in this case, pertaining to

barge landings, arresting gear asphalt, and environmental restrictions, are certainly not design specifications because they left all of the discretion for means and methods of performance to Metric. In short, Metric's invocation of Spearin is inapposite.

## CONCLUSION

For the foregoing reasons, and those that will be established at trial, we respectfully request the Court to find in favor of the Government and to deny Metric's claim in total.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director

s/Brian S. Smith
BRIAN S. SMITH
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Tele: (202) 616-0391
Fax: (202) 353-7988

Attorneys for Defendant

June 25, 2007

CERTIFICATE OF FILING

I hereby certify that on June 25, 2007, a copy of foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Brian S. Smith