# UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| METRIC CONSTRUCTION CO., INC.,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 04-635C<br>Judge Charles F. Lettow |

PLAINTIFF'S POST TRIAL BRIEF

Steven D. Meacham
Peel Brimley LLP
2014 East Madison Street, Suite 100
Seattle, WA 98122-2965
(206) 770-3339
Fax: (206) 770-3490

Attorneys for Plaintiff

TABLE OF CONTENTS


I. INTRODUCTION ........................................................................ 1

II. CONTENTIONS OF FACT ........................................................ 3

1. The Contracts and Claims......................................3

2. The Pontoon Claim.............................................4

3. The Arresting Gear Claim....................................16

4. The Contaminated Soil Removal Claim....................24

III. CONTENTIONS OF LAW...........................................28

1. The Court has Jurisdiction for the Metric Claims..........28

2. The Government's Placement of the Pontoon at the Daytona Beach Landing Site, the Government's Rejection of the 3' Asphalt Patch, the Government's Directive to Install the Salvaged Rubber Rails, the Government's Directive to use an Outside Hazardous Waste Contractor, the Government's Requirement for metric to submit and Obtain Navy Approval of the Clean-up Plan, and the Government's directive for Metric to Remove All of the Soil Contaminants at the Sand Spit Area Constituted Constructive changes to the Contract entitling metric to an Equitable Adjustment.........................................28

3. Metric was entitled to rely upon the plans and specifications provided by the government ................30

4. Metric's Use of the Blue Book Owned Equipment Rates is a Reasonable Basis for Computation of Its Costs.......... 31

5. Metric Did Not Waive Its Right to Assert Its Claims Due to the Execution of Modification Nos. P00001 on the roadway project and P00017 on the Airfield Project.................. 36

IV. CONCLUSION.......................................................................... 41

TABLE OF AUTHORITIES

**Cases**

*Ace Constructors, Inc. v. United States*,
70 Fed.Cl. 253, 274 (2006) .................................................. 31, 32

*Appeal of U.A. Anderson Const. Co.*,
02-1 BCA P 31715 (2001) .................................................................. 35

*Appeals of Marshall Associated Contractors, Inc. and Columbia Excavating, Inc. (J.V.) 2002* WL 504788 (IBCA),
IBCA 1901, IBCA 3433, IBCA 34335..........................32, 34

*Bruce Constr. Corp v. United States*,
163 Ct.Cl. 97, 324 F.2d 516, 518-19 (1963).........................31

*C&H Commercial Contractors v. U.S.*,
35 Fed.Cl. 246, 254.......................................34, 38, 39, 40

*Chris Berg, Inc. v. United States*,
197 Ct. Cl. 503, 455 F2d 1037, 1050 (1972)........................29

*C.L. Fairley Construction Co., Inc.*,
ASBCA No. 32851, 90-2 BCA ¶ 22,665 at 113,870,
*aff'd on reconsid.*, 90-3 BCA ¶ 23,005 (1990) ......................35

*Conner Bros. Constr. Co. v. United States*,
65 Fed.Cl. 657, 685-6 (2005)..................................................... 31

*Daly Constr., Inc. v. Garrett*,,
5 F.3d 520, 522 (Fed.Cir. 1993)......................................31

*Donovan v. Kaszycki & Sons Contractors, Inc.*,
599 F.Supp. 860, 869 (D.C.N.Y. 1984) ..............................40

*F.H. McGraw & Co. v. United States*,
131 Ct.Cl. 501, 130 F.Supp. 394 (1955)............................31

*Gasaway v. Northwestern Mut. Life Ins. Co.*,
26 F.3d 957 (C.A.9 1994) ............................................34

*George Bennett*,
178 Ct. Cl. 61, 371 F.2d 859 ........................................33

*George H. Whike*,
135 Ct.Cl. 126, 140 F.Supp. 560 (1956) ..............................37

*George Sollit Constr. Co. v. United States*,
64 Fed.Cl. 229, 245 (2005)............................................31

*Harvey C. Jones, Inc.*, IBCA 2070 et al. 90-2 BCA
22,762 at 114,246-47..................................................33

*Houston Ready-Cut House Co. v. United States*,
119 Ct.Cl. 120, 96 F.Supp. 629 (1951)................................31

*Howell v. Colonial Penn Ins. Co.*,
842 F.2d 821, 823 (6th Cir.1987) .....................................35

*Jack L. Olsen, Inc.*, 93-2 BCA 25,767 at 128,220...........................33

*Jack L. Olsen v. Epsy*, 26 F.3d 141, 93-1324, 1994 WL 198184
(May 19, 1994, unpublished)..........................................33

*L.L. Hall Constr. Co. v. United States*,
177 Ct.Cl. 870, 886, 379 F.2d 559 (1966)...........................32

*Lathan Co. v. United States*,
20 Cl. Ct. 122, 128 (1990)............................................29

*Laura Campbell Trust v. John Hancock Life Ins. Co.*,
411 F.Supp.2d 606 (D.Md. 2006) .....................................34

*Locke v. United States*,
151 Ct.Cl. 262, 283 F.2d 521 (1960)..................................31

*Miller Elevator Co. v. United States*,
30 Fed. Cl. 662, 678 (1994)........................................................ 29

*Narva Harris Construction Corp.*,
216 Ct.Cl. 238, 574 F.2d 508 (1978) ................................38

*North American Const. Corp. v. United States*,
56 Fed. Cl. 73, 83 (2003)........................................................... 30

*Richerson Construction, Inc.* GSBCA 11161,
93-1 BCA 25,239 at 125,704, ..................................................33

*Robert D. Carpenter*,
ASBCA Nos. 25742, 25743, 81-2 BCA
15,263 at 75,581 (1981) ...................................................35

*SIPCO Servs. & Marine v. United States*,
41 Fed. Cl. 196, 222 (1998)............................................29

*Teledyne McCormick-Selph v. united States*,
218 Ct.Cl. 513, 588 F.2d 808, 810 (1978) ............................31

*Tom Shaw Inc.*, DOT BCA 2106, et al. 90-1 BCA 22,580
at 113,337-38.......................................................32, 33

*United States v. Spearin*,
248 U.S. 132, 137, 39 S.Ct. 59, 63 L.Ed. 166 (1918).......................... 31

*U.S. for Use and Benefit of F&G Mechanical Corp. v. Manshul Const. Corp.*, 1998 WL 849327 (E.D.N.Y. 1998) ........39

*Wunderlich Contracting Co. v. United States*,
173 Ct.Cl. 180, 351 F.2d 956, 968 (1965)............................31

## I. INTRODUCTION

In August 1994, Metric entered into a contract with the government to repair the airfield on San Nicolas Island. In September 1998, Metric entered into a contract with the government to repair certain roadways on San Nicolas Island. There are three claims that are the subject of this trial: (1) the pontoon claims; (2) the arresting gear claim; and (3) a claim for removing contaminated soil at the Sand Spit area.

The pontoon claim is a constructive change claim. San Nicolas Island ("SNI") is one of the channel islands off the coast of California. Access to the island is limited. At the time Metric entered into the contracts with the government, materials and supplies were brought to the island either by plane or by barge. Barge deliveries were adversely affected by weather, tides, currents, surf, and other conditions. The government has since constructed a pier to improve access to the island for delivery of materials and supplies. Metric was familiar with SNI and had performed other contracts on the island prior to the contracts at issue in this trial. Due to the limited access to the island, a critical aspect of the project was Metric's ability to get materials and supplies to the island. The contracts designated two barge landing sites on the island: Sissy Cove and Daytona Beach. Metric bid the project using a barge that was capable of landing on Daytona Beach. The barge was too large to use at the landing site at Sissy Cove, but it had been used successfully at the Daytona Beach landing site on prior SNI projects. The barge was designed to land directly on the beach. In late December 1998, the government installed pontoons at the Daytona Beach landing site. The pontoons were large floating ramps that were placed directly over the location that Metric had landed its barge on numerous occasions. Metric was directed to land its barge at the pontoons. Placing the pontoons at the landing site severely affected Metric's ability to land its barge at the landing site. Metric could only land the barge on

the pontoons under limited conditions. This delayed Metric's ability to get materials on the island and delayed the performance of the work. After months of limited pontoon landings and some aborted pontoon landings, the government allowed Metric to land the barge further up the beach and create another landing site. Due to environmental restrictions, this landing site also had restrictions. The installation of the pontoons was a change to the contract that limited Metric's ability to land the barge on the island delaying completion of the project by 310 days.

The arresting gear claim also involves a constructive change to the contract. During the course of the project, Metric received a change order to revise the arresting gear. Arresting gear is a cable system that allows a landing plane to drop a hook that catches a cable slowing the plane down to allow for a shorter stopping distance similar to those found on aircraft carriers. The changed work involved the installation of the concrete, asphalt, and beams that the cable rests on, not the arresting cable system itself. Metric did not have responsibility for installing the cable system. The dispute involves the installation of the asphalt, its quality, and the surface smoothness at the joint between the asphalt and the concrete. Metric installed, removed, and reinstalled the asphalt on numerous occasions to meet the subjective demands of the government. Due to the government's excessive demands, the installation of the arresting gear delayed the project completion requiring Metric and its equipment to be on SNI much longer than anticipated. This claim also involves delays associated with the government providing Metric with rubber rails that attach to steel beams embedded in the concrete. The change order did not indicate that Metric was to install rubber rails on the steel beams that Metric embedded in the concrete it replaced, nor did the change order indicate that the existing rails were to be salvaged and reinstalled.

The hazardous waste removal claim also involves a constructive change to the contract. After completion of work on the island, Metric was directed to clean-up and remove contaminated soils. Metric concurs that it contaminated the soil at various locations, and was prepared to remove the contaminated soils. The government required Metric to implement a plan that exceeded what was required by the contract, to hire an outside firm to administer the removal of the contaminated materials, and to remove contaminants that were not Metric's responsibility. Specifically, Metric was directed to clean-up and remove contaminated soils at the Sand Spit location. This work involved the removal of contaminates that existed prior to Metric using that area and were found in grinds that came from materials that Metric had demolished and brought to the Sand Spit area. Metric accepted responsibility for some of the clean-up, but requests compensation for removal of the contaminated soil that is not its responsibility.

## II. CONTENTIONS OF FACT

### 1. The Contracts and Claims.

On or about August 1, 1994, Metric Construction Company, Inc. ("Metric") was awarded Contract No. N62474-94-C-6807 (the "airfield contract") entitled Repair Airfield Pavement at the Naval Air Weapons Station on San Nicolas Island, California (the "airfield project"). PX 2.

In September 1998, Metric was awarded Contract No. N68211-98-C-5553 (the "roadway contract") entitled Roadway and Storm Drainage Repair Effort at San Nicolas Island, California (the "roadway project"). DX 1008 pp. 353-360.

The U.S. Department of the Navy (hereinafter referred to as the "government" or the "Navy") prepared the plans and specifications for the projects. The government also administered the projects. PX 1; PX 2; PX 3; DX 1008 pp. 353-360.

Metric submitted four claims relating to the government's installation of a pontoon at Daytona Beach. Metric submitted the four claims to the government on January 9, 2003 in the amounts of $281,991.62 for the Airfield project from May 14, 1999 through June 8, 1999; $1,322,205.54 for the Airfield project from June 9, 1999 through December 23, 1999; $918,820.82 for the Roadway project from June 9, 1999 through December 23, 1999; and $1,637,784.10 for the Roadway project from December 24, 1999 through May 18, 2000. These four claims total $4,160.802.08. These claims were certified in accordance with the Contract Disputes Act. PX 7. Metric made minor modifications to the claims which were submitted to the Contacting Officer on April 4, 2003 in the amounts $281,966.23; $1,341,354.13; $903,501.70; and $1,741,420.51 for a total of $4,268,242.57. These claims were also certified in accordance with the Contract Disputes Act. PX 293; PX 294; PX 295; PX 296.

On June 17, 2003, Metric submitted a claim for work related to the installation of the arresting gear. The arresting gear claim was submitted in the amount of $3,454,432.40. The claim was certified in accordance with the Contract Disputes Act. PX 343.

On January 26, 2004, Metric submitted a claim for work related to the removal of contaminated soil. The contaminated soil claim was submitted in the amount of $183,417.78. The claim was certified in accordance with the Contract Disputes Act. PX 330.

**2. <u>The Pontoon Claim</u>.**

San Nicolas Island ("SNI") is a one of the channel islands off the coast of California. Access to the island is limited. Per the contract, materials, equipment and machinery had to be shipped to the island by barge. DX 1008 pg. 102. Due to the limited access to the island, a critical aspect of the project was Metric's ability to get materials and supplies to the island. Specification Section 1011.1.5.1.2 states:

> "Delivery orders will be issued to the Contractor throughout this contract. Each delivery order will include construction phasing for that portion of the contract. Since the delivery of materials to San Nicolas Island is often the critical activity (longest duration) the Contractor may be required to have all materials for each Delivery Order on site prior to beginning actual construction."

DX 1008 pg 43.

The airfield project included 8 delivery orders. PX 4. The government did not require Metric to have the materials for each Delivery Order on site prior to beginning actual construction. Tr. 501-502 (Kostelny).

Specification Section 1600.1.6.3.5 informed the contractor that there were two barge landing sites on SNI: Daytona Beach and Sissy Cove. DX 1008 pg. 104. The contractor had the option of using either site. Tr. 902-903 (Miller).

Metric was familiar with SNI and had performed other contracts on the island prior to the contracts at issue in this trial. Metric barged its equipment and materials to the island using a barge designed to land directly on the beach. Metric had landed the barge at the landing site at Daytona Beach and bid the project accordingly. Tr. 456 ( Holmes); Tr. 879-880, 902-904 (Miller). Metric's barge could not land at Sissy Cove. Sissy Cove was determined not to be a viable option for landing bulk asphalt materials and equipment at SNI due to access, depth of water, and rocks. Tr. 70 (Kostelny); Tr. 481-482 (Holmes). Metric made successful barge landings at the Daytona Beach landing sites for projects prior to the airfield and roadway projects and continued to make successful barge landings for both the airfield and roadway projects at Daytona Beach prior to the installation of the pontoon. Tr. 483 (Holmes); Tr. 902-904 (Miller).

Barge deliveries were adversely affected by weather, currents, surf, and other conditions. These conditions made it difficult to predict when the barge could land. Tr. 76-78 ( Kostelny): Tr. 517 (Holmes). The number of successful barge landings varied from year to year based upon

the conditions encountered. Tr. 912 (Miller). The government has since constructed a pier to improve access to the island for delivery of materials and supplies.

Because delivery of materials to the island was critical and unpredictable, Metric would attempt to land the barge and deliver material whenever possible. Tr. 527 (Holmes). Metric did not wait to attempt the landings until it ran out of materials or make landings on an as needed basis. Metric attempted to land the barge whenever it deemed that a safe landing could be made. Landing the barge was the top priority. The instruction to the site was that it didn't matter what else was going on, if it was possible to land a barge, they were to land a barge. Tr. 78-79 (Kostelny). If there was a long period that a barge wasn't landed, it was because they couldn't land the barge. Tr. 79-80 (Kostelny). Prior to installation of the pontoon, the government had granted a number of time extension because the material delivery was critical and Metric could not land the barge to deliver materials. Tr. 644-645 (Holmes); Tr. 2058 (Jones).

After a successful landing, Metric would return the barge to Terminal Island/San Pedro. Immediately upon its return to Terminal Island, the barge would be loaded with bulk materials such as sand and gravel so it could depart for SNI as soon as conditions allowed. Tr. 708 (Holmes); Tr. 901 (Miller). The barge would remain loaded at Terminal Island sometimes for weeks or months at a time awaiting the next opportunity that the barge could be safely transported, landed, and offloaded on SNI. For example:

(1) Metric landed and off loaded its barge on February 16, 1999, the barge was loaded again on February 18, 1999 (PX 12 pg. 24), but the barge did not land again and was not off loaded until April 14, 1999. Tr. 541-542 (Holmes).

(2) Metric landed and off loaded its barge on April 19, 1999, the barge was loaded again on April 21, 1999 (PX 12 pg. 21), but the barge did not land again and was not off loaded until June 17, 1999. Tr. 548-550 (Holmes).

(3) Metric landed and off loaded its barge on November 7, 1999, the barge was loaded again on November 8, 1999 (PX 12 pg. 10), but the barge did not land again and was not off loaded until December 7, 1999. DX 1001 pg. 10.

On December 18, 1998, Metric's asphalt plant caught on fire. Tr. 132-133 (Kostelny). At that time, the airfield project was scheduled to be complete on May 14, 1999. The roadway project was scheduled to be complete in June 28, 1999. Tr. 1305 (Burnell); PX 5 pg. 3. Because the delivery of material was critical for the completion of the project, Metric did not stop delivery of materials. Even though the asphalt plant burned on December 18th, Metric delivered a load of materials four days later on December 22nd, reloaded the barge on the 23rd, and was ready for a return trip to SNI after the Christmas/New Year holiday. Tr. 503-504, 525-526. Metric continued to barge and stock pile materials on SNI for the completion of the two projects even when the asphalt plant was inoperable. Tr. 499 (Holmes).

Between December 23, 1998 and January 3, 1999, the government installed a pontoon at Daytona Beach to assist the government in loading and unloading its barge. Tr. 90 (Kostelny). By letter dated January 5, 1999, Metric notified the government that Metric was cancelling its barge landing because Metric was told that Metric's barge was not conducive to landing on the pontoon. Tr. 461-463 (Holmes); PX 20. By letter dated January 6, 1999, Metric notified the government that the placement of the pontoon was a change to the contract. Metric received no response to either letter from the government. Tr. 464 – 465 (Holmes); PX 21. Metric was told that the government no longer had a permit to land on the beach and directed Metric to land its

barge using the pontoon. Tr. 72, 92 (Kostelny); Tr. 471 (Holmes). Metric's instruction was that there were to be no more beach landings and Metric had to utilize the pontoon. Tr. 487-488 (Holmes). Metric attempted to land barges using the pontoon as directed by the government; however, landing Metric's barge on the pontoon required more restricted conditions than landing the barge at the landing site without the pontoon in place. With the pontoon in place, Metric could only land the barge with a 4.5' or higher high tide. Tr. 99-100 (Kostelny). Not all days had high tides of 4.5' or higher. There were many days that the tide did not reach 4.5'. Tr. 840-841 (Holmes). This limited the number of days Metric could land using the pontoon. Even with a 4.5' or higher tide, there were occasions Metric could not land because sand bars would build up in front of the pontoon which prevented Metric from landing on the pontoon. Tr. 93 (Kostelny); Tr. 466-468 (Holmes); PX 22. American Workboats sent a letter dated February 18, 1999 informing Metric of the unsafe conditions and hazards of landing on the pontoon. Tr. 472-473 (Holmes); PX 33. Had the pontoon not been installed, Metric's barge landings would not have been affected by the tide, the sand bars, or the unsafe conditions complained about by American Workboats. Tr. 93, 99-101, 105 (Kostelny)

Installation of the pontoon delayed critical material deliveries to SNI. Because of the landing restrictions caused by the pontoon, Metric did not attempt to land the barge on several days when landing the barge would have been possible but for the pontoon being installed. Metric also made attempts to land on the pontoon that were aborted because of tide and sand bar conditions that would not have prevented a landing but for the pontoon being in place. Tr. 475-476 (Holmes).

After almost six weeks of restrictions and difficulties Metric encountered with the pontoon in place, Metric requested the government remove the pontoon and return the landing

site to the pre-pontoon condition. PX 22. The government did not remove the pontoon, but discussed with Metric getting a permit to land further up the beach. Tr. 109 (Kostelny). Metric had American Divers perform a survey of the underwater conditions. American Divers issued its report on March 22, 1999. PX 24.

The original landing site at Daytona Beach had deadmen located on the beach. Deadmen are anchors embedded on both sides of the landing site that allowed Metric to tie off the barge to stabilize the barge so that the barge would not drift to one side or the other and get hung up on the beach. It was not possible for Metric to land their barge without having the deadmen in place to tie off the barge to prevent it from drifting side to side. For safety purposes, Metric would not land its barge without the deadmen in place. Tr. 73-74 (Kostelny).

On or about May 3, 1999, public works installed deadmen further up the beach for Metric making it possible for Metric to resume landing on the beach once authorized to do so. Tr. 120 - 121; PX 107. Mr. Douglas noted on May 3, 1999 that Public Works had installed tie downs for Metric's barge over the weekend; PX 46 pg. 7. Metric would not and did not land its barge on the beach until after the deadmen were installed in May 1999. Tr. 120-121 (Kostelny). Metric received oral authorization to land on the beach in the latter part of May 1999 or early June. Tr. 479, 844 (Holmes). The installation of the pontoon prevented Metric from making several barge landings that it could have made otherwise which delayed completion of both projects.

The installation of the pontoon also delayed getting the replacement parts for the asphalt batch plant to SNI by several weeks. The replacement asphalt plant tank and boiler were on Metric's barge on February 25, 1999. Tr. 530-532; PX 7 pg. 71. The landing was aborted on February 25th because the barge was late in arriving and missed the high tide which would not have been a problem if the pontoon had not been installed. Metric aborted its landings on

February 25th and 26th, because the barge could not land on the pontoon due to a sand bar in front of the pontoon. Tr. 111 (Kostelny); PX 47 pp. 3-4; PX 97. Due to the problems Metric was encountering landing on the pontoon, the government agreed to deliver the tank on its barge. The tank was delivered on March 31, 1999. Tr. 143 (Kostelny); PX 7 pg. 72: PX 47 pg. 38. The replacement boiler was delivered on April 14, 1999. Tr. 144 (Kostelny); PX 7 pg. 73. Thus, the delivery of the main repair components of the asphalt batch plant were delayed by 48 calendar days from February 25th to April 14th due to the placement of the pontoon. After the tank and boiler were delivered, additional parts were not delivered until later barge landings. The jacketed pipe was not delivered until April 14th and the wiring was not delivered until after the pipe was delivered which would have been on the next barge landing of June 17th. Tr. 145-146 (Kostelny); PX 7 pg. 73; PX 47 pg. 51. Even though Metric had installed new parts on the batch plant, the equipment was damaged when Metric started the asphalt plant on June 24, 1999 due to the government's deficient power supply. Tr. 147-149 (Kostelny). It took another 15 days for Metric to replace the parts and restart the asphalt plant on July 9, 1999. Tr. 132 (Kostelny).

After the asphalt plant was repaired, Metric soon ran low on materials and had to cut back on the production a number of times and send workers home. Tr. 127-128 (Kostelny); Tr. 559 (Holmes). In order to avoid lay-offs and losing its crew, Metric did not work at full capacity due to the lack of material. They paced themselves so as to not run out of materials. Tr. 1198-1199 (Miller); Tr. 1568-1569 (Burnell). Because of numerous lost barge landing opportunities due to the pontoon, Metric's production caught up with the stockpiled materials four months after the asphalt plant went back on line. Tr. 1616-1618 (Burnell).

Metric notified the government on numerous occasions that the installation of the pontoon was a change to the contract and that it was affecting Metric's operations. Metric sent

letters on January 5, 1999 (PX 20), January 6, 1999 (PX 21), and February 11, 1999 (PX 22). The government told Metric that it did not have permits to land on the beach . Tr. 72 (Kostelny). The government failed to provide Metric with any written direction on how to proceed. Behind closed doors, the government knew that it would take 4 to 6 months to get permits and was considering other options such as modifying the pontoons or Metric's barge or delivering materials on the government's barge, but Metric was left without direction from the Contracting Officer. PX 19.

Even after Metric was authorized to land on the beach in late May or early June of 1999, the government imposed additional restrictions on Metric. Metric could not build sand ramps to off load the materials. Tr. 82 (Kostelny); PX 18. Metric was also told that Metric should try to use the pontoon for hot oil deliveries. PX 18.

The installation of the pontoon delayed the completion of both projects. Metric completed the airfield project paving except for the changes to the arresting gear on December 22, 1999. Tr. 1358 (Burnell). Metric completed the roadway project paving on May 18, 2000. Tr. 1310 (Burnell). It took 26 successful barge landings after the pontoon was installed to deliver the materials to SNI to complete the paving work. These landings occurred on the following dates: January 14, 1999; February 2, 12, and 16, 1999; April 14 and 19, 1999; June 17 and 29, 1999; July 8 and 20, 1999; August 4, 12, 17, and 24, 1999; October 4, 1999; November 2, 4, and 7, 1999; December 7 and 16, 1999; January 4 and 24, 2000; March 22 and 30, 2000; and April 20 and 25, 2000. PX 5 pp. 39-43. The roadway paving was completed 23 calendar days after the last delivery of materials.

During the period from January through June of 1999, Metric had good conditions for making multiple landings at Daytona Beach had the pontoon not been placed at the landing site

which would have allowed Metric to stockpile materials for placement of the asphalt overlay for both the airfield and roadway projects. Tr. 495-496 (Holmes).

During the time frame that the pontoon was in place and Metric was not allowed to land on the beach, Metric canceled or aborted landings on January 5, 1999 (PX 20), February 4, 1999 (PX 22), and February 25 and 26, 1999 (Tr. 111-112; PX 47 pp. 3-4). In addition to the six successful landings Metric was able to make on the pontoon before the beach restriction was lifted, Metric could have landed on the beach numerous other days if the pontoon had not been placed at the landing site. Metric could have landed on January 4, 13, 15, 16, 17, 18, 20, 25, 26, and 29; February 1, 3, 10, 11, 15, 17, 18, 19, 20, 22, 23, and 24; March 16, 17, 18, and 19; April 18, 20, 21, and 22. Tr. 504-550 (Holmes); PX 7 pp. 70-75. Metric could not land a barge on consecutive days, but they could land every other day. It was not uncommon for Metric to have multiple landings in one week when conditions allowed. Metric made five landings between June 4 – 15, 1996; three landings between October 17 – 24, 1996; three landings between December 15 – 22, 1998; three landings between November 2 – 7, 1999; and 2 landings per week on multiple other occasions. DX 1001 pg. 10, 16, 17. Metric would also land on Sundays. Tr. 519 (Holmes). For example, Metric landed on Sunday, November 7, 1999. DX 1001 pg. 10. But for the pontoon being placed at the landing site, Metric could have made 26 successful landings on SNI between January and June of 1999. Tr. 910-911 (Miller). This would have allowed Metric to stock the entire project and allowed Metric to complete the work unimpeded by material shortages.

Mr. Burnell's analysis indicated a few more landable days during that time frame. He concluded that all of the materials could have been delivered to SNI by April 21, 1999. PX 5 pg. 40. It is not unrealistic that Metric could have landed the barge as indicated. The government

admits that in 1995 Metric was able to achieve 26 landings between January and June. DX 1018 pg. 33.

Barging the materials to SNI was critical path work. Tr. 418 (Kostelny); Tr. 476 (Holmes). Both the government and Metric agreed that the barging was critical. Prior to the pontoon being installed, Metric received time extensions for delays to the barging. No time extensions would have been warranted if the barging was not critical. Tr. 644-645 (Holmes); Tr. 2058 (Jones).

Mr. Burnell performed a delay analysis to determine the delay caused by the placement of the pontoon. Mr. Burnell prepared a baseline CPM schedule and an as-built schedule using recognized and accepted practices as set forth by AACEI. Mr. Burnell's anlaysis was reasonable and concluded that but for the placement of the pontoon and the changed condition, Metric could have completed both projects by July 13, 1999, 15 days after the scheduled completion rather the actual completion of May 18, 2000. This resulted in a 310 day delay in completing the work on the airfield and roadway projects. Tr. 1302-1341 (Burnell); PX 5 pp 3-7.

With the changed conditions and added restrictions placed on Metric because of the pontoon, the materials could not and were not delivered to SNI until April 25, 2000. Tr. 1126 (Miller). The paving completed 23 days later on May 18, 2000. Tr. 1310 (Burnell); Tr. 2215 (Jones). At a minimum, Metric was delayed by the number of barge landings it lost because of the pontoon including those landings that were cancelled, aborted, or not attempted because of the tide or landing conditions.

The government contends that Metric could not have completed the paving by July 13, 1999. The government is wrong. Metric had comparable production earlier in the project. There was approximately 14,700 tons of asphalt placed on both projects to complete the airfield

and roadway paving after the asphalt plant was repaired. PX 5 pg. 44. Mr. Burnell opined that but for the pontoon delays, the asphalt batch plant could have been on line and producing asphalt by March 16, 1999, averaged placing 300 tons per work day, and completed both projects by July 13, 1999. Tr. 1332 (Burnell); PX 5. This calculation is not unrealistic. It is essentially averaging 122.5 tons per calendar day over 120 calendar days. As Mr. Miller testified, between September 3 and November 26, 1997, a period of 84 calendar days, Metric placed 10,233 tons of asphalt, an average of 122 tons per calendar day. Tr. 2340-2342 (Miller); PDX 3. During the period from September 3 through November 26, 1997, the asphalt plant was, by the government's own admission, down eleven days, 13% of the time. DX 1018 pg. 45. This is comparable to the 94 days the asphalt plant was down between July 9, 1999 and December 31, 2000. DX 1018 pp. 45-46.

Metric incurred costs as a result of the government installing the pontoon including the costs associated with preparing a new landing site, costs resulting from the aborted landings, costs for the extended duration that Metric was on SNI for completing the contract work. The costs are broken down into two categories: (1) equipment and labor costs for the delay; and (2) one time charges. The one time charges include the costs for the aborted landings and the survey performed on Daytona Beach for the new beach landing site. These costs totaled $34,641. PX 344.

Metric and the government agreed to use Blue Book rates in calculating the ownership costs of the equipment. Prior to entering into the Airfield and Roadway contracts, Metric had performed other contracts for the government at San Nicolas Island. On those projects, Metric and the government had agreed to use Blue Book Equipment Rates for Owned Equipment. At the start of the airfield project, Metric and the government also agreed to use Blue Book rates on the

airfield project. The Blue Book rates were used on all modifications between Metric and the government. Tr. 553-557 (Holmes); Tr. 925-927 (Miller); PX 55.

Metric used the Blue Book rates in calculating the damages for the claims. Tr. 677-678 (Holmes). The Blue Book rates are a reasonable calculation of Metric's and Holmes' owned equipment costs. Tr. 1666-1699 (Pepin); PX 5 pp. 16-19. The appropriateness of using Blue Book rates is discussed in more detail below. Using the Blue Book rates, the monthly rate for Metric's spread of equipment is $137,686.77 per month. Metric's claimed amount is $139,896.67 per month. PX 5 pg. 212. The difference between the two calculations is $2,209.90 per month, and represents a difference of 1.6% and is not deemed to be a significant difference that may be attributable to slightly different applications of the Blue Book rates. Tr. 1666-1699 (Pepin).

The Blue Book also allows for adjustments due to severity of the working conditions. Tr. 1441 (Burnell); Tr. 1686 (Pepin). SNI is a remote location subject to a windy and corrosive salt water environment; therefore, a 25% severity factor is not unreasonable under those conditions. Tr. 927-929, 1242 (Miller). Applying the 25% severity factor to the equipment rates yields a monthly cost of $174,871 for the owned equipment costs. PX 344.

Metric used a monthly barge rate of $30,000 per month. This rate was based on the fair market rate that Metric received when it rented its equipment to third parties. The Blue Book rate for a barge of comparable size is $11,614 per month. Since Metric's barge is unique and has added reinforcing and accessories, the $30,000 per month is a more reasonable estimate of Metric's ownership costs for the barge. Tr. 1046-1050 (Miller). The barge mooring costs were $1,969 per month. PX 344. The total monthly costs for the owned equipment is $206,840, or $2,109,772 for a 10.2 month period. PX 344. There were additional direct equipment and direct

job costs for outside equipment rental, extended job costs and equipment repair costs not included in the Blue Book rate that totaled $728,151. PX 344. Except for the owned equipment costs calculated using the Blue Book rates and the monthly barge rate, Metric's costs are supported by the detailed documentation submitted by Metric with its claim in support of the claim costs. PX 8; PX 9; PX 10: and PX 11. Although minor portions of the non-owned equipment costs were questioned by the DCAA, Mr. Peppin confirmed that those costs were incurred by Metric and were appropriate for inclusion in the claims. Tr. 1678-1679 (Pepin); PX 5 pp. 10-19.

After applying an 8.45% overhead mark-up, 12% profit, and 1.15% bond the total equipment costs are $3,486,695 for 10.2 months or $11,247 per day. PX 344. Metric did not calculate its actual overhead rate, but used a previously negotiated rate of 8.45%. According to the government's expert, the actual overhead rate is 5.31%. DX 1019 pg. 64. If the overhead rate is adjusted to 5.31%, the daily rate is adjusted down to $10,922 per calendar day of delay.

The labor costs were calculated using actual labor rates and averaged $495 per day (PX 344); however, using the actual overhead rate of 5.31%, the daily labor rate is $480 per day. After adding the $10,922 and the $480, the combined average daily rate is $11,402 per day of delay. Using the daily rate of $11,402 multiplied by the 310 days of delay yields $3,534,620. When added to the aborted landing and underwater survey costs of $34,641, Metric is entitled to an equitable adjustment to the contracts of $3,569,261.

**3. The Arresting Gear Claim.**

In June 2000, the government issued a change order proposal to "remove and dispose of off the island the existing concrete and rails of the arresting gear" and to install new concrete and rails for the arresting gear. Tr. 562 (Holmes); PX 120.

Metric submitted a price of $637,924 to perform this work. Tr. 565-566 (Holmes); PX 126. The government did not have funding for the change. To use the words of the government, there was some "horse-trading" that went on to fund the change. At that time, there was an issue as to how much material the contract required and whether materials delivered to the island was to be paid if not needed to perform the work. The government indicated that Metric should be paid approximately $570,000.00 less than what Metric thought the government was to pay. The government agreed to pay for the materials as requested by Metric if Metric would agree to Change Order No. P000017 for $50,000.00. Tr. 566-567 (Holmes); Tr. 1016-1019 (Miller); Tr. 1772-1774 (Dep. of J. Carrignan).

The government issued Change Order No. 17 to demolish the existing arresting gear concrete pads and install new arresting gear pads. The scope of work included the demolition of the existing pads, pouring new concrete pads with new steel beams embedded in the concrete, and installing a 3' wide asphalt patch between the existing asphalt and the new concrete pads. PX 129.

The arresting gear was the last remaining work that Metric was to perform except for clean-up and demobilization; therefore, any delays to this work resulted in the delayed completion of the contract and Metric and its equipment being on SNI for an extended period of time. Tr. 153 (Kostelny); Tr. 560 (Holmes)

Metric delivered the materials to the island in late August 2000 and began work on the arresting gear in early September 2000. PX 6 pg. 15. The arresting gear was to be replaced at two locations. Metric was required to repair one arresting gear at a time. Metric was to repair the arresting gear at what is referred to as the "30-end" first. Tr. 156 (Kostelny). After the "30-end" was complete and operational, Metric could start work on the "12-end." PX 129.

Metric poured the 30-end concrete in late September 2000. There were disputes about the concrete installation and the length of the embedded steel rails. Those issues were resolved in late November 2000 when Metric completed the recommended repair procedures. PX 6 pg. 15. Metric believes that the government contributed to the problem relating to the embedded steel rails because Change Order 17 states that the new steel beams are to be 10'-0" long, but it also states that the beams were to be drilled according to the template provided by the government. The government provided a template for a 9'-8' rail. Metric drilled and installed 9'-8" beams per the government provided template. The government rejected the beams and required Metric to weld extensions onto the steel beams extending them to 10'-0". Tr. 158-160 (Burnell). Metric is not seeking damages or delays for issues arising from the concrete or the embedded steel beams. Metric's claim is related to the asphalt installation.

After completing the concrete work, the plans called for a "3'-0" wide AC Patch" between the existing asphalt runway and the newly placed arresting gear concrete. PX 6 pg. 13. The specifications set forth the gradation requirements of the asphalt mix. DX 1008 pp. 154-155. Since the plans indicated this was only a 3' wide "patch", the asphalt could not be laid with an asphalt paving machine. During change order negotiations, Metric notified the government that this work could not be machine placed and would be hand placed as set forth in the specifications. Specification Section 02511.3.2.3 for Hand Spreading in Lieu of Machine Spreading states, "In areas where the use of machine spreading is impractical, spread mixture by hand." Tr. 605-611 (Holmes); PX 126; DX 1008 pg. 160.

Metric placed the 3' asphalt patch around November 27, 2000 using the hand placement methods as set forth under Specification Section 02511.3.2.3 and using the mix designs as specified by the contract. Tr. 605-611 (Holmes); Tr. 1022-1023 (Miller). The government

rejected the asphalt and directed Metric to remove it and replace it. The basis of the rejection was subjective. The government claimed that there was excessive exposed aggregate. Tr. 610-611 (Holmes). However, the only witness that testified on behalf of the government that was on the project during its construction, Mr. Douglas, did not even see the initial asphalt placed by the government. The initial paving was complete on November 29, 2000, rejected and removed on December 1, 2000, and then repaved on December 4, 2000. Mr. Douglas was on leave when the initial patch was installed. Tr. 2310 (Douglas). PX 47 pp. 72-77. The asphalt did have exposed aggregate, but the asphalt complied with the specifications. The exposed aggregate was not "excessive" for a hand placed asphalt. Tr. 167-172 (Kostelny); DX 1008 pg. 148. The asphalt placed by Metric that the government rejected did not have an excessive amount of exposed aggregate. The asphalt as shown on DX 1009 pp. 55, 57 and 59 was rejected by the government, but show no signs of loose aggregate or excessive aggregate exposure. Tr. 615-620 (Holmes); DX 1009 pp. 55, 57 and 59. Even though the exposed aggregate was not excessive, Metric proposed sealing the exposed aggregate with Top Guard. TR. 613 (Holmes); DX 1012 pp 79-80. Top Guard had been used to seal exposed aggregate on other parts of the runway. Tr. 174-175 (Kostelny); DX 1009 pg. 177. The government initially rejected Metric's use of TopGuard to seal the exposed aggregate, but there was nothing in the specifications that precluded Metric from using TopGuard. Tr. 172-176 (Kostelny). After multiple attempts at providing a surface acceptable to the government, the government eventually allowed Metric to use TopGuard on the exposed aggregate. Tr. 200-201 (Kostelny).

In its attempt to satisfy the government's subjective requirements in placing the 3' patch, Metric retained a paving expert, John Terry from Terra Pave. He confirmed that the asphalt finish was typical for what you would get with a hand placement. Tr. 178-180 (Kostelny). After

multiple rejections of the finish, Metric brought in a cold planer, ground down the rejected asphalt, brought in a paving machine and paved the arresting gear "patch" using a paving machine. Tr. 181-183 (Kostelny). From late November 2000 to early August 2001, Metric removed and replaced the 3' asphalt patch on five occasions. Tr. 1591 (Burnell); PX 6 pg.4. Prior to the arresting gear, Metric had placed around 2.5 to 3 million square feet of paving without any of it being rejected or removed and replaced. Tr. 153-154 (Kostelny). It was only after Metric used a paving machine to place the "patch" that the government accepted the 30 end arresting gear asphalt. Tr. 182-183 (Kostelny); Tr. 624-625 (Holmes).

Due to the multiple rejections of the asphalt patch at the arresting gear, it took from November 27, 2000 to August 14, 2001 for Metric to satisfy the government's subjective requirements for the asphalt patch. Tr. 582 (Holmes); PX 337.

The modification indicated that the surface between the asphalt and the concrete had to be flush. Metric requested clarification as to what tolerances would be allowed. The government would not allow any deviation in elevation between the new asphalt and the new concrete. Tr. 195-196 (Kostelny). The government was concerned that if the concrete was higher than the asphalt that it would be possible for a plane hook to get caught on the lip. After months of discussion regarding the allowable tolerances, the government finally specified that the concrete had to be lower than the asphalt and that so long as the asphalt was higher than the concrete the acceptable tolerance would be ¼". Tr. 433-436 (Kostelny); PX 43.

Once the asphalt was accepted by the government, the completion of the 30-end was delayed due to the installation of the rubber rails. The proposal request provided to Metric required Metric to remove and dispose of the existing concrete and rails and to install new concrete and rails. Metric was told that the government would provide Metric with the new rails

for Metric to install. Tr. 561-567 (Holmes); PX 120. The change order stated that Metric was to demolish "all existing concrete arresting gear material and replacing with new compacted base material, concrete, and to patch the asphalt as shown." PX129. The change order referenced the same drawing, Drawing No. T04972, that was referenced in the change order proposal. PX 120; PX 129; PX 6 pg. 13. Drawing No. T04972 gave no indication that the existing rubber rails were to be salvaged and reinstalled. In fact, Drawing No. T04972 notes, "NEW I BEAM TO BE DRILLED AND TAPPED PRIOR TO INSTALLATION. GOVERNMENT SHALL FURNISH TEMPLATE FOR LOCATION OF HOLES." There was nothing that required Metric to save the existing rubber rails or provide new rubber rails. Tr. 157-159; Tr. 425 (Kostelny); PX 120; PX 129; PX 6 pg 13.

Even though the new embedded steel beams were longer than the existing rubber rails, the government directed Metric to reinstall the rubber rails that had been removed during the demolition process. Metric had to retap the new I beams so the old rubber rails could be installed on the new I beams. Tr. 160-162 (Kostelny); Tr. 569-570 (Holmes). Since Metric was unaware that it was suppose to salvage and reinstall the old rubber rails, it could not locate all of the removed rubber rails. Tr. 162 (Kostelny). The government now claims that it was their intent that the rubber rails be saved. The government's position is inconsistent with what occurred during the course of the project. On September 4, 2001, the government inspector told Metric that the existing rubber rails were to be installed "if the other ones don't arrive." PX 47 pg 18. Metric was told that they would be getting new rubber rails from the government. Tr. 163 (Kostelny). The 30 end arresting gear was complete by August 14, 2001 except for the rubber rails. Tr. 582 (Holmes); Tr. 214-215 (Kostelny); PX 337. Metric could not move to the other end until the rubber rails were installed. Tr. 570-571 (Holmes). It took until November 8, 2001

for Metric to obtain and install the rubber rails from the government. Tr. 213 (Kostelny); PX 339. This represents a 86 day delay to project completion from August 14 through November , 2001.

After completion of the 30-end, Metric started work on the 12-end. Due to the problems encountered on the 30-end to install the 3' asphalt patch, Metric used a unique approach in performing the work on the 12-end. Instead of placing the concrete first, Metric placed the asphalt first, sawcut a straight edge along the asphalt, installed the expansion joint against the sawcut asphalt edge, and then poured the concrete against the expansion joint material. This allowed Metric to machine place the asphalt and pour the concrete at the same height as the asphalt. Tr. 626-630 (Holmes); Tr. 188-198 (Kostelny); PX 202; PX 203; DX 1009 pp. 79-80. This method of placing the asphalt was necessary to meet the government's demands, but is not a "patch."

Metric incurred costs as a result of the government's wrongful rejection of the 3' asphalt patch. Metric was required to perform much more work and at a higher quality than expected and as set forth in the modification and in the contract documents. Metric was also damaged by the government's directive to reinstall the removed rubber rails and the delays Metric incurred in procuring new rails for those rubber rails that were damaged or were not salvaged.

Metric's initial claim was submitted on June 17, 2003, in the amount of $3,454,432.40. TX 343. It included the delay period from November 27, 2000, when the 30-end asphalt paving was initially completed through November 2, 2001 when the 30-end arresting gear was completed to the government's satisfaction. Tr. 1022-1024. PX 343. The 30 end was not accepted in its entirety until November 8, 2001. PX 339.

Mr. Burnell performed a delay analysis of the arresting gear. His analysis concluded that the government was responsible for 390 days of delay. Tr. 1393-1411 (Burnell); PX 6. His analysis included 6 days of operational delays. Metric and the government had agreed upon 14 days of operational delays in the May 28th Settlement Agreement; therefore, Mr. Burnell reduced the delay to 382 calendar days based on the difference between the six days in his analysis and the agreed upon 14 days . Tr. 1421 (Burnell); PX 5 pg. 191; PDX 2. Mr. Burnell's analysis includes delays of 35 calendar days and 27 calendar days prior to November 27, 2000 when Metric and the government were addressing the issues with the concrete cracks and the embedded steel I beams. Tr. 1395-1397 (Burnell). Although Metric believes the government has some responsibility for the concrete cracking due to the government design, those delays were not included in the claim period; therefore, as set forth in the pretrial brief, Metric is not pursuing the delays associated with those issues.

After subtracting the 35 and 27 calendar days from the 382 days of delay calculated by Mr. Burnell, the delay allocable to the government is 320 calendar days. In preparing his damage analysis, Mr. Burnell used Metric's entire equipment fleet. Tr. 1419 (Burnell); PX 6 pg. 45. Mr. Holmes testified that all the equipment listed was needed for the arresting gear change except for the asphalt paver since the arresting gear asphalt was to be a hand spread asphalt patch (although Metric ultimately had to machine pave the 30-end to get a finish acceptable to the government). Tr. 672-673 (Holmes).

The claim submitted included the back-up documentation to support each of the costs except for the owned equipment which was calculated using Blue Book rates similar to the Pontoon Claim. PX 343. During the course of the trial, Mr. Miller agreed that even though the equipment may have been on SNI, Metric should reduce its claim by removing that equipment

that was not absolutely necessary to perform the changed work. After removing the equipment not essential to performing the arresting gear work, the daily rate was reduced to $7,686.76. Mr. Miller also testified that after May 5, 2001, the arresting gear material had been delivered to the project; therefore, the barge was no longer needed on a regular basis. After deducting the barge costs, the daily rate for delays after May 5, 2001 is $6,506.82. Tr. 2325- 2330 (Miller); PDX 3. Based on Mr. Burnell's delay analysis, 84 days of government delay were prior to May 5, 2001 and 236 days of government delay were after May 5th. PX 6 pg 15. The damages allocable to the government are $2,181,297 ($7,686.76 multiplied by 84 days and $6,506.82 multiplied by 236 days).

**4. <u>The Contaminated Soil Removal Claim</u>.**

Shortly after entering into the airfield contract, Metric prepared an Environmental Protection Plan. The Plan was submitted to the government and the government made revisions to the Plan. Metric revised the Plan which was resubmitted and approved by the government. Tr. 974-977 (Miller); PX 60; PX 61 The Plan includes in part, "Removal of hazardous waste from Government property will be by a hazardous waste transporter registered with the State of California. This includes transportation by barge. Used lubricants, excess fuels or construction materials, hazardous waste and contaminated soils will be carefully transported off the island per applicable CCR and CFR regulations. In the event of an accidental oil or hazardous material spill, the Contracting Officer will be notified and appropriate clean-up procedures implemented immediately." PX 61 pg.5. Neither the approved Environmental Protection Plan or the contract required Metric to prepare and submit for approval a clean-up plan in the case of a spill.

On occasions during the course of the project, Metric did have spills of hazardous materials. On those occasions, Metric, with the government's knowledge, took the appropriate

steps to clean-up the spills and properly dispose of the contaminated soil. Tr. 216-218 (Kostelny). As Metric neared completion of the project, the government observed some contaminated soils at various locations. Metric acknowledged its responsibility to clean those areas that it had contaminated. In May 2002, Metric, at the government's request, informed the government of the clean-up procedures it intended to use to clean the contaminated areas. These procedures were the same procedures Metric had used throughout the project on those occasions that accidental spills had occurred. Tr. 970-971 (Miller); PX 61; PX 225. The government rejected Metric's proposal and wanted Metric to submit a clean-up plan before it could proceed. The government told Metric that if it hired an approved clean-up contractor it would not have to get an approved clean-up plan. Tr. 984-985 (Miller); PX 235. There was no contractual requirement for Metric to hire an outside contractor to prepare a clean-up plan or to get government approval of the clean-up plan. In spite of Metric's position that it was not required to submit a clean-up plan for the government's approval or that it required government approval before it could proceed with the clean-up, Metric submitted numerous proposals which the government rejected and prohibited Metric from proceeding with the clean-up. Tr. 987-990 (Miller); PX 263. Ultimately, the government got what it wanted forcing Metric to hire an outside contractor to prepare the clean-up plan and remove the material. Metric hired IWS. Tr. 987-988 (Miller); PX 264. After almost a year of rejected plans and after hiring an outside environmental contractor, the government finally approved a clean-up plan prepared by IWS Environmental. Tr. 991-992 (Miller); PX 298.

Metric was directed by the government to clean up contaminated soil in the Sand Spit area. The Sand Spit area was not an area originally assigned to Metric for its work. Metric was given access to the Sand Spit area in late 1998 after it was awarded the roadway project. Prior to

Metric being given access to the Sand Spit, it had been used by the government and other contractors for many years. Although the government and Metric had inspected other areas for contamination prior to giving Metric access, no inspection was done nor was it required under the roadway contract in the Sand Spit area. Tr. 980-983 (Miller).

The Sand Spit was not an area that Metric used as a concrete or asphalt batch plant area. Metric did not have any production operations in the Sand Spit area. The Sand Spit area was used by Metric as a storage area. Tr. 994 (Miller). Metric had an agreement with the government that if it crushed the material that it had demolished from the roadway project that it could leave the material on SNI. Tr.997 (Miller). It was determined that the crushed aggregate piles were contaminated. Tr. 998 (Miller).

The only evidence of contamination caused by Metric is a single occasion that a loader had a minor leak. The spilled fluid was cleaned up and put on the edge of a pile. This material was readily identifiable and Metric agreed to clean it up. Tr. 225-229 (Kostelny). Other than this small readily identifiable area of contamination that Metric agreed to remove, Metric did not contaminate the crushed aggregate pile. The government required Metric to remove ½ to 2/3 of the crushed aggregate pile. Tr. 1000-1002 (Miller); DX 1001 pg 323.

Mr. Schwartz, the environmental protection specialist at SNI testified that the Sand Spit was an area used by a number of different people and groups. Tr. 1762. (Deposition of S. Schwartz). The contamination the government found at the Sand Spit were from piles of asphalt grindings and the removal of asphalt where Metric had ground up chunks of asphalt from other areas. Tr. 1763-1764. (Deposition of S. Schwartz). Mr. Schwartz was unable to draw any conclusions as to how the ground-up asphalt became contaminated. They surmised that the grindings were material that Metric had transported to the Sand Spit and it did not appear that the

contamination had occurred at the site, but may have occurred elsewhere. Tr. 1765-1766. (Deposition of S. Schwartz). Since Metric had transported the material to the Sand Spit, the government assumed Metric was responsible. Tr. 1768. (Deposition of S. Schwartz).

Mr. Douglas had no knowledge of other materials in the Sand Spit area other than the grinds. Tr. 2277

In spite of the government's knowledge of the years of use by both the government and other contractors prior to Metric ever touching this area and the government's knowledge that the contamination was from asphalt removed from other areas with no evidence that Metric had contaminated the asphalt ground and hauled to the Sand Spit, the government required Metric to remove ½ to 2/3 of the grinds as hazardous material.

The government's requirement to hire an outside contractor to prepare a detailed clean-up plan, to get government approval of the clean-up plan, and the requirement to clean the Sand Spit area constituted a change to the contract.

The damages associated with cleaning up the Sand Spit area and disposing of the hazardous material were $183,417.78 and were based on Metric's 12/30 of Metric's actual clean-up costs. These costs and cost records are set forth in Metric's certified claim. Tr. 1004-1009 (Miller); PX 330. Metric had to remove 30 bins during the clean-up of the concrete batch plant area, the asphalt batch plant area, and the Sand Spit area. Twelve bins were removed from the Sand Spit area; therefore, the 12/30ths is the pro rata share of the Sand Spit contamination. The government's expert testified that only 5 bins (60 cy) were removed from the Sand Spit area. She relies on a document addressed to Mssrs. Campbell and Weiler at China Lake NAWS. The letter is unsigned and not copied to Metric. DX 1001 pp. 324-331. The quantities appear to be

inconsistent with the government's requirement that Metric remove ½ to 2/3 of a aggregate pile 15' wide, 50' long, and 8.5' high. DX 1001 pg. 323; PX 311 pp. 2 and 5.

## III. CONTENTIONS OF LAW

### 1. The Court has Jurisdiction for the Metric Claims.

Metric properly submitted and certified the pontoon claims. PX 7, PX 293, PX 294, PX 295, PX 296. No Contracting Officer's decision was issued within the time frame required by the Contract Disputes Act; therefore, the claims were deemed denied. This Court has proper jurisdiction over the pontoon claims.

Metric properly submitted and certified the arresting gear claim. PX 343. No Contracting Officer's decision was issued within the time frame required by the Contract Disputes Act; therefore, the claim was deemed denied. This Court has proper jurisdiction over the arresting gear claim.

Metric properly submitted and certified the contaminated soil removal claim. PX 330. No Contracting Officer's decision was issued within the time frame required by the Contract Disputes Act; therefore, the claim was deemed denied. This Court has proper jurisdiction over the claim.

### 2. The Government's Placement of the Pontoon at the Daytona Beach Landing Site, the Government's Rejection of the 3' Asphalt Patch, the Government's Directive to Install the Salvaged Rubber Rails, the Government's Directive to Use an Outside Hazardous Waste Contractor, the Government's Requirement for Metric to Submit and Obtain Government Approval of the Clean-Up Plan, and the Government's directive for Metric to Remove All of the Soil Contaminants at the Sand Spit Area Constituted Constructive Changes to the Contract Entitling Metric to an Equitable Adjustment.

A **constructive change** generally arises where the Government, without more, expressly or impliedly orders the contractor to perform work that is not specified in the contract

documents. ►*SIPCO Servs. & Marine v. United States*, 41 Fed.Cl. 196, 222 (1998) (quoting ► *Lathan Co. v. United States*, 20 Cl.Ct. 122, 128 (1990), and citing ►*Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 455 F.2d 1037, 1050 (1972)). Several categories of constructive changes have been identified. These include "(I) disputes over contract interpretation during performance; (II) Government interference or failure to cooperate; (III) defective specifications; (IV) misrepresentation and nondisclosure of superior knowledge; and (V) acceleration." *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994) (citations omitted).

The specifications designated the barge landing sites on San Nicolas Island. The specifications allowed the contractor to land on either site. Metric bid the project with the expectation that it would land its barge at the landing site at Daytona Beach. It was familiar with this landing site and had used it on prior occasions. By installing the pontoons at Daytona Beach landing site and directing Metric to land on the pontoon, the government changed the contract. The installation of the pontoons and the delays associated with the pontoon installation constituted a constructive change to the contract. This change in the contract entitles Metric to an equitable adjustment to the contract.

The specifications and Change Order No. 17 set forth the manner and method of installation of placing the asphalt. Metric complied with the specifications. The government's multiple rejections of the asphalt placed at the arresting gear locations and associated delays constituted a construction change to the contract. This change to the contract entitles Metric to an equitable adjustment to the contract.

Change Order No. 17 did not require Metric to install the rubber rails on the embedded concrete rails, nor did it require Metric to salvage the existing rubber rails and reinstall them.

The government's directive for Metric to salvage the rubber rails and reinstall them was a constructive change to the contract and entitles Metric to an equitable adjustment to the contract.

The specifications did not require Metric to retain an outside contractor to prepare a clean-up plan or to remove hazardous materials, to submit a clean-up plan for government approval, or to clean-up contaminated soil at the conclusion of the project that Metric had not caused. Metric was required to hire an outside contractor to prepare a clean-up plan, obtain government approval of its clean-up plan prior to commencing the clean-up, and to clean-up and remove contaminated soil that was not contaminated by Metric. This delayed Metric's clean-up of SNI process and resulted in Metric performing extra work and constituted a constructive change to the contract. This change to the contract entitles Metric to an equitable adjustment to the contract.

**3. Metric was entitled to rely upon the plans and specifications provided by the government.**

Metric was entitled to rely upon the plans and specifications provided by the government. The plans and specifications allowed for Metric to land its barge at the landing site at Daytona Beach. Metric relied upon those representations. The government's installation of the pontoons changed Metric's manner and method of landing its barge at Daytona Beach. A contractor is entitled to rely upon the representations and instructions given him by the government for the purpose of giving guidance in connection with the contract. *North American Const. Corp. v. United States*, 56 Fed. Cl. 73, 83 (2003). Metric reasonably interpreted the government's specifications to allow it to land on Daytona Beach in the condition that it existed at the time of the contract.

The contract also set forth with detail how the asphalt was to be hand laid when machine spreading is impractical. Machine spreading was not practical for the arresting gear's three foot

wide patches. Neither the government nor Metric were aware of a paving machine that would spread a three foot wide patch. Metric followed the hand spreading specifications, used asphalt mix designs designated and approved by the government. Although Metric followed the specifications, it resulted in a product unsatisfactory to the government.

The government's liability for losses that occur after a contractor follows the plans and specifications is well-settled law. The government impliedly warrants the accuracy of matters set forth in the contract documents. *United States v. Spearin*, 248 U.S. 132, 137, 39 S.Ct. 59, 63 L.Ed. 166 (1918). If the contractor follows the specifications, the government warrants that satisfactory performance will result. *Conner Bros. Constr. Co. v. United States*, 65 Fed.Cl. 657, 685-6 (2005).

**4. Metric's Use of the Blue Book Owned Equipment Rates is a Reasonable Basis for Computation of Its Costs.**

In computing damages, this Court in *Ace Constructors, Inc. v. United States*, 70 Fed.Cl. 253, 274 (2006), stated:

> The question remaining for the court concerns the quantum of recovery. The burden is on ACE to establish the amount of the equitable adjustment by a preponderance of the evidence. *See* ►*Teledyne McCormick-Selph v. United States*, 218 Ct.Cl. 513, 588 F.2d 808, 810 (1978). However, "[a] claimant need not prove his damages with absolute certainty or mathematical exactitude." ►*Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956, 968 (1965) (citing ►*Houston Ready-Cut House Co. v. United States*, 119 Ct.Cl. 120, 96 F.Supp. 629 (1951)). "It is sufficient if [a claimant] furnishes the court with a reasonable basis for computation, even though the result is only approximate." ► *Wunderlich Contracting*, 351 F.2d at 968 (citing ►*Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521 (1960); ►*F.H. McGraw & Co. v. United States*, 131 Ct.Cl. 501, 130 F.Supp. 394 (1955)); *see also* ►*Daly Constr., Inc. v. Garrett*, 5 F.3d 520, 522 (Fed.Cir.1993) ("it was incumbent upon [the contractor] to establish a reasonable method for computing the requested compensation"). The proper measure of an equitable adjustment is the extra costs incurred by the contractor, if those additional costs are reasonable. *Cibinic & Nash* 682; *George Sollit Constr. Co. v. United States,* 64 Fed.Cl. 229, 245 (2005) (citing ►*Bruce Constr. Corp. v. United States*, 163 Ct.Cl. 97, 324 F.2d 516, 518-19 (1963)).

The Court in *Ace* allowed the contractor to recover the estimated operating costs for rented equipment using the Caterpiller Handbook and the Blue Book finding that ACE was reasonable in using these two widely used reference guides. The Court also allowed the use of the Corps of Engineers Construction Equipment Ownership and Operating Expense Schedule for calculating the ownership and operating costs for owned equipment. *Ace Constructors, Inc. v. United States*, 70 Fed.Cl. @ 278.

The dispute over the use of Blue Book rates in this case is similar to the issues set forth in *Appeals of Marshall Associated Contractors, Inc and Columbia Excavating, Inc. (J.V.),* 2002 WL 504788 (IBCA), IBCA 1901, IBCA 3433, IBCA 34335. The Board's decision regarding the use of Blue Book rates was addressed as follows:

> OwnershipRental Rates on Pre-Owned Equipment
>
> This category of costs produced the greatest differences of opinion and occupied the most time at the hearing, but it would serve no useful purpose to recapitulate the entire controversy here. The core of the disagreement was the allowability of "Blue Book" ownership rental rates versus some version or adaptation of the Corps of Engineers' rate manual which, not surprisingly, would have been more favorable to the Government than the Blue Book, since it is prepared from the standpoint of the Government as a customer. The imbroglio in this situation began with Appellant's submission of its CDA claim in September 1984. Appellant's equitable adjustment claim was for approximately $8.8 million, based on differing site conditions and defective specifications, and using the Dataquest Company's "Rental Rate Blue Book" for hourly rates. The CO at the time virtually ignored the claim and never rendered a final decision on it. But in 1989, when BOR finally audited the claim, the auditors denied the portion of it pertaining to pre-owned equipment on the ground that it had been fully depreciated and (erroneously) that it was based on AGC (i.e.. Associated Contractors of America) rental rates, which the auditors regarded as unacceptable. The auditors were wrong in both respects, for fully depreciated equipment is clearly entitled to reasonable ownership rental rate reimbursement ►(Tom Shaw. Inc.. DOT BCA 2106 ►et al.. 90-1 BCA 22,580 at 113,337-38) and AGC rates were accepted by the Government at least 18 years previously, on the ground that they are specifically owner rates rather than excessive commercial lease rates. ►L.L. Hall Construction Company v. United States. 177 Ct. Cl. 870, 886; ►379 F. 2d 559 (1966). It was the Associated Equipment Distributors (AED) Rate Manual and the so-called Means Manual, not AGC or Blue Book rates, that were ultimately

rejected by the boards as unreasonable. See M.E. Brown, supra, 91-1 BCA at 116,819, citing Tom Shaw, supra. Blue Book rates have generally found acceptance in recent cases, and they were again proposed by Appellant in this appeal after BOR rejected its various alternative proposals, as discussed below. This Board accepted them in Harvey C. Jones. Inc.. IBCA 2070 et al.. 90-2 BCA 22,762 at 114,246-47, even though in that case the appellant had challenged them as inadequate rather than excessive. However, AGC rates have also been challenged as inadequate. See George Bennett. 178 Ct. Cl. 61, 371 F. 2d 859. The challenge in that case was also unsuccessful.

In this appeal, there was more than adequate testimony that the Blue Book is a widely-used rate reference source that has been relied upon by contractors for many years and is still approved by the Federal Highway Administration for use in connection with Federal highway grants in all 50 States. It was used by the Appellant in its initial claim; the State of Pennsylvania directs use of the Blue Book exclusively in its contracts; and Blue Book rates were used in a similar AGBCA case. Jack L. Olsen, Inc.. 93-2 BCA 25,767 at 128,220, which was reviewed by the Federal Circuit Court in Jack L. Olsen v. Espy. 26 F. 3d 141, 93-1324, 1994 WL 198184 (May 19, 1994, unpublished). No change was made in the Board's use of the Blue Book as a result of that review...

Mr. Grubb readily **agreed** that the COE manual was inadequate under the circumstances, so Appellant again proffered **Blue Book** rates as the best solution, whereupon the CO produced a formula of his own, one that Appellant regarded as both arbitrary and inadequate. In light of testimony at the hearing that Blue Book rates were relatively high, however. Appellant offered to reduce its total pre-owned equipment costs, based on Blue Book rates, by 20 percent, after increasing it by approximately 39 percent to account for the ultra severe site conditions of the project. The Board rejects as unnecessary any arbitrary recasting of the applicable and appropriate Blue Book rates for this project, but accepts the need to make a special adjustment of approximately 39 percent for the exceptional deterioration of the equipment used on the project, as proposed by the Appellant...

We find the testimony of John Marshall, one of the contractor's principals, as to the amount of equipment wear that was incurred to be entirely credible (See Richerson Construction. Inc., GSBCA 11161, 93-1 BCA 25,239 at 125,704, where the board similarly relied on the testimony of the company's president), but there was also ample supporting testimony from various experienced contracting and engineering witnesses to the same effect. While it is beyond the power of this Board to "make the Appellant whole," as the Agriculture Board was instructed to do in Olsen, we are satisfied both that the use of Blue Book rates as such is reasonable and allowable, and that the approximately 39 percent increase in those rates on the basis of proven ultra severe site conditions is fully justified. Accordingly, we award Appellant the sum of $5,530,632-i.e., $3,991,038, plus an

adjustment of $1,539,594 or approximately 39 percent- as legitimate pre-owned equipment costs.

Similar to the circumstances in *Marshall,* the Blue Book rates including the 25% adjustment were a reasonable calculation of the owned equipment costs incurred by Metric on the airfield and roadway projects. The Blue Book rates with the 25% adjustment are reasonable for the contractor owned equipment on SNI.

The undisputed evidence was that the government and metric agreed at the start of the project that Blue Book rates would be used to calculate the owned equipment costs. The government's failure to present evidence contradicting Metric's claim that there was an agreement to use the Blue Book rate to calculate the owned equipment costs suggests that the government either has no such evidence or none exists, further bolstering Metric's position. *See C&H Commercial Contractors v. U.S.,* 35 Fed.Cl. 246, 254 (In determining the government was guilty of material misrepresentation, the Federal Court of Claims noted in part: "Defendant presents no evidence to counter the sworn testimony of these corporate officers."); *Laura Campbell Trust v. John Hancock Life Ins. Co.,* 411 F.Supp.2d 606 (D.Md. 2006)(where beneficiary filed action to recover life insurance proceeds, the District Court granted summary judgment for insurer, giving much weight to one witness' deposition testimony: "[t]here is no witness to contradict this. Accordingly, there exists no genuine dispute of material fact as to whether the statement on the application was untrue."); *Gasaway v. Northwestern Mut. Life Ins. Co.,* 26 F.3d 957 (C.A.9 1994)(where insured sought recovery under insurance policy, the Court of Appeals held: "[insured] offered no witnesses, depositions, or affidavits to contradict [insurer] NML's position. Instead she argued that [underwriter] Westphal's conclusions were nothing more than self-serving speculation that should be disregarded. This is nothing more than 'mere allegations or denials' which are insufficient to overcome NML's showing. That being

so…'reasonable minds could reach only one conclusion,'" citing *Howell v. Colonial Penn Ins. Co.*, 842 F.2d 821, 823 (6th Cir.1987)).

In *Appeal of U.A. Anderson Const. Co.,* 02-1 BCA P 31715 (2001), the Armed Services Board of Contract Appeals reviewed an appeal by a government contractor against the United States, where the contractor brought forth a statement of costs incurred during a work stoppage in the repair of underground gas mains and service lines. There, the government argued against plaintiff's calculation method that was based on rates published by the U.S. Army Corps of Engineers, denying the parties ever reached agreement as to which rate the contractor could use in calculating costs. Contractor agreed that while their actual cost data was available, the Corps' method was an alternate pricing method appropriate to resolve the claim. Though the Board agreed actual cost data was generally the appropriate cost method, "general rules governing recovery for contractor-owned equipment are not applied where a different computation method is stated in the contract or modified in negotiations by the parties." *Id.,* citing *C.L. Fairley Construction Co., Inc.,* ASBCA No. 32851, 90-2 BCA ¶ 22,665 at 113,870, *aff'd on reconsid.,* 90-3 BCA ¶ 23,005 (1990)(emphasis added). Affirming the Board's previous finding for plaintiff, the Board reiterated:

> "The Board held [plaintiff] appellant entitled to recovery on its claim, and appellant may present whatever quantum evidence and arguments it deems appropriate. [Citation.] Appellant's statement of costs is sufficient to proceed with the appeal."
>
> *Id.*, citing *Robert D. Carpenter,* ASBCA Nos. 25742, 25743, 81-2 BCA 15,263 at 75,581 (1981).

Accordingly, the Board dismissed defendant's motion to dismiss contractor's calculation method.

Here, the government argues Metric should not be permitted to use the reasonable, widely accepted Blue Book rates to calculate its equipment costs. The undisputed evidence was that the government agreed during performance of the contract that the Blue Book rate was reasonable and would be used in pricing changes to the contract. The government presents no witnesses to contradict Metric's evidence that the government agreed to use the Blue Book rates for calculating the owned equipment rates. Not a single witness was produced to contradict Metric's evidence. Whereas, there was an agreement between Metric and the government to use Blue Book rates, Blue Book rates are commonly used in the construction industry to determine reasonable equipment ownership costs, and the Blue Book rates were used in pricing adjustments to the contracts, the Court should apply the Blue Book rates in calculating Metric's damages caused by government's changes to the contracts.

**5. Metric Did Not Waive Its Right to Assert Its Claims Due to the Execution of Modification Nos. P00001 on the Roadway Project and P00017 on the Airfield Project.**

The government argued that Metric waived and released it claims by executing Modification No. P00001 to the Roadway project and Modification No. P00017 to the Airfield project.

The request for proposal for the work relating to the arresting gear that would later become Modification P00017 was issued on June 23, 2000. It states that additional contract time would be required "to accomplish the changed work." PX 120. Metric submitted its proposal and included costs for an additional 2.75 months for the changed work. PX 126 pg. 2. After the "horse trading" went on between Metric and the government, Modification No. P00017 was executed on August 3, 2000 by Metric and August 4, 2000 by the government. The modification gave no indication that it was a release of Metric's claims relating to the pontoon

claim. It merely states that the change order work is to be complete by November 2, 2000. The release was for time and money related only to the "work herein revised." PX 6 pp. 9-13.

Modification No. P00001 was executed on June 13, 2000 by Metric. DX 1001 pp 142-143. When Metric signed the change order purporting to release the government of further monetary claims, it was only under the contracting officer's assurance that the change order would not act as a full release of Metric's pontoon claim. Mr. Miller contacted Ms. Martonick, the contracting officer that executed the modification on behalf of the government, and confirmed that the modification would not release Metric rights regarding the pontoon claim. Ms. Martonick assured Mr. Miller that it would not affect Metric's rights for damages caused by the installation of the pontoon. Metric was not waiving or releasing the government from liability relating to the pontoon claim. Tr. 963-967, 1152 (Miller).

In *George H. Whike,* the Court of Claims heard a similar action by a government contractor to recover additional compensation for costs due to overtime charges. 135 Ct.Cl. 126, 140 F.Supp. 560 (1956). The court was presented with "a situation in which plaintiff's president was induced to sign a contract on the representations of the lawyers of the contracting officer that the provision for reimbursement contained in the bids would protect plaintiff." 140 F.Supp. at 563 (emphasis added). Not only were the assurances made by the attorneys for the contracting officer, but the same contracting officer had given written assurances to another contractor in a similar position; "in view of all these circumstances it is reasonable to conclude that the assurances given plaintiff had the effect of binding the government." *Id.* Further, these assurances "were acted on by plaintiff which signed the contract in reliance on them. Plaintiff's subsequent actions did not contradict its reliance on them." *Id.* Accordingly, the Court of Claims allowed full reimbursement for the increased costs due to overtime labor.

The Court of Federal Claims has previously reprimanded similar behavior by a government officer. In *C&H Commercial Contractors, Inc. v. U.S.*, 35 Fed.Cl. 246 (1996), a plaintiff contractor signed similar release language, contending that the government assured it that the release language would not bar subsequent claims for delay and impact costs. When the government moved for summary judgment, contending that plaintiff's claims were barred by the parol evidence rule, the court criticized the government's behavior:

> "We are faced with what we hope is an unusual factual situation—one in which the government representatives promised a contractor that it would not be precluded from bringing future delay claims by signing a release and then asserted the release as a bar to such claims. Such conduct is outrageous."

*Id.* at 257 (emphasis added). Accordingly, the court remanded to allow plaintiff to prove the amount of damages incurred and that it was entitled to compensation.

In *Narva Harris Construction Corp.*, the Court of Claims denied the government's motion for summary judgment against a contractor suing for breach of an oral agreement with United States to increase cost figures. 216 Ct.Cl. 238, 574 F.2d 508 (1978). There, prior to the drafting of the construction contracts, plaintiff developer informed defendant at two different stages of the project, that preliminary investigation demonstrated that the cost figures required by defendant were less than necessary to develop and construct the project. Both times plaintiff brought up these concerns, defendant verbally assured plaintiff that while the contracts would have to be drafted with the lower figures, the cost figures would be adjusted at a later time in accordance with standard procedures. 574 F.2d at 509. Further, "in both cases, defendant's commitments were oral only. Relying on these representations, plaintiff proceeded with the two projects, and completed them both, to the satisfaction of all the parties." *Id.* at 509-510 (emphasis added).

Like the contractors above, Metric too was induced to sign the change order by the specific representations made by the government's contracting officer. Metric is entitled to rely on these assurances, made by the particular person with vested authority to bind the government.

The government's position is that Metric's execution of the change orders represented a full release of future claims for payment. However, when confronted with testimony to support Metric's position—that it signed the modification only after receiving assurances that they would not be barred from seeking further compensation—the government failed to present a single witness or other evidence to support its claim. Presumably, the government should have witnesses who could contradict Metric's position by claiming the contracting officer or other agents of the Defendant never made such assurances to Metric. In fact, the evidence is quite the opposite. In an email exchange dated February 6, 2001, seven months after P0001 was executed and five months after P00017 was executed, between Mr. Serrano and Ms. Carrignan, another contracting officer, Ms. Carrignan writes:

> "As we both know, these are not the last of the claims he will be filing – I imagine the one for the pontoon issue will be a doozie!! So it makes sense that a daily rate will have to be established sooner or later. I hope you can help me with this."

PX 5 pg. 182.

Certainly, Ms. Carignan would not have written that the pontoon issue would be a "doozie" and requesting a daily rate be established if either Metric or the government believed that Metric had released and waived its right to seek compensation for the pontoon claim months earlier.

Because the government failed to produce any evidence refuting Metric's claim, this Court should find that Metric is entitled to recovery for the delays and changed work. *See i.e. C&H Commercial Contractors, Inc. v. U.S.*, 35 Fed.Cl. 246 (1996); *U.S. for Use and Benefit of*

*F&G Mechanical Corp. v. Manshul Const. Corp.*, 1998 WL 849327 (E.D.N.Y. 1998)(Not Reported in F.Supp.2d); *Donovan v. Kaszycki & Sons Contractors, Inc.*, 599 F.Supp. 860, 869 (D.C.N.Y. 1984)(where the court reviewed the compensation and overtime methods of contractor, and held in part "[b]ecause defendants [contractor] failed to produce any evidence to challenge plaintiff's calculations...the Court finds that the evidence produced by plaintiff, consolidated in P.Ex. 38, is sufficient to establish the number of hours worked and the amount of regular-time wages the defendants owe each employee.")(emphasis added).

The Court of Federal Claims recognized the importance of providing testimony to contradict similar claims in *C&H Commercial Contractors, Inc. v. U.S.*, 35 Fed.Cl. 246 (1996). There, the plaintiff contractor brought action against the government seeking compensation for contract modifications and extensions that occurred during performance of the contract. The government moved for summary judgment arguing the contractor signed releases waiving the right to additional payment for modifications and extensions, amounting to accord and satisfaction. In response, the contractor offered testimony of three witnesses describing oral representations made by the contracting officer, assuring them they would be entitled to submit a subsequent claim for delay and impact costs despite the express release language to the contrary. *Id.* at 254. The defendant presented no evidence to counter the sworn testimony of the three corporate officers. The Court agreed the statements of plaintiff's witnesses were clear and persuasive regarding the government's representations. *Id.* at 256. The court held:

> "In response to plaintiff's assertions of misrepresentation and the evidence plaintiff has provided....Nowhere does defendant respond to the substance of plaintiff's misrepresentation claim or deny that the government misrepresented the significance of the releases to plaintiff. Because the government does not contradict the factual details of plaintiff's deposition testimony, we conclude that no genuine issues of material fact remain..."

*Id.* at 257 (emphasis added).

Here, the government's argument centers on the enforcement of Metric's execution of the modifications. However, this is not an issue raised by the contracting officers that actually administered the contracts with Metric. This is a defense raised by the government's counsel and experts that had virtually no involvement in negotiating the modifications or understanding of the agreement or intent of the parties executing the modifications. Metric has produced evidence in support of its reliance on the contracting officer's verbal assurances that execution of the modification was not a waiver of the pontoon claim. In response however, the government has failed to produce a single witness to counter Metric's evidence. If government's argument were valid, there would be some evidence to support it. Therefore, the government either has no evidence to support its argument, or none exists. Accordingly, this Court should grant recovery to Metric for additional work performed.

## IV. CONCLUSION

Metric had a right to rely upon the plans and specifications furnished by the government. The government's installation of the pontoons and multiple directives regarding the pontoon, the 3' asphalt patch, the installation of the rubber rails and the government's directives regarding the soil contamination were constructive changes to the contract. These items resulted in Metric incurring additional costs and delay damages. As a result of the changes to the contract, Metric is entitled to an equitable adjustment to the contracts in the amount of $5,933.976 plus interest in accordance with the Contract Dispute Act.

DATED this 1st day of October, 2007.

PEEL BRIMLEY LLP

*/s/ Steven D. Meacham*
Steven D. Meacham
Attorney for Plaintiff

Peel Brimley LLP
2014 East Madison Street, Suite 100
Seattle, WA 98122-2965
(206) 770-3339
Fax: (206) 770-3490