IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| METRIC CONSTRUCTION CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-635C |
| | ) | (Judge Charles F. Lettow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S POST TRIAL BRIEF

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

DEBORAH A. BYNUM
Assistant Director

ROBERT C. BIGLER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Tele: (202) 307-0315
Fax: (202) 514-7988

Attorneys for Defendant

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANT'S POST-TRIAL BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

I. CONTENTIONS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

A. The Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

B. Facts Related To Metric's Pontoon Claim . . . . . . . . . . . . . . . . . . . . . . . . -5-

C. Facts Related To Metric's Arresting Gear Claim . . . . . . . . . . . . . . . . . . -8-

D. Facts Relating To The Contaminated Soil Removal Claim . . . . . . . . . -11-

E. Facts Relating To Metric's Use Of Blue Book Rates . . . . . . . . . . . . . -13-

F. Facts Relating To Metric's Waiver Of Its Claims . . . . . . . . . . . . . . . . -14-

II. CONTENTIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

A. Metric's Pontoon Claims Are Contractually Unavailing . . . . . . . . . . . -16-

1. There Was No Change . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

2. Metric's Damage Claim Must Be Denied . . . . . . . . . . . . . . . . -18-

B. Metric's Arresting Gear Claims Are Contractually Unavailing . . . . . -19-

C. Metric's Contaminated Soil Removal Claim Is Contractually Unavailing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

D. Even If The Government Constructively Changed The Contract, Metric Cannot Meet Its Burden Of Proof For Delay Or Hindrance To Its Contract Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

E. Metric's Damages Claim Is Insufficient . . . . . . . . . . . . . . . . . . . . . . . -26-

F. Metric's Reliance Upon The "Spearin Doctrine" Is Inapposite . . . . . -31-

G. Metric Waived Its Right To Assert Its Claims . . . . . . . . . . . . . . . . . . -35-

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-

## TABLE OF AUTHORITIES

### CASES

Avedon Corp. v. United States,
15 Cl.Ct. 648(1988) . . . . . . . . . . 23

Baifield Indus., Div. Of A-T-O, Inc., ASBCA 13418,
77-1 BCA ¶ 12,308, aff'd 706 F.2d 320 (Fed. Cir. 1983), . . . . . . . . . . 30

Barron Bancshares, Inc. v. United States,
366 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 36

Blake Construction Co. v. United States,
987 F.2d 743 (Fed Cir. 1993) . . . . . . . . . . 32, 33

Blinderman Constr. Co. v. United States,
695 F.2d 552 (Fed. Cir. 1982) . . . . . . . . . . 19, 22, 23

C & H Commercial Contractors, Inc. v. United States,
35 Fed. Cl. 246 (1996) . . . . . . . . . . 37, 38, 39

Connor Brothers Construction Co. v. United States,
65 Fed. Cl. 657 (2005) . . . . . . . . . . 32, 33

Daewoo v United States,
73 Fed. Cl. 547 (2006) . . . . . . . . . . 29, 30

G.M. Shupe, Inc. v. United States,
5 Cl. Ct. 662(1984) . . . . . . . . . . 23

George H. Whike Construction Co. v. United States,
140 F.Supp. 560 (1956) . . . . . . . . . . 37

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . 19

J.L. Simmons Co. v. United States,
188 Ct. Cl. 684 F.2d 1360 (1969) . . . . . . . . . . 32

Johnson, Drake & Piper, Inc. v. United States,
209 Ct.Cl. 313 F.2d 1037 (1976) . . . . . . . . . . 36

Meva Corp. v. United States,
511 F.2d 548 (Ct.Cl. 1975) . . . . . . . . . . 30

Monitor Plastics Co., ASBCA No. 14447,
72-2 BCA ¶ 9626 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Navra Harris Construction Corp. v. United States,
574 F.2d 508 (Ct. Cl. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

PCL Const. Services, Inc. v. United States,
47 Fed. Cl. 745 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

P.R. Burke Corp. v. United States,
277 F.3d 1346(Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Penguin Industries, Inc. v. United States,
209 Ct. C 530 F.2d 934 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

S.S. Silberblatt, Inc. v. United States,
228 Ct. Cl. 729 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Servidone Constr. Corp. v. United States,
931 F.2d at 861 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Stuyvesant Dredging Co. v. United States,
834 F.2d 1576 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

United States v. Callahan Walker Const. Co.,
317 U.S. 56 (1242) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

United States v. Spearin,
248 U.S. 132 (1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 35

Utility Contractors, Inc. v. United States,
8 Cl. Ct. 42, 50-51 (1985) (Fed.Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Weaver-Bailey Contractors, Inc. v. United States,
19 Cl.Ct. 474, 476 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

William F. Klingensmith, Inc. v. United States,
731 F.2d 805 (Fed. Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

DEFENDANT'S POST-TRIAL BRIEF

In accordance with the Court's post-trial order of October 26, 2007, defendant, the United States, respectfully submits the following post-trial brief.

INTRODUCTION

In our pretrial memorandum, we set forth the factual and legal reasons that demonstrate that the claim of plaintiff Metric Construction Co., Inc. ("Metric") is unavailing. The trial of this case did not alter those reasons and, instead, offered additional testimonial evidence to defeat Metric's claim.

This is a "constructive changes" case in which plaintiff Metric sought to prove that the Government constructively changed Metric's contracts in six ways that purportedly delayed Metric's performance and increased Metric's costs. Pl. Br. i-3.[1] In Metric's post trial brief, Metric contends that the Government imposed the following contract changes which allegedly impacted Metric as noted:

Pontoon Claim for $3,569,261:

1. The Navy's placement of the pontoon at the Daytona Beach landing site.

Arresting Gear Claim for $2,181,297:

2. The Navy's rejection of the 3' asphalt patch.

[1] "Pl. Br. #" refers to Metric's post trial brief.

3. The Navy’s directive to install the salvaged rubber rails.

Soil Removal Claim for $183,417:

4. The Navy’s directive to use an outside hazardous waste contractor.

5. The Navy’s requirement for Metric to submit and obtain Navy approval for a clean up plan.

6. The Navy’s directive for Metric to remove all of the soil contaminants at the sand spit area.

Pl. Br. i, 1-3, 16, 24, 27.

As shown at trial and for the reasons established below, Metric’s contentions are incorrect because the “constructive changes” alleged by Metric were simply not changes to Metric’s contracts. Also, Metric’s primary factual allegations, that the so-called constructive changes delayed Metric’s performance, are incorrect and Metric failed to meet its burden of proof with regard to Government-caused delay or hindrance of contractor performance. Finally, Metric’s damages claim, and particularly Metric’s use of “blue book” equipment rates, is fraught with unsupported and inflated costs that are insufficient to support any damages award and, in fact, help disprove the liability aspects of Metric’s case. In addition, Metric waived its claims when it signed the contract modifications.

In this post-trial brief, we will restate the legal arguments that support our position and, in addition, offer citations to the trial testimony and evidence that respond to Metric's post-trial brief and further support our arguments. All told, Metric's attempts to blame its delayed completion of its contracts upon the Government is unavailing, and the Court should enter judgment in favor of the Government.

## I. CONTENTIONS OF FACT

### A. The Contracts

In August 1994, the Government awarded Contract No. N62474-94-C-6807 ("the airfield contract") to Metric to make improvements or repairs (pursuant to later-issued delivery orders) to the Government's airfield runway on San Nicholas Island, California ("SNI"). PX 2.

In September 1998, the Government awarded Contract No. N68211-98-C-5553 ("the roadway contract") to Metric to make improvements or repairs (pursuant to later-issued delivery orders) to the roads on San Nicholas Island, California ("SNI").[2] DX 1008 pg. 353-360.

The Solicitation/contract advised Metric of the environmentally sensitive nature of the site as follows:

[2] Where necessary for clarity to distinguish between the airfield and roadway contracts, or individual delivery orders issued under either contract, we will do so. Otherwise we will refer to both contracts as "the contract" or simply "the project."

> San Nicolas Island harbors many rare and sensitive plant and animal species, some of which occur nowhere else on earth. The island also has numerous archaeological sites, some with evidence of early human occupation at least 10,000 years old. These biological and cultural resources are extremely valuable, not only because of their rarity, but also because they provide important opportunities for scientific research and discovery. San Nicolas Island has the unique capacity of extending our knowledge, both of isolated biological populations and of early human migration and settlement in the Western hemisphere. Federal and state law mandate protection and preservation of this biological and cultural legacy. Areas having sensitive archaeological or biological features are identified and protected. All existing and proposed activities are assessed and tailored if necessary early on in planning to ensure harmony between the military mission and resource protection requirements.

DX 1008 pg. 112.

B. Facts Related To Metric's Pontoon Claim

The contract contained a provision (section 1600.1.6.3.5) that required Metric to transport construction equipment and materials to SNI via boats or barges that could land on one of two beaches: Daytona Beach and Sissy Cove. DX 1008 pg. 104-05.

In general, section 1600.1.6.3.5 provided that Metric's use of the beach landing sites was affected by many factors and controlled by the Government; that Metric was to provide notice of intended barge landings; and that Metric would not be able to use Daytona Beach when Government barges were scheduled to land or when protected wildlife were present. DX 1008 pgs. 104-05.

Daytona Beach is frequently populated by protected wildlife, sometimes for significant periods of time. Tr. 2264 (Douglas).

Section 1600.1.6.3.5 also noted that, if Metric chose to facilitate beach landings with a sand ramp, that Metric was required to take steps to ensure that certain environmental restrictions were met. DX 1008 pg. 104.

Finally, and most importantly, Section 1600.1.6.3.5 explicitly provided that the remedy to Metric for aborted or impossible barge landings was a "no cost time extension" as follows:

> If the Contractor's attempt to land his barge is not successful due to weather and/or a high surf conditions - or if data is available which proves that barge landing is impossible, then sufficient justification may exist for a no cost time extension.

DX 1008 pg. 104.

Since the inception of its work at SNI, Metric had invoked the no-cost-time-extension remedy several times when "Metric received numerous time extensions because of delays in landing the barge due to adverse conditions." Pl. Br. 6.

In December 1998, as part of a continuing and evolving Government effort to improve the facilities at SNI and to reduce the environmental impact of barge landings at Daytona Beach (which virtually always required the construction of large sand ramps and often involved disturbing protected sea mammals who occupied the area), the Government replaced the beach landing facility with a barge-landing pontoon dock ("pontoon") and

directed that further barges landings at Daytona Beach use the pontoon. Pl. Br. at 7-8.

Metric complained that the barge that it was currently using was not entirely compatible with the pontoon and that pontoon landings required more ideal weather conditions than beach landings. Id. Over the next several months, from January until June 1999, Metric made a series of attempts to use the pontoon that resulted both in successful landings and a few aborted landing attempts. DX 1001, pg. 8; DX 1018, pg. 10.

As an accommodation in response to Metric's requests, in June 1999, the Government installed additional equipment at Daytona Beach that permitted Metric to conduct beach landings again. Metric conducted beach landings at Daytona Beach for the remainder of its contract performance. Tr. 312 (Kostelny).

Faced with the purported impediment to Metric's work caused by installation of the pontoon between January and June of 1999, Metric:

a. Did not rent or otherwise obtain the use of another barge that, like the Government barge, was more compatible with the pontoon. Tr. 288, 306 (Kostelny).

b. Did not avail itself of the Sissy Cove landing site. Tr. 287-288 (Kostelny).

c. Did not properly document the purported impacts of the aborted beach landings or the barge trips that Metric allegedly

never scheduled as a result of the presence of the pontoon. See Tr. 780-81 (Holmes).

d. Did not properly take into account that the installation of the pontoon eliminated the need to construct sand ramps when landing upon the pontoon. See Tr. 767-68 (Holmes).

Metric's work, upon both the airfield and roadway contracts, was impacted far more by events that are unrelated to Metric's barge landings (such as the fire that incapacitated Metric's asphalt plant from December 1998 through July 1999) than by the purported shortage of materials that Metric attributes to the installation of the pontoon. There is no dispute that the asphalt batch plant suffered a fire in December 18, 1998 and did not become operational again until July 9, 1999. Tr. 132-33 (Kostelny). The pontoon did not cause any of the delay to which Metric complains because Metric admitted during the trial that it never ran out of materials. Tr. 1543 (Burnell). Moreover, Metric was not capable of landing the barge during the month of May 1999, because the barge was being repaired. Tr. 2038 (Jones).

C. Facts Related To Metric's Arresting Gear Claim

The Government issued change order 17 to Metric's airfield contract that provided for modifications to the airfield arresting gear pads, including installation of a three-foot asphalt patch between the existing asphalt runway and the new

concrete arresting gear pads to be installed by Metric. The parties bilaterally agreed to a price of $50,000 for the change-order work. Pl. Br. 19.

Although Metric suggests that it “believes that the Navy contributed to the problem” by providing a 9'-8" template where the contract called for a 10-foot steel rail (Pl. Br. 18), Metric “is not seeking damages or delays for issues arising from the concrete or the embedded steel rails. Metric’s claim is related to the asphalt installation.” Id.

The contract permitted Metric to hand-spread the asphalt, and also required the interface between the asphalt and the new concrete to be “flush” in order to maximize the safety of the aircraft whose tail hooks would come into contact with the asphalt/concrete seam. PX 43 pg. 1.

Metric’s asphalt was not flush and was poorly installed upon repeated occasions. The Government rejected Metric’s asphalt installations several times for those reasons. Each time that Metric installed the asphalt, it was very rocky allowing rocks to dislodge from the asphalt leaving loose rocks on the runway that could get caught up in aircraft’s jet engines and destroy the engines. Tr. 2268-69 (Douglas).

As an accommodation, after Metric’s repeated inability to comply with the contract requirements, the Government relaxed the “flush” requirement to permit a three thirty-seconds of an inch

tolerance between the asphalt and the concrete, and permitted Metric to demolish an additional section of the runway in order to use Metric's asphalt paving machine to properly install the asphalt. Tr. 269-70 (Kostelny); PX 129. Metric admitted that the asphalt was never rejected by the Navy when the asphalt was within the three thirty-seconds of an inch requirement. Tr. 269-270 (Kostelny).

In addition to Metric's poor asphalt placement techniques, the completion of Metric's arresting gear work was further delayed by Metric's misapprehension of the contract requirements for reinstallation of the "rubber rail" component of the arresting gear pad.

Contrary to Metric's argument that "[t]here was nothing that required Metric to save the existing rubber rails or provide new rubber rails," (Pl. Brief 21), the contract (drawing C-25) clearly provided that Metric was to "remove cable support rail, weld new c-channel to exist[ing] I beam and <u>reinstall</u> cable support rail." DX 1018, pg. 58 (emphasis added). In fact, while Mr. Kostelny testified that he did not believe the words "refasten" or "reinstall" meant that Metric had to use the rubber rails that it removed, he admitted that the term "refasten" means to "[p]ut it back on." Tr. 275-77 (Kostelny).

Metric's failure to salvage the existing rubber rails means that the time and costs associated with Metric's failure to

comply with the contract are not the responsibility of the Government.

In short, Metric now attempts to claim that it is entitled to recover damages of $2,181,297 for alleged changes and delays in the performance of the $50,000 arresting gear change order. Such a claim is simply ludicrous.

D. Facts Relating To The Contaminated Soil Removal Claim

SNI is an environmentally sensitive area where, among other things, the breeding, birth, and nursing of several sensitive species of marine mammals (including seals, sea lions, and sea otters) is protected. DX 1008 pg. 112.

As part of the contract obligations, Metric submitted an environmental protection plan that committed to remove hazardous waste, comply with Federal environmental regulations, and clean up accidents and spills “immediately.” Pl. Br. 24.

The contract required Metric to, among other things, “[s]tore hazardous waste in approved containers that are properly labeled.” DX 1008, pg. 97 (section 3.5.1).

Near the conclusion of the project, the Government discovered several violations of Metric’s environmental plan that had been allowed to go unmitigated for a significant period of time. Some of those violations were documented in a report prepared by the Government. DX 1001, pgs. 262-263. The violations included: a leaking fuel tank; oily residue leaking

from open pipes; stained soil around an unmarked 55-gallon drum; numerous buckets of asphalt or oily residue; extensive staining of soil; and trash left in the storage area. Id. The report also found that Metric was "complicating the removal/disposal of waste asphalt by scraping the work sites and stained soil areas and mixing them with piles of materials that may be suitable for reuse." DX 1001, pg 265. For instance, Metric admitted at trial that rather than place contaminated soil in hazardous waste containers as required by the contract, Metric shoveled the material into the bucket of a loader and then dumped it on top of a pile of other materials in the sand spit. Tr. 226 (Kostelny).

When the Government became aware of Metric's poor environmental performance, "Metric acknowledged responsibility to clean up those areas that it had contaminated." Pl. Br. 25. Unsatisfied with Metric's lack of adherence to its own environmental plan, and particularly Metric's unfulfilled promise to clean up contamination "immediately," the Government required Metric to obtain Government approval of an independent clean-up plan and the Government required Metric to clean up all contamination that could reasonably be attributed to Metric. Tr. 971-73 (Miller).

Considering Metric's environmental violations, at the very least, the Government's direction to Metric to mitigate its

environmental contamination does not entitle Metric to extra compensation.

Metric objected to the Government's directive to clean up all contaminated soil in "the sand spit area," which Metric had used for storage of construction materials and equipment. Tr. 972-73 (Miller).

Metric suggested that the soil had been contaminated prior to Metric's arrival, but Metric does not dispute that Metric caused at least a "localized" leak of hydraulic fluid in the sand spit area. Tr. 225 (Kostelny). Metric also admitted that its heating oil tank also leaked. Tr. 984 (Miller).

Without conclusive proof that the sand spit soil was contaminated prior to Metric's contact, and based on Metric's own admissions that it contaminated some of the sand spit area and had violated its environmental plan regarding immediate detection and remediation of environmental contamination, the Government is not liable for its order to Metric to clean up the sand spit area.

E. <u>Facts Relating To Metric's Use Of Blue Book Rates</u>

Metric's claim seeks to recover "ownership costs" for Metric's equipment during the periods of delay claimed by Metric.

Instead of basing its ownership costs upon Metric's actual equipment records, Metric calculated hypothetical ownership costs

using generic "blue book rates" obtained from a Dataquest guide book. Pl. Br. at 34.

There is no contractual provision that authorizes or mandates the use of blue book rates for an equitable adjustment or certified claim. See Tr. 1056 (Mr. Miller testified that it was not a written agreement).

The only evidence that the Government agreed to Metric's use of blue book rates is the self-serving testimony of a single Metric employee. Tr. 925 (Miller). Furthermore, the Government certainly never agreed to compensate Metric for change order work using an inflationary costing technique.

Based upon the limited information provided by Metric, Metric's use of blue book rates for the claims at issue in this case have been determined to be inflationary to a significant degree and unreasonable by the Government's expert accountant. See DX 1002, pg. 123.

F. Facts Relating To Metric's Waiver Of Its Claims

During the course of the SNI projects, Metric waived and released its claims by executing Modification No. P00001 to the Roadway project and Modification No. P000017 to the Airfield project. Modification P00001, dated February 28, 2000, states:

> CONTRACTOR'S STATEMENT OF RELEASE
>
> Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs, impact effect, and for delays and

> disruptions arising out of, or incidental to, the work as herein revised.

DX 1001 pg. 143. The second modification, P00017, relating to the arresting gear, contains identical release language. DX 1001, pg. 145. By executing these two modifications, Metric waived its claims.

## II. CONTENTIONS OF LAW

### OVERVIEW

Although many of Metric's factual contentions are undisputed (for example that the Government installed the pontoon dock on Daytona beach and, for a time, required Metric to use it), the six constructive changes alleged by Metric were simply not changes to the contract. For this reason, Metric's changes claims are not legally supported and the Court should enter judgment in favor of the Government. The Court need only resolve the dispute between the parties regarding contract interpretation.

Even if the Government did impose contract changes upon Metric, the changes did not cause Metric's delayed contract completion (or claimed costs). To resolve this portion of the case, the Court should find that plaintiff failed to meet its burden of proof and that the six changes that plaintiff alleges were not changes to the contract.

Finally, Metric's damages claim is so unsupported and inflationary that, even if contractual liability exists, Metric

cannot recover. Again, the Court should find that Metric's damages evidence fails to meet plaintiff's well-settled burden of proof.

ARGUMENT

A. Metric's Pontoon Claims Are Contractually Unavailing

Metric's argues that the "pontoon claim is a constructive change claim." Pl. Br. 1. However, during the trial, Metric's witnesses testified that the pontoon claim was a "delay claim." Tr. 637 (Holmes); Tr. 1598 (Burnell). As profit is not allowed on a delay claim, plaintiff is not entitled to recover the profits included in its claim. S.S. Silberblatt, Inc. v. United States, 228 Ct. Cl. 729 (1981).

1. There Was No Change

Metric correctly identifies the contract specification (Section 1600.1.6.3.5) that identifies the two barge landing sites on SNI and the procedures for conducting barge landings. Pl. Br. 5-6. Metric appears to argue, however, that Metric's choice of Daytona Beach, Metric's use of a specific barge, and Metric's previous experience conducting beach landings, were somehow contractually guaranteed to continue indefinitely in the manner that Metric preferred. They were not. The contract provisions governing barge landings are quite restrictive and Metric simply had no right to unfettered access to beach landings on Daytona Beach. DX 1008 pg. 104-05. The Government's

installation of the landing pontoon, and instruction for Metric to use it from January to June of 1999, was simply not a change to Specification Section 1600.1.6.3.5.

The contract plainly restricted Metric's use of Daytona Beach based upon environmental concerns. DX 1008, pgs. 104-05. The Government's installation of the pontoon dock, in lieu of beach landings, did not preclude Metric from utilizing Daytona Beach. Indeed, Metric made several successful deliveries to Daytona Beach using the pontoon.

More importantly, the pontoon did not cause any of the delay to which Metric complains because Metric admitted during the trial that it never ran out of materials. Tr. 1543 (Burnell). Moreover, Metric's failure to land the barge during the month of May 1999, cannot be blamed on the Navy or even the weather because the barge was being repaired. Tr. 2038 (Jones).

Even if the landing pontoon was inconvenient for Metric compared to the restrictions already imposed by Section 1600.1.6.3.5, there was no contractual provision that guaranteed Metric an unfettered ability to land directly on Daytona beach – especially when beach landings were believed to violate environmental regulations and policies or to unduly disturb protected wildlife. DX 1008 pg. 104-05.

2. Metric's Damage Claim Must Be Denied

Moreover, even if the Government's directive to use the pontoon was a change to Specification Section 1600.1.6.3.5, at the very most Metric might have been entitled to compensation for the extra costs of obtaining a barge that was more compatible with the pontoon (such as the Government's barge), as this was a much more cost effective alternative that Metric never proposed or implemented. In fact, Metric admitted at trial that it rented the barge used by the Navy on two occasions. Tr. 1228-29 (Miller). Metric now claims that it is entitled to $3,569,261 as a result of the Navy requiring Metric to use the pontoon. Pl's Br. 16. Yet Metric could have rented a barge that was compatible with the pontoon for a tenth of the costs it is now seeking. Even according to plaintiff's own calculations, the blue book rate for a barge of comparable size is $11,614, yet Metric used an average monthly barge rate of $30,000 per month, the fair rental market of its own barge, in computing its claim. Tr. 1047 (Miller).

Even using plaintiff's own inflated market rate figure of $30,000 per month to determine the cost of a barge compatible with the pontoon, had Metric simply rented a compatible barge for the five months that Metric was required to land on the pontoon (from January 1999 to May 1999), the total additional cost would have been a mere $150,000 when compared to Metric's current

pontoon claim of a whopping $3,569,261. In short, even if the Government's requirement to land on the pontoon was a change to the contract (which it was not) and even if it caused delays, Metric had an obligation to mitigate its damages by renting a barge that was compatible with the pontoon rather than continuing to use a barge that could not land on the pontoon as an excuse to inflate its claim. Indiana Michigan Power Co. v. United States, 422 F.3d 1369, (Fed. Cir. 2005)("[A] party cannot recover damages for loss that he could have avoided by *reasonable efforts*." (quoting Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting Restatement Second Contracts §350 cmt. B (1981)(emphasis original))).

For these reasons, the installation of the pontoon was not a constructive change to Metric's contact and there is no Government liability for Metric's pontoon claim. Blinderman Constr. Co. v. United States, 695 F.2d 552, 559 (Fed. Cir. 1982).

B. Metric's Arresting Gear Claims Are Contractually Unavailing

The gist of Metric's arresting gear claim is that Metric's asphalt installations were contractually conforming and that the Government did not have the right to reject Metric's installations as non-conforming. Metric's argument fails because there is no dispute that change order 17 (which was agreed upon bilaterally prior to Metric's asphalt installation) unambiguously required Metric to provide a properly installed three-foot

asphalt interface between the existing runway and the concrete arresting gear pad installed by Metric. Metric simply did not conform to the contract's quality-control requirements and did not comply with the requirement that the seam between asphalt and concrete be "flush." Following Metric's repeated inability to comply with the contract requirements, as an accommodation, the Government relaxed the "flush" requirement to permit a three thirty-seconds of an inch tolerance between the asphalt and the concrete, and permitted Metric to demolish an additional section of the runway in order to use Metric's asphalt paving machine to properly install the asphalt. Tr. 269-70 (Kostelny); PX 129. At trial, Metric was unable to demonstrate that the asphalt installations that were rejected were, in fact, contractually conforming. Tr. 269-270 (Kostelny). In fact, Metric admitted that the asphalt was never rejected by the Navy when the asphalt was within the three thirty-seconds of an inch requirement. Tr. 269-270 (Kostelny). That Metric was delayed by its own failures, or that the Government finally relented to Metric's request for a waiver of strict compliance with the specifications, is not attributable to the Government. To the extent that Metric's contract completion was delayed at all by its arresting gear asphalt failures, the Government is not liable for that delay.

The portion of Metric's arresting gear claim that is based upon Metric's replacement of the cable supporting rubber rail is

simply incorrect. The contract (change order 17, drawing C-25) unambiguously required Metric to remove the original rubber rail and to "reinstall" or "refasten" it. DX 1018, pg. 58. Indeed, Mr. Kostelny admitted that the term "refasten" means to "[p]ut it back on." Tr. 275-77 (Kostelny). Metric's destruction or disposal of the original rubber rail was a clear violation of the contract, and the resultant costs and delay to Metric's performance are Metric's responsibility.

C. Metric's Contaminated Soil Removal Claim Is Contractually Unavailing

Metric's soil removal claim is unavailing for the same reasons as its pontoon and arresting gear claims. The Government's requirement for Metric to clean up the contaminated soil at the sand spit area is simply not a change to Metric's contract, which unambiguously required Metric to submit and comply with its own environmental plan and also to mitigate its environmental violations. See DX 1008, pg. 97 (section 3.5.1). Pl. Br. 24.

Metric does not dispute that it did, in fact, cause soil contamination on SNI in general, and at the sand spit area in particular – both of which were documented by the Government contemporaneously. DX 1001, pgs. 262-63; accord Pl Br. 25. The only dispute is the extent of the soil contamination at the sand spit area caused by Metric, and that Metric was unable to prove that its soil contamination was limited to an area that is

smaller than the 200 cubic yards that Metric was required to remove. Given Metric's clear violations of its own environmental plan, the Government's clean-up directive to Metric was neither unreasonable nor extracontractual. Metric has not met its burden to demonstrate that its clean-up efforts exceeded what was required by the contract.

D. Even If The Government Constructively Changed The Contract, Metric Cannot Meet Its Burden Of Proof For Delay Or Hindrance To Its Contract Performance

Metric's claims for constructive changes are garden-variety constructive change claims, where Metric alleges that the Government's actions caused Metric's performance to be delayed – and seeks delay damages for the delay periods alleged. Even if the Government's actions constituted constructive changes to the contract, Metric cannot recover. There is ample case law that explains Metric's burden of proof – a burden that Metric was unable to meet at trial.

This Court explained in PCL Const. Services, Inc. v. United States, 47 Fed. Cl. 745 (2000):

> In order to recover for an alleged compensable delay, whether or not the delay is caused by hindrance, a contractor must demonstrate: (1) the extent of the delay with a reasonable degree of accuracy; (2) that the delay proximately was caused solely by the government's actions; and (3) that the delay caused specific, quantifiable injury to the contractor. See Servidone Constr. Corp. v. United States, 931 F.2d at 861; see also William F. Klingensmith, Inc. v. United States, 731 F.2d 805, 809 (Fed. Cir.1984); Blinderman Constr. Co. v. United States, 695 F.2d 552, 559 (Fed.

> Cir. 1982). The burden of establishing these factors falls squarely upon the contractor. William F. Klingensmith, Inc. v. United States, 731 F.2d at 809; Avedon Corp. v. United States, 15 Cl.Ct. 648, 653 (1988). Moreover, "[o]nly if the delay was caused solely by the government will the contractor be entitled to both an extension of time within which to perform, and recovery of excess costs associated with the delay." Weaver-Bailey Contractors, Inc. v. United States, 19 Cl.Ct. 474, 476 (1990) (emphasis in original) (citing William F. Klingensmith, Inc. v. United States, 731 F.2d at 809), reconsid. denied, 20 Cl. Ct. 158 (1990); G.M. Shupe, Inc. v. United States, 5 Cl. Ct. 662, 700 (1984); see also Blinderman Constr. Co. v. United States, 695 F.2d at 559.

PCL, 47 Fed. Cl. at 801.

Here, Metric cites its alleged pontoon difficulties and its rejected arresting gear asphalt and rubber rail replacement as the cause of its delayed contract completion and corresponding increased costs. Metric's expert analysis is insufficient to support its delay allegations, and to meet Metric's burden of proof. Furthermore, the Government's expert analysis clearly demonstrated that Metric's delays were not caused solely by the Government, were actually Metric's responsibility, and, in any event, were not attributable to the constructive changes alleged by Metric – even if they were, indeed, constructive changes.

For example, the Government's expert analysis showed:

1. Although the Navy installed the pontoon on January 2, 1999, the fire at the asphalt plant which disabled the plant for over seven months on the project preceded the installation of the Navy's pontoon bridge. The asphalt plant delay continued through

July 1999, concurrent to the alleged beach landing restriction and beyond the point when Metric resumed barge landings on the beach. DX 1001, pgs. 17-18.

2. Metric asserts that delays due to the inability to land its barge on the beach caused material shortages. In fact, Metric had all the materials necessary to produce asphalt in late December 1998 because the barge had landed three times, just before the asphalt plant caught fire, the day of the fire, and just after the fire. As a result, Metric had the materials but the plant could not produce asphalt. Metric did not produce asphalt again until July 9, 1999, after the Government permitted Metric to land directly upon Daytona beach again. DX 1001, pg. 18.

3. The asphalt plant was certainly not on standby between December 18, 1998 and July 9, 1999 (a period of seven months) because it was not operational and was incapable of producing asphalt. DX 1001, pg. 27.

4. The asphalt plant was in a constant state of needing repairs. During 1998, the plant was being repaired and not operational for 118 days, and during 1999, the plant was being repaired and not operational for 223 days. DX 1001, pgs. 23, 24, 27.

5. Metric rarely achieved its as-bid production rate of 600 cubic yards per day for asphalt, a rate that was confirmed in a

letter from Tom Miller to E. G. Holmes (see DX 1001, pg. 141). In fact, Metric's average production of asphalt for the last half of 1999 was approximately 200 cubic yards per day (about one third the bid production rate). DX 1001, pg. 26.

6. Metric failed to start the work for the roadway contract when it was awarded in October 1998 (prior to the asphalt plant fire and prior to the installation of the pontoon) until a full five months later -- in March 1999. DX 1001, pg. 18.

7. Metric's crew size remained constant throughout 1998 and 1999 which, once they were awarded the roadway contract in the amount of $2 million, meant that the same crew was performing work upon two contracts instead of one, which by definition detracted from Metric's efforts upon the airfield contract. In addition, Metric did not have different crews for asphalt and concrete work so when asphalt was being produced the crew abandoned any concrete work and vice versa. DX 1001, pg. 28.

The Government's expert has reached many more conclusions, summarized in her report, that contradict the fundamental basis of Metric's case. DX 1001 (Expert Report of Ms. Jones). In any event, as the above facts established, the delays suffered by Metric from January to June 1999 were the direct result of Metric's own actions, not those of the Government. Accordingly, Metric has failed to establish entitlement to delay damages. PCL, 47 Fed. Cl. at 745.

E. Metric's Damages Claim Is Insufficient

The damages issues raised by Metric in its post trial brief, primarily Metric's use of "blue book" rates to recover the purported "ownership costs" for Metric's equipment, are irrelevant because there is no Government liability for Metric's constructive change claims for the reasons discussed above. Even if there is Government liability, however, and delay periods can be attributed to the constructive changes alleged by Metric, Metric's damages are so improperly calculated (for a myriad of reasons described in Mr. Cotton's expert report which is not republished here See DX 1002) that any recovery by Metric is precluded. However, we will briefly respond to Metric's contention that its use of blue book rates is appropriate.

Metric's use of the Dataquest blue book rates for its claim calculations is inflationary because Metric's actual equipment costs were substantially lower that the costs for equipment upon which the blue book rates are based. For just six of the 87 items in Metric's claims, use of the blue book rates rather than Metric's actual equipment costs inflates the claims by $2,456,870. DX 1002, pgs. 22-25, 123 (Cotton Report). Despite requests, Metric has failed to supply sufficient information to enable Mr. Cotton to determine the full inflationary effect of Metric's use of the blue book rates, but Metric's use of the blue book is clearly inflationary.

Metric’s barge costs are a good example of its attempt to inflate its costs. With respect to the barge, Metric seeks standby costs related to the pontoon bridge delay claim of $367,800. DX 1002, pg. 17. In addition, Metric seeks another $341,100 of standby costs for the barge relating to its arresting gear claim. Id. Metric then adds office overhead and profit and claims a total of $868,870 of “costs” and profits relating to the barge. Id. Metric’s claim is grossly inflated given that Metric purchased the barge in December 1994 for only $650,000. Id.

While Metric claims that it is entitled to the blue book rate for its equipment due to an “oral agreement” with the Navy, Metric apparently believes that when it comes to the barge, the blue book rate of $11,614 per month is simply not high enough. Therefore, Metric attempts to collect the market rate that it rents the barge to customers of $30,000 per month. Tr. 1047 (Miller). But Metric is not entitled to market rates only its actual costs. See United States v. Callahan Walker Const. Co., 317 U.S. 56, 61 (1242). In fact, Metric admitted as much during the trial. Tr. 1049-50 (Mr. Miller testified “I doubt if it would be $30,000 because, as I said, blue book typically doesn't represent market rates. Yeah, I think you make a valid point there.”). As a result, Metric’s barge claim is $486,605 more than the amount calculated using the blue book rate. DX 1002, pg. 18.

Finally, Metric improperly depreciated its barge over a 5-year period which further inflated the cost. Id. Defendant's expert calculated Metric's cost of ownership using a 20-year useful life which resulted in a barge cost of $4,717.01 per month. Id. This means that Metric's claimed barge cost is $597,437 more than Metric's actual cost of ownership. Id. In total, Metric is seeking $174,871 per MONTH for equipment that according to Metric's own financial statements only cost about $1 million in total. All in all, Metric's use of the blue book rates rather than actual costs results in inflating Metric's claim by $2,456,870. DX 1002, pg. 25; Tr. 1824 (Cotton).[3] This is both excessive and inflationary and should not be awarded by the Court.

Metric also misapplied the blue book by failing to make required adjustments to the rates and by applying a wholly unsupported 125% so-called "area adjustment factor," further inflating its claim. Cotton Report; DX 1002, pgs. 22-27. This is incorrect for two reasons. First, "[r]egional adjustment factors are meant to apply only to the rental rates; they are not

[3] Mr. Cotton testified that "[Metric] had total equipment costs recorded in their books of a little over a million dollars for that three year time period. All of the equipment on San Nicolas Island was owned by Metric as of August 31, 2000. Their claims include total equipment costs of 5.5 million. So it's unlikely -- I think I go so far as to say it's impossible that they could have $5.5 million of actual equipment costs in the face of what their financial statements disclose as their equipment costs allocated to this job." Tr. 1824 (Cotton).

intended to be adjustments to the "Estimated Operating Cost/Hour." DX 1002, pg. 26 (quoting Dataquest Blue Book). Second, the most significant factor in determining the regional adjustment factor is the climate to allow the adjustment for shorter working seasons in northern locations. DX 1002, pgs. 26-27. SNI is off the cost of Southern California. Regional adjustment factors for Southern California vary from .93 to 1.0, DX 1002, pg. 125, which would actually reduce the blue book rate rather than increase the rate as Metric did by improperly using a regional adjustment factor of 1.25 which increases Metric's owned equipment claim by 25%.

Contrary to Metric's claim, the Government presented evidence that the Government did not agree to the use of blue book rates for calculating owned equipment rates. Tr. 1855 (Cotton); DX 1002, pg. 19 (quoting Memorandum of May 22, 2001 from the Resident Officer in Charge of Construction, Naval Base Ventura County stating, "The contracting officer has no knowledge of such an agreement.") Indeed, had the Navy known of the full extent of the inflationary impact of use of the blue book on Metric's other changes orders, the Navy would undoubtedly not have allowed it to be used. In any event, use of blatantly inflated equipment rates in a claim calculation is patently improper. In Daewoo v United States, 73 Fed. Cl. 547 (2006), this Court held that "plaintiff purposely avoided looking at its

own acquisition costs in favor of the higher manual [i.e. rate book] numbers. This intentional inflation of the claim is fraud. Daewoo also applied the manual rates improperly and inconsistently." Daewoo, 73 Fed. Cl. at 591-2.

The burden is on the contractor to prove that booked costs should be used instead of actual costs:

> the burden is on the party seeking to substitute AGC costs for the contractor's own actual, booked costs to demonstrate that the contractor's own costs (as shown) are inadequate or incomplete or do not fairly represent the full costs rightly attributable to the particular contract.

Meva Corp. v. United States, 511 F.2d 548, 559 fn. 10a (Ct.Cl. 1975).

As the board stated in Baifield Indus., Div. Of A-T-O, Inc., ASBCA 13418 77-1 BCA ¶ 12,308, aff'd 706 F.2d 320 (Fed. Cir. 1983), at 59,455:

> The absence of records supports our finding on entitlement. We cannot conceive that a responsible contractor would knowingly incur losses of millions of dollars, for which it considered the Government to be responsible, without maintaining records of the costs claimed to be the Government's responsibility. [The contractor] kept extensive records but, in support of its quantum claim, has present none identifying the Government responsibility.

That is exactly the situation here, Metric failed to make any attempt to rely on actual costs, choosing instead to rely on blue book rates which are higher than Metric's actual costs and, thus, inflationary.

Metric's post trial arguments in favor of its use of the blue book miss the mark entirely. Although Metric can cite cases where blue book rates have been applied in litigation where there was no contention that use of those rates was unreasonably inflationary, that is not the case here. Certainly, any costing technique that is inflationary should be rejected by this Court.

F. Metric's Reliance Upon The "Spearin Doctrine" Is Inapposite

Although unclear how it applies to the facts of this case, Metric devotes approximately three sentences in its post-trial brief (at page 31) to United States v. Spearin, 248 U.S. 132 (1918), suggesting that "if the contractor follows the specifications, the government warrants that satisfactory performance will result." This is a misstatement and misapplication of the "Spearin doctrine," which only applies to "design specifications" which are certainly not present in this case.

The United States Court of Appeals for the Federal Circuit has explained:

> Performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, *selecting the means and assuming a corresponding responsibility* for that selection." . . . Design specifications, on the other hand, describe in precise detail the materials to be employed and *the manner in which the work is to be performed.* The contractor has no discretion

> to deviate from the specifications, but is "required to follow them as a road map."

P.R. Burke Corp. v. United States, 277 F.3d 1346, 1357 (Fed. Cir. 2002) (emphasis supplied) (quoting Blake Construction Co. v. United States, 987 F.2d 743, 745 (Fed. Cir. 1993) (quoting J.L. Simmons Co. v. United States, 188 Ct. Cl. 684, 689, 412 F.2d 1360 (1969))); accord, e.g., Connor Brothers Construction Co. v. United States, 65 Fed. Cl. 657, 685-86 (2005); Utility Contractors, Inc. v. United States, 8 Cl. Ct. 42, 50-51 (1985) ("[D]esign specifications are explicit, unquestionable specifications which tell the contractor exactly how the contract is to be performed . . . ."), aff'd, 790 F.2d 90 (Fed. Cir. 1986) (table). The Government warrants the accuracy of design specifications, but no such warranty accompanies performance specifications. E.g., Connor Brothers Construction Co. v. United States, 65 Fed. Cl. 657, 685-86 (2005); Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed. Cir. 1987). Thus, whether the specifications were design or performance specifications is critically important for an understanding of the parties' respective rights and obligations.

Many Government specifications include both design and performance provisions. E.g., Blake Construction, 987 F.2d at 746. Thus, when a contractor alleges a violation of the Spearin warranty, the Court must first identify the specific provisions at issue, in light of the contractor's allegations; determine if

these provisions are performance specifications (where the contractor had discretion for determining how to perform) or design specifications (where the contractor had no such discretion); and then determine if the problems alleged by the contractor were caused by design specifications (i.e., contractor had no discretion) or by the manner in which the contractor exercised its discretion under performance specifications. See Blake Construction, 987 F.2d at 746; Conner Brothers, 65 Fed. Cl. at 685-86; PCL, 47 Fed. Cl. at 796 (citing cases); Monitor Plastics Co., ASBCA No. 14447, 72-2 BCA ¶ 9626 at 44,971-72 (1972); R. Nash, Jr. & J. Cibinic, Jr., Federal Procurement Law 1017, 1023-24 (3d ed. 1980); D'Alosio, The Design Responsibility and Liability of Government Contractors, 22 Pub. Cont. L.J. 515, 519-24, 537-40, 567-73 (1993).

Furthermore, contractors typically are granted at least some discretion even when specifications are largely of the design variety, and the labels "design" and "performance," while helpful to some degree, are merely labels. It is the contract's provisions, and the amount of discretion that the contract affords the contractor, that govern whether the contractor can recover for problems that occurred during performance. Blake Construction, 987 F.2d at 746; Conner Brothers, 65 Fed. Cl. at 685-86; PCL, 47 Fed. Cl. at 796.

Thus, where a specification does not tell a contractor how to perform a specific task, that part of the specifications is a performance specification even if the rest of the specifications are design specifications. This is clearly illustrated in Penguin Industries, Inc. v. United States, 209 Ct. Cl. 121, 530 F.2d 934 (1976). In that case, the contractor was partially terminated for default when it failed to produce acceptable ignition cartridges under a supply contract. The specifications provided detailed direction with regard to many aspects of production, but did not explain how the contractor was to glue one component to another. The contractor encountered great difficulties mastering this one step, which led to the Government's rejection of one lot of ignition cartridges. Id. at 123-25, 530 F.2d at 936.

The contractor argued that the specifications were design specifications and that they were defective because they failed to explain how the two components were to be glued together. The Court of Claims rejected this notion and upheld the termination for default, stating that "selection of the method of applying the glue was left to the manufacturer" and that, accordingly, the Government's "data package was not defective." Id. at 124-25, 530 F.2d at 936. Thus, where the specifications allow the contractor the discretion to determine how to perform, the specifications are performance specifications.

Here, Metric has not identified any portion of its contract that it contends to be design specifications. Further, the contract specifications at issue in this case, pertaining to barge landings, arresting gear asphalt, and environmental restrictions, are certainly not design specifications because they left all of the discretion for means and methods of performance to Metric. In short, Metric's invocation of Spearin is inapposite.

G. Metric Waived Its Right To Assert Its Claims

During the course of the SNI projects, Metric waived and released its claims by executing Modification No. P00001 to the Roadway project and Modification No. P000017 to the Airfield project. Modification P00001, dated February 28, 2000, states:

> CONTRACTOR'S STATEMENT OF RELEASE
>
> Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised.

DX 1001, pg. 143. Modification P00001 provided a no cost extension of 384-days from June 12, 1999 to June 30, 2000 "due to batch plant fire, weather etc." DX 1001, pg. 143. As Metric agreed to a no cost extension of the contract as a result of delays caused by weather and other problems relating to Metric's batch plant, Metric has waived any claim for costs that occurred during this period. A second modification, P00017, dated June

23, 2000, and executed on August 3, 2000, relating to the arresting gear, contains identical release language. DX 1001, pg. 145. This modification continued until November 2, 2000 when the arresting gear work was to be completed. By executing these two modifications, Metric waived its claims. Like the contractor in Johnson, Drake & Piper, Inc. v. United States, 209 Ct.Cl. 313, 531 F.2d 1037 (1976), at the time Metric executed the releases, Metric "knew all about the present claims" and is now barred from seeking damages against the Government.

In an obvious attempt to avoid the preclusive effect of these releases, Metric contends in its brief that the contracting officer orally informed Metric's personnel that the releases would not preclude Metric from pursuing its pontoon claim. Pl Br. 37. Under the parol evidence rule, extrinsic evidence pre-dating a written agreement may not be used "to add to or otherwise modify the terms of a written agreement in instances where the written agreement has been adopted by the parties as an expression of their final understanding." Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004). Here, plaintiff is attempting to rely upon alleged oral conversations that occurred prior to the execution of the written modification. As a result, plaintiff's reliance upon these alleged oral assurances is precluded by the parole evidence rule.

Plaintiff's reliance upon George H. Whike Construction Co. v. United States, 140 F.Supp. 560 (1956), is completely misplaced. Plaintiff incorrectly relies upon Whike for the proposition that where a contractor is induced to sign a contract based upon the representations of lawyers of the contracting officer that provisions for reimbursement contained in the bid would protect plaintiff. Pl Br. at 37. From this, plaintiff argues that Metric is entitled to rely upon alleged oral representations by the contracting officer that the "modification would not release Metric['s] rights regarding the pontoon claim." Id. Such a representation by the contracting officer is completely contrary to the written language contained in the modification. As such, plaintiff cannot rely upon Whike, because that case involved assurances that "were not contrary to any provisions in the contract." Whike at 563.

Plaintiff also relies upon C & H Commercial Contractors, Inc. v. United States, 35 Fed. Cl. 246 (1996). In C & H, the court considered whether modifications signed by the contractor, which included a clause releasing the Government from any claims, barred the contractor from collecting additional damages. The court found that the contractor's execution of the modifications resulted in accord and satisfaction for the differing conditions and changes in the work performed by the contractor. Id. at 253. However, the court went on to find that the Government made

misrepresentations to the contractor by providing oral assurances that the release clause of the modifications would not preclude future claims. The contractor's evidence of misrepresentations included the testimony of three corporate representatives and a memorandum from the contracting officer and testimony by the contracting officer in a related proceeding that the release was not intended to preclude the contractor from bringing a future claim. Id. at 255.

Here, Metric has not proved, or even introduced any evidence, that the Government misrepresented the extent of the release to Metric or did anything else that would support applying an exception to the parol evidence rule. The only evidence that plaintiff relies upon in support of its argument that it did not release its pontoon claim when it signed the modification is the self-serving testimony of a single Metric employee, Mr. Miller. Mr. Miller testified that he discussed the release language with the contracting officer, Ms. Martonick, and was assured that Metric would not be precluded from pursuing its pontoon claim by signing the modification. Tr. 963-967 (Miller). Yet Mr. Miller admits that he did not add a reservation of rights to the modification before he signed it, nor did he send Ms. Martonick, or anyone else, a letter memorializing his alleged discussion with Ms. Martonick. Tr. 1158-59 (Miller). Mr. Miller's testimony is completely self-serving and unlike the

evidence put forth in C & H, is not supported by any evidence from other Metric employees. More importantly, Metric did not present any supporting evidence from any Government employees, and certainly not any contracting officers, that the release would not apply. As Metric did not provide any evidence at trial that the Government made misrepresentations, Metric's reliance on C & H is misplaced.

Lastly, plaintiff's reliance upon Navra Harris Construction Corp. v. United States, 574 F.2d 508 (Ct. Cl. 1978) is also misplaced. In Navra, the court simply ruled against plaintiff's motion for summary judgment by holding "that a trial is necessary to determine whether such additional facts can be proved in the face of the Government's opposition." Navra, 574 F.2d at 510. As a result, Navra simply does not apply here where the Court has held a trial and listened to all of the evidence.

At a minimum, Metric has admitted that it waived any claims that occurred during the period of the 384-day extension from June 12, 1999 to June 30, 2000 (P00001) and between August 3, 2000 and November 2, 2000 (P000017). As a result, any damages awarded to Metric should not have been incurred during this period. Tr. 652-53 (Holmes); DX 1001, pg. 142-43.

## CONCLUSION

For the foregoing reasons, and those established at trial, we respectfully request the Court to find in favor of the Government and to deny Metric's claim in total.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director

s/Robert C. Bigler
ROBERT C. BIGLER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Tele: (202) 307-0315
Fax: (202) 514-7988

Attorneys for Defendant

December 28, 2007

CERTIFICATE OF FILING

I hereby certify that on December 28, 2007, a copy of foregoing “DEFENDANT’S POST TRIAL BRIEF” was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Robert C. Bigler