# UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| METRIC CONSTRUCTION CO., INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 04-635C<br><br>Judge Charles F. Lettow |

## PLAINTIFF'S POST-TRIAL REPLY BRIEF

Steven D. Meacham
Peel Brimley LLP
2014 East Madison Street, Suite 100
Seattle, WA 98122-2965
(206) 770-3339
Fax: (206) 770-3490
Attorneys for Plaintiff

**TABLE OF CONTENTS**


I. INTRODUCTION ....................1

II. PLAINTIFF'S REPLY TO DEFENDANT'S "CONTENTIONS OF FACT"....................1

A. Reply to Defendant's "Facts Related to Metric's Pontoon Claim". ....................1

B. Reply to Defendant's "Facts Related to Metric's Arresting Gear Claim". ....................4

C. Reply to Defendant's "Facts Relating to the Contaminated Soil Removal Claim"....................8

D. Reply to Defendant's "Facts Relating to Metric's Use of Blue Book Rates"....................8

E. Reply to Defendant's "Facts Relating to Metric's Waiver of its Claims". ....................10

III. PLAINTIFF'S REPLY TO DEFENDANT'S "CONTENTIONS OF LAW"....................12

A. Reply to Defendant's Argument that "Metric's Pontoon Claims Are Contractually Unavailing". ....................12

1. Defendant argues that "Plaintiff is not entitled to the profits included in its claim" ....................12

2. Defendant argues that its "installation of the pontoon was not a constructive change to Metric's contract....................13

3. Defendant argues that "Metric had an obligation to mitigate its damages by renting a barge that was compatible with the pontoon ....................14

B. Reply to Defendant's Argument that "Metric's Arresting Gear Claims Are Contractually Unavailing". ....................15

C. Reply to Defendant's Argument that "Metric's Soil Removal Claim is Contractually Unavailing". ....................15

D. Reply to Defendant's Argument that "Even if the Government Constructively Changed the Contract, Metric Cannot Meet its Burden of Proof For Delay or Hindrance to its Contract Performance" ....................15

E. Reply to Defendant's Argument that "Metric's Damages Claim is Insufficient"....17

F. Reply to Defendant's Argument that "Metric's Reliance Upon the 'Spearin Doctrine' is Inapposite" ....................18

G. Reply to Defendant's Argument that "Metric Waived its Right to Assert its Claims". ....................18

# TABLE OF AUTHORITIES

## Cases

*Ets-Hokin Corp. v. United States,*
190 Ct. Cl. 668, 420 F.2d 716, 720 (1970) .......... 12

*National Sur. Corp. v. United States,*
31 Fed. Cl. 565, 579 n. 11 (1994) .......... 13

*North American Construction Corp. v. U.S.,*
56 Fed.Cl. 73, 76 (2003) .......... 13

*United States v. Callahan Walker Constr. Co.,*
317 U.S. 56, 61, 63 S.Ct. 113, 87 L.Ed. 49 (1942) .......... 13

*Rumsfeld v. Applied Cos., Inc.*
318 F.3d 1317, 1329 (Fed.Cir.2002) .......... 13

*Earth Burners, Inc. v. United States,*
43 Fed.Cl. 481, 482, n. 1 (1999) .......... 13

*Derek & Dana Contracting, Inc. v. United States,*
7 Cl.Ct. 627, 639 (1985) .......... 13

*Salem Eng'g and Constr. Corp v. United States,*
2 Cl.Ct. 803, 809 (1983) .......... 13

*Bennett v. United States,*
178 Ct.Cl. 61, 70, 371 F.2d 859, 864 (1967) .......... 13

*American Federal Bank, FSB v. U.S.,*
72 Fed. Cl. 586 (2006) .......... 14

*T.C. Bateson Construction Company v. U.S.,*
162 Ct.Cl. 145, 188, 319 F.2d 135, 160 (1963) .......... 14

*Koby v. U.S.,*
53 Fed. Cl. 493, 497 (2002) .......... 14

*Robinson v. United States,*
50 Fed.Cl. 368, 370 (2001) .......... 15

*Citizens Federal Bank v. U.S.,*
Fed. Cl. 179, 185 (2005) .......... 15

*Gemini Electronics, Inc. v. U.S.*,
65 Fed.Cl. 55 ___ (2005) ........................................ 19

*Jowett, Inc. v. United States,,*
234 F.3d 1365, 1368 (Fed.Cir.2000) ........................................ 19

*National Steel and Shipbuilding Company v. U.S.*,
49 Fed.Cl. 579 (2001) ........................................ 20

*Community Heating & Plumbing v. Kelso,,*
987 F.2d 1575, 1581 (Fed.Cir. 1993)........................................ 20

In accordance with the Court's post trial order of October 26, 2007, Metric respectfully submits a reply to Defendant's Post Trial Brief.

## I. INTRODUCTION

Defendant's Post-Trial Brief raises a number of "factual contentions" and "legal contentions" that are not supported by the actual facts or the applicable law. Accordingly, Metric responds to these factual and legal contentions as follows:

## II. PLAINTIFF'S REPLY TO DEFENDANT'S "CONTENTIONS OF FACT"

### A. Reply to Defendant's "Facts Related to Metric's Pontoon Claim"

The government argues that the Metric's ability to land on the beach was restricted due to environmental limitations such as government barge landings and protected wildlife. They further argue that Metric's remedy is limited to a "no cost time extension."

The facts presented at trial were that Metric coordinated its landings with the Navy's barge landings. In fact, there were occasions when both the Navy and Metric would coordinate their landings and land their barges on the same day. Tr. 486-487 (Holmes). The evidence also showed that over the entire duration of the project of more than six years Metric was only stopped from landing on Daytona Beach a couple of times due to the other environmental restrictions such as seals on the beach. Tr. 83-85 (Kostelny); Tr. 485 (Holmes); Tr. 914 (Miller). Section 1600.1.6.3.5(b) states that the Contracting Officer will notify the Contractor if a barge will not be allowed to land at Daytona Beach. DX 1008 pg. 105. The government presented no evidence that Metric could not land on Daytona Beach because of Navy barge landings or the presence of seals on those days Metric claims it could have landed but for the pontoon.

The government admits that as a "continuing and evolving Government effort to improve the facilities at SNI" it changed the work by "replac[ing] the beach landing facility with a barge-landing pontoon dock ("pontoon") and directed that further barge landings at Dayton Beach use the pontoon." Def. Br. at 6-7. The government then mistakenly argues that Metric is limited to a

"no cost time extension." Metric's claim is for the times it could have landed because weather and surf conditions **were** acceptable to land on the beach, but could not land because conditions were not right **to land on the pontoon because of additional restriction imposed by the pontoon.** There were many days between January and June 1999 that Metric could have landed on the beach as they had done in years past, but could not land on the pontoon because of tides, sandbars, and other restrictions caused by the placement of the pontoon. Tr. 93-100 (Kostelny); Tr. 458-459, 534-535 (Holmes).

The government's brief lists four items that Metric failed to do once the pontoon was put in place including obtaining another barge, using the Sissy Cove landing site, better documenting the aborted beach landings or missed barge landings, and not taking into consideration that installation of the pontoon eliminated the need to construct sand ramps. The government provides no evidence to support its position that another barge was available or conducive to landing on Daytona Beach. The only two barges that could land on SNI were Metric's barge and the Navy (Foss) barge. Tr. 903 (Miller). The undisputed evidence was that Metric notified the government of the problem and the government failed to provide direction. PX 20, PX 21, and PX 22. Metric did not know from day to day when or if the pontoon would be removed as requested by Metric or when the government would provide Metric with authorization to land elsewhere on Daytona Beach. Tr. 908-909 (Miller). In its legal conclusions, the government argues that Metric could have used the Navy (Foss) barge. The undisputed evidence was that the Navy barge was loaded most of the time to go to SNI [Tr. 395 (Kostelny)], and that the Navy barge had a significantly lower carrying capacity than Metric's barge which would have required three times as many landings. Tr. 443 (Kostelny); Tr. 771 (Holmes). The government's Monday morning quarterbacking is convenient, but Metric's conduct at the time was reasonable given the circumstances and the lack of direction and information from the government.

The undisputed testimony was that Metric could not land its barge at Sissy Cove without significant risk. Tr. 70 (Kostelny); Tr. 481 (Holmes). Again, the government presents no evidence that landing at Sissy Cove was a reasonable option or that Metric should have taken the steps to procure another landing craft small enough to land at Sissy Cove.

Metric did document the aborted landings and presented evidence of those days it could have landed, but was prevented from doing so because of the pontoon restrictions. PX 20; PX 21; PX 22; PX 97. Shortly after Metric was given access to land on the Beach in June 1999, Mr. Holmes prepared his analysis indicating the days that Metric could have landed but was prevented from doing so by the pontoon restrictions. PX 7 pgs. 69-75.

The government's argument that Metric did not take into account that the pontoon installation eliminated the need to construct sand ramps when landing on the pontoon is no defense to Metric's claims. If beach landings and placing sand ramps was a not benefial to Metric, it would have been illogical for Metric to request the pontoon be removed. PX 22.

The government claims that the project was impacted far more by events that are unrelated to Metric's barge landings such as the asphalt plant fire, the fact that Metric did not run out of materials, and because Metric was not capable of landing the barge in May 1999 because the barge was being repaired. These arguments have no substance.

In Metric's analysis, it takes into consideration the asphalt batch plant down time and analyzed when the plant would have been operational as compared to when it was operational due to the pontoon delays. PX 5. The pontoon delayed delivery of the asphalt batch plant parts necessary for the repair. The asphalt batch plant started up again on June 24, one week after Metric resumed beach landings, because of the parts delivery. Tr. 773 (Holmes). After the batch plant was operational, it was able to keep up with the asphalt production, but production was reduced due to the lack of materials. Tr. 127-128 (Kostelny); Tr. 1198-1199 (Miller).

The government argues that there was no delay because Metric did not run out of material. The undisputed testimony as set forth above was that Metric reduced it crew and production to avoid running out of materials and maintain a constant crew size. These are steps that Metric would not have needed to take if the pontoon had not been installed and Metric could, as it attempted to do, continue to deliver materials between January and June 1999. Even the government's expert acknowledged that Metric's production in 1999 was much less than prior years, but jumped dramatically in 2000 when the last of the materials was delivered. DX 1001 pg. 26. The government's apparent arguments are that Metric should have increased its crew size when it was awarded the Roadway project and should have not reduced production until it ran out of materials. These arguments are ridiculous. It would have terrible management and more costly to increase the crew size and maintain top production, run out of materials, stop work, lay off the crew, wait until more materials could be delivered, hire a new crew that may or may not include former crew members, and start the process over again.

The government argues that Metric could not land the barge in May 1999 because the barge was in repair. Based on Mr. Holmes analysis, there were no days in May 1999 that Metric could have landed the barge and repairs were scheduled when conditions would not have allowed a landing. PX 7 pg. 74; Tr. 844 (Holmes). According to Mr. Burnell's analysis, the materials could have and should have been delivered prior to May 1999. PX 5 pg. 40. Thus, the government's argument is without substance.

The facts related to the pontoon claim support Metric's claim that the installation of the pontoon restricted Metric's ability to land on SNI resulting in aborted landings and material shortages that limited production and extended the project durations.

**B. <u>Reply to Defendant's "Facts Related to Metric's Arresting Gear Claim"</u>**

In its post trial brief, the government argues that Metric admitted that the asphalt was

never rejected by the Navy when the asphalt was within 3/32 of an inch; however, the change order states, "The new concrete shall be flush with the surrounding surface and shall not have any deviation of more than 3/32 of an inch." PX 6 pg. 11. The 3/32" deviation relates to the concrete surface, not the elevation difference between the concrete and the adjacent surfaces. As set forth in the change order, the joint sealant which is between the concrete and asphalt was to be recessed 1/8". An eighth of an inch is 4/32" which is greater than 3/32". PX 6 pg. 11. The issue was what did the Navy consider "flush." In the QC meeting of June 7, 2001, the lip between the asphalt and the concrete was discussed with Mr. Serrano stating the lip "has to be flush – ¼ inch in ten feet." However, Mr. Serrano wanted the lip of the concrete to be higher rather than lower. Mr. Douglas said that it had "to be flush. Need clarification." PX 43. Seven months after the initial asphalt patch, the issue of "flush" was not resolved.

The main issue regarding the rejection of the asphalt as testified by both Mr. Kostelny and Mr. Douglas was whether or not the asphalt patches had excessive aggregate exposure. The other main issue relating to the arresting gear is whether or not the rubber rails were to be salvaged and reinstalled.

The government argues that "each time that Metric installed the asphalt, it was very rocky allowing rocks to dislodge from the asphalt leaving loose rocks on the runway that could get caught up in the aircraft's jet engines and destroy the engines." Def. Br. pg. 19. Mr. Douglas did not testify that "each time" the asphalt was rejected it was due to loose rocks. The reasons for rejection were as set forth on the notices of non-compliances. Tr. pg. 2270 (Douglas).

The facts are that the resting gear asphalt patch was placed on November 29, 2000; however, the government's portion of the report is not signed by Mr. Douglas until December 21, 2000, and he had no comments regarding the quality of the work. PX 47 pgs. 70-71. The asphalt is repaved on December 4, 2000. Again the government's portion is not filled out until

December 21, 2000 when Mr. Douglas notes, "Back from leave." PX 47 pgs. 76-77. On the Quality Control Report of December 4, 2000, Mr. Douglas notes, "Pavement at edges of arresting gear (30 End) very rocky Metric already removed some areas & replaced asphalt, in the process of removing more. Dave Maddes & Leonard Serrano came out to look at on 6 Dec. 2000." Again, this entry is made December 21, 2000 when Mr. Douglas got back from leave. PX 47 pg. 6.

Mr. Douglas doesn't indicate there are loose rocks. He said that the asphalt was very rocky at the pavement edges. The testimony of Metric's witnesses were that the asphalt was rejected due to excessive exposed aggregate at the edges of the paving because they could not hand place the material without having some exposed aggregate. They further testified that the amount of exposed aggregate was not excessive and met industry standards. Mr. Holmes testified regarding certain photographs (DX 1009 pg. 55, 57, and 59) and that those areas shown on those photographs were rejected by the government claiming that there was excessive aggregate exposure, not loose rocks. Tr. 606-620 (Holmes). The non-compliance notice rejecting the asphalt on December 6, 2000 is not signed by a Navy Representative. DX 1001 pg 179.

The first time the Navy raises the issue of loose rocks is in April 2001 when Mr. Douglas inspects the asphalt and takes his photographs. It is Metric's position that it complied with the specifications for a hand placed patch as required by the contract (DX 1008 pg 160) and that the exposed aggregate was not "excessive." DX 1008 pg 169. After the April 2001 rejection that Metric demolished a wider area to allow for the asphalt to be machine paved and that no hand placement was accepted by the government. Tr. 207-208 (Kostelny); DX 1009 pg 93.

In regards to the Rubber rails, the government's argument relies on contract drawing C-25 that addresses reinstalling the cable support rail. When Metric performed the original

contract work, it installed the existing rubber rails as set forth on C-25. After the contract work was complete, the government issued PC #25 to replace the arresting gear Metric had installed under the contract. PC # 25 (2) specifically states, "Remove and dispose of off the island the existing concrete and rails of the arresting gears (2 each)." PX 120.

Shortly thereafter, the government then issued Modification No. P00017 that states:

> "Replace concrete as per details shown on drawing number TO4972 and per specifications of contract numberN62474-94-C-6807. Work includes the demolition of all existing concrete arresting gear material and replacing with new compacted base material, concrete, and to patch the asphalt as shown..." PX 6 pg. 11.

There is no reference in P00017 to Contract Drawing No. C-25 and there is nothing on drawing number TO4972 that requires Metric to refasten or reinstall the existing rubber rails. "Demolition of all existing concrete gear material" as set forth in the modification is consistent with PC #25 language of removing and disposing "of off the island the existing concrete and rails." Drawing TO4972 Note 6 states that the new I-beam were to be drilled and tapped prior to installation and that the government would provide a template for the location of the holes. PX 6 pg. 13. The government would not have needed to provide a template for the holes if the plan was to use the existing rails.

Mr. Douglas in the daily report dated 9/4/01 states, "Told Contractor that the rubber rails (existing) will be installed when they want to complete the 30 end Arresting gear if the other ones don't arrive." PX 47 pg. 18. The 9/5/01 report states, "Have told contractor to install existing rubbers that we were not waiting or being delayed by customer on trying to get 10' rubber from Air Ops Point Magu." PX 47 pg. 17. There would have been no need to direct Metric to install the existing rails if new rails had not been expected by the parties.

References back to C-25 is a defense concocted by the government at trial to defend against Metric's claim and is inconsistent with PC # 25, Modification P00017, and the understanding of the parties prior to this government caused delay.

C. **Reply to Defendant's "Facts Relating to the Contaminated Soil Removal Claim"**

The government's post trial brief goes on at length about Metric's environmental violations which the government acknowledges Metric cleaned up at its own expense. The issue in dispute is whether the contamination at the sand pit was caused by Metric. Metric acknowledges that it placed a bucket load of contaminated material at the edge of the stockpile that it was able to identify and remove. The larger issue is how the Sand Spit stockpile of grinds got contaminated requiring Metric to remove one half to two thirds of the stockpile as hazardous materials as directed by the government.

No government witnesses were called that had any knowledge of how the stock pile was contaminated. The government's environmental protection specialist, Mr. Schwartz, was unable to draw any conclusions as to how the grindings became contaminated. He surmised that it was from materials transported to the site and that it did not appear that the contamination had occurred at the Sand Spit. Since Metric had transported the materials to the site, the government assumed that Metric was responsible. Tr. 1762-1768 (Schwartz).

The grinds came from asphalt and concrete removed by Metric on both the airfield and roadway projects. Tr. 2274-2275 (Douglas). Virtually no evidence was presented that Metric had contaminated the materials it had demolished on the airfield and runway projects. Metric had demolished part of the airfield and runway, hauled those materials to the Sand Spit, and ground the materials at the Sand Spit for use as base material by the government.

The government's requirement for Metric to remove the contaminated materials without evidence that Metric had actually contaminated the grinds is a change to the contract.

D. **Reply to Defendant's "Facts Relating to Metric's Use of Blue Book Rates"**

The contracts incorporate DFAR 252.243-7001 which states that when costs are a factor in any price adjustment under the contract, the contract cost principles and procedures in FAR

Part31 and DFARS Part231, in effect on the date of the contract, apply. PX3 pg 152.

FAR 31.105 (d)(2)(i) states:

> "(A) Actual cost data shall be used when such data can be determined for both ownership and operation costs for each piece of equipment, or groups of similar serial or series equipment, from contractor's accounting records. When such costs cannot be so determined, the contracting agency my specify the use of a particular schedule of predetermined rates or any part thereof to determine ownership and operating costs of construction equipment…
>
> (B) Predetermined schedules of construction use rates (e.g., the Construction Equipment Ownership and Operating Expense Schedule, published by the U.S. Army Corps of Engineers, industry sponsored construction equipment cost guides, or commercially published schedules of construction equipment use cost) provide average ownership and operating rates for construction equipment…"

The Blue Book is such a predetermined schedule of construction use rates. It is widely accepted and used in the construction industry on both public and private projects. Tr. 1691-1693 (Pepin). Even the government's expert agreed that the FARs allow for the use of the Blue Book if that decision is made by the contracting agency. Tr. 1959 (Cotton).

The undisputed testimony was that Metric and the Navy agreed to use the predetermined equipment rates as set forth in the Blue Book. The parties agreed to use the Blue Book rates at the preconstruction meeting and used the Blue Book rates in the change orders. Tr. 457 – 558 (Holmes); Tr. 925 (Miller).

The government claims that the use of Blue Book rates was inflationary and unreasonable; however, in making that determination, the government's expert failed to take into consideration all of Metric's costs. The government's expert, Mr. Cotton, prepared a sheet attached as Exhibit 4 to his report (DX 1002 pg. 123). That showed what he considered to be inflationary rates for six pieces of equipment. In preparing that analysis, Mr. Cotton broke down the costs into Blue Book elements for depreciation, cost of facilities capital (CFC), and indirect costs. In calculating the depreciation, he did not use the Blue Book but some calculation based on the COE manual. He then applied these non-typical modified rates to establish the CFC. Mr.

Cotton also did not include the indirect costs stating that these indirect costs "would have either been claimed as a direct job cost, or possibly included in Metric's overhead." Tr. 1935-1936 (Cotton). Thus, using this atypical method of analysis the government has incorrectly concluded that using the Blue Book rates costs were inflationary.

Segregating direct equipment expenses, indirect equipment expenses, and equipment capitalization costs is not an easy task. Maintaining the records and allocating the costs for each dollar spent on each piece of equipment and recording the manhours spent on repairing and maintaining each piece of equipment would have been a nightmare. So Metric and the Navy agreed to use Blue Book rates to avoid the very issues being raised by the government at trial. It seems rather disingenuous to have an agreement in place that eliminated the need to maintain detailed cost records and then deny the claim because those records were not maintained.

Metric incurred costs relating to the equipment, including but not limited to, maintaining the equipment is a corrosive environment, repair costs, permitting and licensing costs, replacement costs in the case of the asphalt batch plant, and transportation costs. These costs were not broken down into identifiable costs for each piece of equipment but have contributed to the $2 million Metric is out of pocket on this project (DX 1002 pg. 121) exclusive of Holmes indirect equipment costs. Tr. 661 – 668 (Holmes); Tr. 1930 – 1931 (Cotton).

The government claims that Metric's evidence of the Blue Book agreement is the "self-serving" testimony of a single Metric employee. Def. Br. pg. 14. As set forth above, both Mr. Holmes and Mr. Miller testified that the agreement was made. The government's counsel has been aware of Metric's position regarding this agreement for years and the government was unable to provide a single witness to dispute the existence of the agreement.

**E. <u>Reply to Defendant's "Facts Relating to Metric's Waiver of its Claims"</u>**

The government contends that Metric waived its claims by executing Modification No.

P00001 to the Roadway project and Modification No. P00017 to the Airfield project.

Modification No. P00001was signed by both parties in June 2000. DX1001 pgs. 142-143. Upon receipt of the modification, Mr. Miller contacted the contracting officer, Ms. Pat Martonick, to confirm that Metric could still pursue its claim for damages associated with the pontoon claim. Ms. Martonick confirmed that Metric could still pursue the pontoon claim, because the modification was only for "work herein revised." The pontoon issue was not the subject of the change. After assurance from Ms. Martonick that signing the modification would not affect Metric's pontoon claim, Mr. Miller signed the modification. Tr. 963 – 965 (Miller).

Although the government's counsel and its experts claim that Metric waived the pontoon claim based on its interpretation of the modification, the government has presented no evidence that has contradicted Mr. Miller's testimony that here was no waiver of the pontoon claim. Other than the modification itself that contains virtually no reference to the pontoon issue, the government has produced no evidence from the contracting officers or other personnel working on the project that P00001 constituted or was intended to be a waiver of Metric's pontoon claim. In the government's responses to the Metric's pontoon claims, long after P0001 was signed, there was no mention of Metric waiving the pontoon claim. As pointed out in Metric's post trial brief, seven months after the modification was signed the government was expecting that the "pontoon issue will be a doozie!!" Pl. Br. 39; PX 5 pg. 182. Surely, not the comment of a contracting officer that deemed the pontoon claims to have been waived.

Modification No. P00017 to the Airfield project was also not a waiver of the claims. The modification only states that the work as set forth in the change "is to be completed by November 2, 2000." DX 1001 pg. 144-145. The release is also for work arising out of, or incidental to, the work therein described. There is virtually no tie between this change and the pontoon claim.

The government's counsel and its experts seem to think it is incredulous that Metric would not document the conversation with Ms. Martonick and or submit a reservation of rights; however, the government did assure Metric that it could still pursue its pontoon claims and not everything on this project has a paper trail. Even in relationship to Modification No. P00017, not everything was documented by a paper trail. The amount of Modification No. P00017 was reduced from over $600,000 to $50,000 and was the subject of some "horse trading" between Metric and the government that was not memorialized in the modification. Tr. 1771 – 1774 (Carrignan); Tr. 1017 – 1019 (Miller). Even though it was not in writing, Metric held up its end of the agreement and the Navy held up its end. Perhaps that is why no Navy personnel have alleged or raised the issue that Metric and/or the Navy intended that either P00001 or P00017 were waivers of the pontoon claims.

## III. PLAINTIFF'S REPLY TO DEFENDANT'S "CONTENTIONS OF LAW"

### A. <u>Reply to Defendant's Argument that "Metric's Pontoon Claims Are Contractually Unavailing"</u>

#### 1. Defendant argues that "Plaintiff is not entitled to the profits included in its claim"

Defendant's assertion that Metric's claims do not constitute "constructive change claims" goes to the heart of this dispute. Citing *S.S. Silberblatt, Inc. v. United States* without explanation – a case dealing with a "suspension of work" clause, not a changes clause – Defendant audaciously declares that Metric's claim is not a "constructive change" and, therefore, "not entitled to recover the profits included in its claim." Defendant's assertion is an incorrect and misleading statement of the law.

"A constructive change occurs when "a contract contains the standard 'changes' provision and the contracting officer, without issuing a formal change order, requires the contractor to perform work or to utilize materials which the contractor regards as being beyond the [contractual requirements]." *Ets-Hokin Corp. v. United States,* 190 Ct. Cl. 668, 420 F.2d 716,

720 (1970); *see also National Sur. Corp. v. United States,* 31 Fed. Cl. 565, 579 n. 11 (1994). The contract in the instant case incorporates by reference the standard Changes clause set forth at Federal Acquisition Regulation ("FAR") § 52.243-4.

It is well established that *profit* is generally included as an integral part of the pricing an "equitable adjustment." *See North American Construction Corp., v. U.S.*, 56 Fed. Cl. 73, 76 (2003) ("*With respect to profit, there is typically no question that it is a normal part of an equitable adjustment*"). In *North American* the court explained why profit must be included in an equitable price adjustment under the Changes clause:

> The FAR does not define each of the factors that might be included in an equitable adjustment. *However, the cases which have evaluated equitable adjustments pursuant to the Changes clause of the FAR have identified the various elements of the final price agreed upon as including costs resulting from the change plus an allowance for profit* and other administrative costs, including overhead. *See United States v. Callahan Walker Constr. Co.,* 317 U.S. 56, 61, 63 S.Ct. 113, 87 L.Ed. 49 (1942) ("An 'equitable adjustment' ... involved merely the ascertainment of the cost of [additional work] ... and the addition to that cost of a reasonable and customary allowance for profit"); *Rumsfeld v. Applied Cos., Inc.,* 318 F.3d 1317, 1329 (Fed.Cir.2002) (noting that CO had stated that "[a]n equitable adjustment compensates for changes by paying a contractor its increased costs resulting from the change, plus an allowance for profit on that cost"); *Earth Burners, Inc. v. United States,* 43 Fed.Cl. 481, 482, n. 1 (1999) ("[t]he proper measure of an equitable adjustment is reasonable costs, including reasonable profit for the work performed"); *Derek & Dana Contracting, Inc. v. United States,* 7 Cl.Ct. 627, 639 (1985) ("profit and overhead are recoverable under an equitable adjustment"); *Salem Eng'g and Constr. Corp. v. United States,* 2 Cl.Ct. 803, 809 (1983) ("[i]n appropriate circumstances ... [an equitable adjustment] includes profit and overhead"); *Bennett v. United States,* 178 Ct.Cl. 61, 70, 371 F.2d 859, 864 (1967) (allowing overhead and profit as part of equitable adjustment).

*Id.*, at 78-79.

Pursuant to the changes clause in its contract, Metric is entitled to an equitable adjustment including profit.

**2. Defendant argues that its "installation of the pontoon was not a constructive change"**

The government admits that it changed Metric's work when it "**replaced** the beach landing facility with a barge-landing pontoon dock ("pontoon") **and directed** that further barges

landing at Daytona Beach use the pontoon." Def. Br. At 6-7 (emphasis added).

Defendant argues that Metric is asserting it was "contractually guaranteed" to have "unfettered access to beach landings on Daytona Beach. This mischaracterizes Metric's position. Metric does not assert it was entitled to "unfettered" or unrestricted access. Metric's position is that installation of the pontoon, and the government's insistence that Metric use it instead of beach landings, substantially restricted Metric's ability to land at SNI and was, thus, a change.

The government cites no case authority to support its arguments, but relies upon disputed facts. See Section II.A for Metric's reply to the "Pontoon Claim" facts.

**3. Defendant argues that "Metric had an obligation to mitigate its damages by renting a barge that was compatible with the pontoon."**

Next, Defendant asserts, with the advantage of hindsight, that Metric failed to make reasonable efforts to mitigate damages by not "renting a barge that was compatible with the pontoon rather than continuing to use a barge that could not land on the pontoon."

It is a well settled principle that damages a plaintiff might have "avoided without undue risk, burden or humiliation" are not recoverable." *See* Restatement (Second) of Contracts § 350 (1981). However, "[t]he burden of proof shifts with respect to mitigation such that the burden to prove that the actual steps taken in mitigation of a breach of contract were *unreasonable* rests with the breaching party. *See American Federal Bank, FSB v. U.S.*, 72 Fed. Cl. 586 (2006); *see also T.C. Bateson Construction Company v. U.S.*, 162 Ct. Cl. 145, 188, 319 F.2d 135, 160 (1963)("it is the breaching party's burden to prove that the actions taken in mitigation were not reasonable"). In *Koby v. U.S.*, 53 Fed. Cl. 493, 497 (2002), the court explained:

> The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter. Rather, the breaching party must show that reasonable possibilities for mitigation existed and were ignored."

(citations omitted). See also *T.C. Bateson Construction Co. v. United States,* 162 Ct. Cl. 145,

319 F.2d 135, 160 (1963); *Robinson v. United States,* 50 Fed. Cl. 368, 370 (2001).

"It is a bedrock principle of mitigation of damages, however, that even where the plaintiff bears the burden of mitigation, such Monday-morning quarterbacking is irrelevant to an award of mitigation costs." *Citizens Federal Bank v. U.S.*, 66 Fed. Cl. 179, 185 (2005).

Here, Defendant's brief provides no evidence to support its position that Metric was obligated to rent a barge that would have been compatible with the pontoon dock. As set forth in Section II.A, it was not feasible or even possible for Metric to procure another barge. Metric's conduct was reasonable under the circumstances.

**B. Reply to Defendant's Argument that "Metric's Arresting Gear Claims Are Contractually Unavailing"**

The government cites no case authority supporting its position, but relies upon disputed facts. See Section II.B for Metric's reply to the "Arresting Gear" facts.

**C. Reply to Defendant's Argument that "Metric's Soil Removal Claim is Contractually Unavailing"**

The government cites no case authority supporting its position, but relies upon disputed facts. See Section II.C for Metric's reply to the "Soil Removal" facts.

**D. Reply to Defendant's Argument that "Even if the Government Constructively Changed the Contract, Metric Cannot Meet its Burden of Proof For Delay or Hindrance to its Contract Performance"**

The government alleges that Metric did not meet its burden of proof in regards to the delay claims. The government is incorrect. Mr. Burnell's analysis included a CPM analysis using a collapsed as-built analysis which is an accepted methodology for proving delay claims and accepted by the AACEI. Tr. 1327 (Burnell).

The government argues that the asphalt batch plant delay was concurrent to the barge landing delay through July 9, 2000. This issue was analyzed by Mr. Burnell and taken into consideration in his analysis. PX 5. As set forth in both Mr.Burnell's analysis and Metric's post

trial brief, the pontoon installation delayed the delivery of the replacement parts and putting the asphalt batch plant back in service.

The issue of alleged material shortages is addressed in Section II.A.

The government argues that the batch plant was not on standby between December 18, 1998 and July 9, 1999. Metric's claim does not include asphalt batch plant standby costs between December 18, 1998 and July 9, 1999. Metric's claim is for the extended duration that asphalt batch plant was on the project between when Metric could have finished the paving on the projects, July 13, 1999, to when it actually finished the paving, May 18, 2000, excluding the arresting gear paving in Modification No. P00017. PX 5.

The government claims that the asphalt plant caused concurrent delay because it was in a "constant state of needing repairs." The government's argument is speculative at best. The government provided no evidence that the asphalt batch plant actually delayed the work other than the single instance after the batch plant fire and that delay was considered in Mr. Miller's original claim and in the Burnell analysis. At the time the pontoon was installed, there was approximately 14,700 tons of asphalt to be placed. PX. 5 pg. 44. This equates to 49 paving days at 300 tons per day or 73.5 days at 200 tons per day. More than enough paving days to complete the project by July 13, 1999 had it not been for the material shortages and if the batch plant had gone back on line on March 16, 1999 which it could have had the parts not been delayed in being delivered to SNI.

There is no dispute that Metric did not consistently achieve its as-bid production rate of 600 tons per day. However, in performing his analysis, Mr. Burnell used 300 tons per working day which Metric frequently achieved. PX 5. In addition, Mr. Miller testified that during an 84 day period from September 3, 1997 through November 26, 1997, Metric was able to place 10,233 tons of asphalt. During this period, the asphalt batch plant was also down for repairs for

11 days. PX 350; Tr. 2341-2344 (Miller). If Metric actually placed 10,233 tons in 84 days, it could have placed 14,700 tons between March 16, 1999, when the batch plant should have gone back on line, and July 13, 1999, when Mr. Burnell testified Metric could have finished the paving but for the pontoon installation, a period of 119 days.

The government argues that Metric failed to commence the Roadway project when it was awarded in October 1998. The government has provided no evidence that Metric could not have completed the project within the contract duration. Mr. Burnell's analysis shows that both projects could have completed timely, but for the pontoon delay. PX 5.

The government argues that Metric did not bring on an additional crew. As set forth above, the material shortages led Metric to reduce its crew and production. It would have been foolish to increase the crew size, run out of materials, lay workers off and then remobilize once a barge landing could be made.

**E. <u>Reply to Defendant's Argument that "Metric's Damages Claim is Insufficient"</u>**

For the most part, the issues raised by the government in this section of is brief have been addressed in Metric's Post Trial Brief and in Section II.D above. After further review and analysis, Metric does concede that Metric should not have used the $30,000 market rate, but does consider the $11,614 Blue Book rate to be the appropriate rate to be applied in its claims.

The government disputes the application of the 25% factor claiming it is an "area adjustment factor." The 25% factor is **not** an area adjustment factor as defined by the Blue Book. The Blue Book allows for use of a "severity" factor. Tr. 1686 (Pepin). The undisputed testimony is that SNI is a corrosive environment. Tr. 1215 (Miller); Tr. 1970 (Cotton). As such, the 25% severity factor is not unreasonable. Tr 1242 (Miller).

The government says that it presented evidence that the government did not agree to the use of the Blue Book. The only evidence presented was hearsay evidence presented by Mr.

Cotton regarding a memo wherein Ms. Martonick stated that she has "no knowledge of such an agreement." In addition to this evidence being hearsay, Ms. Martonick was not present at the preconstruction meetings wherein the agreement was made. Nor was she the person that reviewed and negotiated the change orders with Metric. Certainly, it begs the question as to why the government did not call witnesses that would have actually known about the agreement.

### F. <u>Reply to Defendant's Argument that "Metric's Reliance Upon the 'Spearin Doctrine' is Inapposite"</u>

The government argues that the Spearin doctrine does not apply to this case. Metric believes that the Spearin doctrine does apply to the arresting gear asphalt patch. The specifications included a section for hand placement of asphalt. Metric followed that specification in placing the asphalt, but the finish was unacceptable to the government. Ultimately, Metric had to result to machine paving to provide the government with a surface that it would accept. The specification was not a performance specification, but was a design specification dictating the mix to be used and the method of placement.

### G. <u>Reply to Defendant's Argument that "Metric Waived its Right to Assert its Claims"</u>

The government argues that Metric "waived and released" its claims. The government's position is that the terms of Modification P0001 (DX 1001 pp 142-143) and Modification P00017 (PX 6 pp 9-13) are unambiguous, and constitute waivers of "any claim for costs that occurred during this period." (Def Brf at 35-36). The government appears to argue that the release language in Modification P0001 covers Metric's pontoon claim because the time extension was granted "due to batch plant fire, weather, ***etc.***" (DX 1001 pg 143; emphasis added). Apparently, according to the government's view, inclusion of "***etc***." is sufficient to establish a clear and unambiguous waiver and release of Metric's entire pontoon claim – even though the nothing related to the pontoon claim is mentioned in the description of the water line and roadway work "as herein revised."

The government's brief goes to great lengths to counter the unrefuted trial testimony that when Metric signed Modification P00001 it was based on the contracting officer's assurance that the terms of the change order did not act as a release of Metric's pontoon claim. However, the government ignores Metric's primary position: that Modification P0001 relates only to "the work herein revised," and it does not include the pontoon claim.

Metric has appropriately presented unrefuted testimony at trial for the Court to use in interpreting ambiguous language. "When the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances for its interpretation. However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous clause. *Gemini Electronics, Inc. v. U.S.*, 65 Fed. Cl. 55, 62 (2005); see also *Jowett, Inc. v. United States,* 234 F.3d 1365, 1368 (Fed.Cir.2000).

Here, the government's unartful drafting ("etc.") prompted Metric's Miller to contact the contracting officer to confirm that Metric could still pursue its pontoon claim – which was consistent with Miller's understanding of the Modification's "work herein revised" language. The unrefuted testimony on the record is that Miller got such assurances that the parties' intentions were the same, and, on that basis, he signed the change orders. Tr. 963-965 (Miller).

The government's reliance on *Johnson, Drake & Piper, Inc. v. U.S.* is inapposite, as that case is distinguishable on multiple counts. First, citing *Johnson* only further undercuts the government's position with regard to the Miller testimony because the holding in *Johnson* turned on the court's consideration of evidence of the facts and circumstances leading up to execution of the release, including the parties' pre-release conduct and communications.

Secondly, the *Johnson* case is easily distinguished because the release language at issue there was clearly a "general release." There, the controlling language provided, in pertinent part,

as follows:

> The Contractor … does hereby release the United States of America … from all claims and demands whatsoever … which … the Contractor, its successors and assigns now have *in connection with or arising out of the performance of this Contract* …"

*Johnson* 531 F.2d at 1041 (emphasis added). Here, the parties did not intend for the Modifications to operate as a "general release" of "all claims" arising under Metric's entire contract. This is seen easily by comparing the all-inclusive scope of the *Johnson* release ("in connection with or arising out of the *performance of this Contract*") to the explicitly narrow scope of the release language at issue here ("arising out of, or incidental to, the *work as herein revised*").

As in *National Steel and Shipbuilding Company v. U.S.*, 49 Fed. Cl. 579 (2001), the parties' conduct following the Modifications manifest an intent that Metric had not waived or released its pontoon claim. *See National Steel*, 49 Fed. Cl. at 594 ("the government's consideration of [plaintiff's] claim after the settlement bars the defense of accord and satisfaction. Such conduct manifests an intent that the parties never construed the release as an abandonment of plaintiff's earlier claim.")(quoting *Community Heating & Plumbing v. Kelso*, 987 F.2d 1575, 1581 (Fed. Cir. 1993)). Here, there is no testimony from a government fact witness that Defendant ever asserted "waiver" or "release" in any of the numerous subsequent communications between the parties concerning Metric's pontoon claim or other constructive change claims at issue here. It is only the Defendant's experts (and counsel) that have asserted this "waiver" defense.

DATED this 30th day of January, 2008.

PEEL BRIMLEY LLP

By /s/ Steven D. Meacham
Steven D. Meacham
2014 East Madison Street, Suite 100
Seattle, WA 98122-2965
(206) 770-3339
Attorney for Plaintiff